**CROUSE–HINDS COMPANY, Plaintiff,**

v.

**INTERNORTH, INC. and I N Holdings, Inc., Defendants.**

No. 80–CV–772.

United States District Court, N. D. New York.

Dec. 5, 1980.

See also D.C. 518 F.Supp. 390, and D.C. 518 F.Supp. 413.

Hancock, Estabrook, Ryan, Shove & Hust, Syracuse, N. Y., Sullivan & Cromwell, New York City, for InterNorth, Inc.; Donald J. Kemple, New York City, Michael Barron, Robert C. Bata, John L. Warden, Robert J. Katz, D. Stuart Meiklejohn, William L. Farris, New York City, of counsel.

Bond, Schoeneck & King, Syracuse, N. Y., Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiff; Charles T. Beeching, Syracuse, N. Y., Edwin E. McAmis, New York City, Rodney O. Thorson, Washington, D. C., Kurt Koegler, New York City, Randy Mott, Washington, D. C., Reid L. Ashinoff, New York City, of counsel.

MUNSON, Chief Judge.

## MEMORANDUM–DECISION AND ORDER

### I.

Presently before the Court are two motions made by plaintiff Crouse-Hinds Company which are aimed at blocking a take over attempt by defendants InterNorth, Inc., and I N Holdings, Inc. [hereinafter referred to jointly as InterNorth]. While both motions seek injunctive relief, they differ as to the grounds upon which such relief should be granted. The first motion asks that the Court declare InterNorth's tender offer null and void because it violates the summary advertisement and "twenty day" rules of the Securities Exchange Act, 17 C.F.R. §§ 240.14d–6(a)(2), and 240.14e–1(a). Crouse-Hinds' second motion for injunctive relief is based on other alleged violations of the securities laws—principally disclosure requirements—and the antitrust laws. Plaintiff has requested the Court to first resolve the summary advertisement and "twenty day" rule issue, since a favorable ruling for Crouse-Hinds would be dispositive of its request for injunctive relief. Upon examining the basis of these arguments, however, the Court is

not convinced of their merits. A more detailed analysis of these claims will be found in the securities portion of this opinion.[1] The Court will begin its consideration of plaintiff's entitlement to injunctive relief with an assessment of its antitrust allegations. Yet before doing so, a brief background of the events leading up to this dispute will prove useful.

## II.

To fully appreciate the factual circumstances surrounding the instant motions, intimate familiarity is assumed with this Court's related Memorandum-Decision and Order, dated October 25, 1980. By way of introduction to the matters at hand, the pertinent facts are as follows. On September 12, 1980, InterNorth publicly announced a tender offer for 6,600,000 shares of Crouse-Hinds' common stock, or approximately 54% of the total shares outstanding, at a price of $40 a share. InterNorth planned to follow this offer with a "second step" merger in which the remaining Crouse-Hinds' shareholders would be issued InterNorth preferred stock in exchange for their Crouse-Hinds' common stock.[2]

News of InterNorth's tender offer was not favorably received by Crouse-Hinds' board of directors, who had, only three days before, announced a merger agreement with the Belden Corporation. The reasons for the Crouse-Hinds board's unreceptive attitude seemed to stem primarily from its belief that the InterNorth offering price was inadequate, and that the central condition of the tender offer—the termination or shareholder rejection of the Crouse-Hinds/Belden merger agreement—worked a disservice to the interests of Crouse-Hinds because it put the success of the proposed Belden merger in doubt.[3] Consequently, on September 16, 1980, the board of directors of Crouse-Hinds recommended that its shareholders reject InterNorth's offer.

In the meantime, Belden moved to put an end to what it considered to be a threat to its interests by filing a lawsuit against InterNorth in Illinois Circuit Court on September 15, 1980. Belden asserted that InterNorth's offer tortiously interfered with the Crouse-Hinds/Belden merger and it sought to enjoin InterNorth's tender offer for Crouse-Hinds stock. A preliminary injunction was ultimately granted by the Circuit Court on October 1, 1980. It enjoined InterNorth from pursing its tender offer, pending a vote by Crouse-Hinds and Belden shareholders on their proposed merger agreement, or until December 1, 1980, whichever was earlier.[4] Subsequently, on November 10, 1980, an Illinois Appellate Court vacated the injunction, and remanded the matter to the Circuit Court.

On September 22, 1980, Crouse-Hinds responded to the InterNorth tender offer with this lawsuit for injunctive relief, alleging that the InterNorth offer violated the federal securities laws. Later by amendment to its complaint, Crouse-Hinds also asserts that, if consummated, an InterNorth/Crouse-Hinds merger would violate the antitrust laws. Crouse-Hinds promptly moved for injunctive relief,[5] and on October

---

1. *See infra*, Section VI at p. 449.

2. Under applicable securities regulations, the September 12 offer was to expire on October 9, 1980. Subsequent intervening events, which will be more thoroughly discussed *infra* at p. 419–420 compelled InterNorth to extend its offer to October 31, 1980. It has now been extended once again until December 5, 1980.

3. Evidence presented by InterNorth further revealed that the Crouse-Hinds Board of Directors were quite concerned that the InterNorth offer put the security of their jobs in jeopardy. The legal implications of this evidence was the subject of the Court's October 25, 1980 Memorandum-Decision and Order.

4. *Belden Corp. v. InterNorth, Inc.*, 90 Ill.App.3d 547, 45 Ill.Dec. 765, 413 N.E.2d 98 (Ill.Cir.Ct. Cook Co., 1980), *rev'd and remanded*, No. 80–2565 (Ill.App. 2nd Division, November 10, 1980).

5. Besides the Illinois Circuit Court's injunction, purchase of Crouse-Hinds' shares was also enjoined by the New York State Attorney General on September 26, 1980 under the State takeover laws. On November 5, 1980, after conducting public hearings, the Attorney General's injunction was lifted.

7, 1980, this Court commenced an extensive hearing on this motion.[6] The hearing produced approximately one thousand pages of testimony, and a host of witnesses, exhibits, affidavits, and legal briefs.

While a hearing on plaintiff's motion for a preliminary injunction was completed on October 31, 1980, events continued to unfold. On November 12, 1980, InterNorth announced an amended offer. One of the principal differences between the amended offer and the original was that InterNorth modified its stance on the Belden/Crouse-Hinds merger. In its amended offer, Inter-North retained its original $40 offering price, but it stated that this price was conditional on the shareholders' rejection of the Belden/Crouse-Hinds merger. However, InterNorth stated further that, should that merger be approved by the shareholders of those companies, then InterNorth was prepared to pay $37 for each share of Crouse-Hinds stock. The legality of the terms of the amended offer was the subject of additional briefing and affidavits of the parties. In addition, on November 18, 1980, the Court heard oral arguments on this subject. The Court will begin its examination of the issues raised by plaintiff, by first considering its antitrust claims.

### III.

The thrust of plaintiff's antitrust claims is that a Crouse-Hinds/InterNorth merger will cause a drastic alteration in the market structure for certain Crouse-Hinds products, and thereby substantially lessen competition in those markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Crouse-Hinds manufactures electrical, construction and lighting equipment, as well as aviation lighting, and traffic control signal equipment. InterNorth is a major energy company which is engaged in acquiring, transporting, and marketing, of natural gas and liquid fuels; the processing and production of petrochemicals; natural gas and oil exploration; and coal mining. According

to Crouse-Hinds, InterNorth intends to use its "power" as both a purchaser of goods, and as a monopolist in the transportation and sale of natural gas, to coerce sales of Crouse-Hinds' products, and foreclose competition.

The prospect of antitrust violations in any industry must be carefully examined by the courts due to the stifling effect such conduct has in the marketplace. The Court views plaintiff's allegations with even greater concern because an "energy monopolist" is involved. For example, two celebrated legal commentators argue that a court need not employ the typically speculative methods of antitrust analysis when assessing the possible anticompetitive harm a monopolist can cause in a secondary product market. The threat of using the economic power of a monopoly of "an *essential* good or service necessarily produces monopoly of the second level." III Areeda & Turner, *Antitrust Law,* ¶ 729 at p. 239 (1978) (emphasis in text); [hereinafter referred to as Areeda & Turner]. Plaintiff's claims will be reviewed in greater detail in a moment. At this juncture, an analysis of Section 7 of the Clayton Act is in order.

An examination of the alleged anticompetitive effects of a merger must begin with Section 7 of the Clayton Act which in relevant part provides:

> No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock . . . of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition or to tend to create a monopoly.

In enacting this provision, Congress sought to curtail what appeared to be the continuous and unrestrained trend of the economy towards economic concentration. *Brown Shoe Co. v. United States,* 370 U.S. 294, 317, 82 S.Ct. 1502, 1519, 8 L.Ed.2d 510 (1962).

---

**6.** Expedited discovery was requested by Crouse-Hinds, and was granted by the Court without objection by InterNorth. Although it was conducted in a short period of time, discovery was indeed extensive. Crouse-Hinds deposed many InterNorth executives and officers, and culled through hundreds of thousands of documents to prepare its case.

To a great extent, corporate expansion through mergers was causing this trend. Congress responded to the problem by enacting Section 7, in order to arrest a merger that was perceived as being anticompetitive in its "incipiency," before the full force of its harm would be felt in the marketplace. *Id.* at 317–18, 82 S.Ct. at 1519–20.[7] Nevertheless, not every merger was intended by Congress to be excluded as undesirable. To screen out those that would likely produce anticompetitive effects, Section 7 provides that the competitive effect of a particular merger is to be judged in the context of a specific product market ("line of commerce"),[8] and in an economically significant geographic market ("section of the country"). *Id.* at pp. 320–21, 82 S.Ct. at pp. 1521–22.[9]

At the same time, Congress recognized that such an analysis must be "functionally viewed, in the context of its particular industry." *Id.* at pp. 321–22, 82 S.Ct. at pp. 1521–22. Various factors need to be considered to assess the probable competitive effect of a merger. The Court in *Brown Shoe* summarized these elements thusly:

whether the consolidation was to take place in an industry that was fragmented rather than concentrated, that had seen a recent trend toward domination by a few leaders or had remained fairly consistent in its distribution of market shares among the participating companies, that had experienced easy access to markets by suppliers and easy access to suppliers by buyers or had witnessed foreclosure of business, that had witnessed the ready entry of new competition or the erection of barriers to prospective entrants, all were aspects, varying in importance with the merger under consideration, which would properly be taken into account.

*Id.* at 322, 82 S.Ct. at 1522. While statistics were viewed as being a useful tool in a court's endeavor, Congress intended that a court go beyond a mere analysis of economic data when assessing the market power of a firm and the likely anticompetitive effect of a merger. "[O]nly a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the proba-

7. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 622, 94 S.Ct. 2856, 2870, 41 L.Ed.2d 978 (1974); *United States v. Von's Grocery Co.*, 384 U.S. 270, 277–78, 86 S.Ct. 1478, 1482–83, 16 L.Ed.2d 555 (1966); *United States v. E. I. duPont deNemours & Co.*, 353 U.S. 586, 597, 77 S.Ct. 872, 879, 1 L.Ed.2d 1057 (1957). The Act was viewed as plugging the gap in protection against such practices, which had not been covered by the Sherman Act. *Id.* Other concerns cited in the legislative history was the loss of "local control" over industry and the protection of small business. *Brown Shoe Co., Inc. v. United States*, 370 U.S. at 315–16, 82 S.Ct. at 1518–19. *See also, United States v. Aluminum Co. of America*, 377 U.S. 271, 281, 84 S.Ct. 1283, 1289, 12 L.Ed.2d 314 (1964).

8. The Court defined "product market" as follows:

The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. *United States v. E. I. duPont deNemours & Co.*, 353 U.S. 586, 593–595 [77 S.Ct. 872, 877, 1 L.Ed.2d 1057]. The boundaries of such a submarket may be determined by exam-

ining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. Because § 7 of the Clayton Act prohibits any merger which may substantially lessen competition "in *any* line of commerce" (emphasis supplied), it is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition. If such a probability is found to exist, the merger is proscribed. [Footnote omitted]

*Brown Shoe Co. v. United States*, 370 U.S. at 325, 82 S.Ct. at 1523–24.

9. *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549, 86 S.Ct. 1665, 1667, 16 L.Ed.2d 765 (1966). This requirement does not mean "the delineation of a 'section of the country' by metes and bounds as a surveyor would lay off a plot of ground." *Id.* Rather, only that the merger have an anticompetitive effect "somewhere" in the United States. *Id. United States v. Philadelphia National Bank*, 374 U.S. 321, 357, 83 S.Ct. 1715, 1738, 10 L.Ed.2d 915 (1963).

ble anticompetitive effect of the merger." *Id.* at p. 322 n. 38, 82 S.Ct. at p. 1522 n. 38.[10]

Finally, the phrase "may be substantially to lessen competition" as used in Section 7, indicates that the concern of the Clayton Act is not with the economic consequences of a merger in terms of "ephemeral possibilities," but with its probable competitive impact.[11] *Id.* at 323, 82 S.Ct. at 1522. "Taken as a whole, the legislative history illuminates congressional concern with the protection of *competition*, not *competitors*, and its desire to restrain mergers only to the extent that such combinations may tend to lessen competition." (Emphasis in text) *Id.* at p. 320, 82 S.Ct. at p. 1521. *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *United States v. Pabst Brewing Co.*, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966); *United States v. Von's Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 15 L.Ed.2d 555 (1966); *United States v. Aluminum Co. of America*, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); *United States v. E. I. duPont deNemours & Co.*, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957).

There are three basic types of mergers that are covered by Section 7 of the Clayton Act. These are horizontal mergers, or the acquisition by a producer of the stock or assets of a firm producing an identical prod-

uct or close substitute and selling it in the same geographical market; vertical mergers, or the acquisition of the stock or assets of a firm that buys the product sold by the acquirer or that sells a product bought by the acquirer; and conglomerate, which are characteristically without appreciable economic relationship between the business of the acquiring and the acquired firm. "Mixed" or quasi-conglomerate mergers involving elements of a horizontal or vertical merger are also included within the scope of the Clayton Act. IV Areeda & Turner, *supra*, ¶ 900 at p. 1. *See also, Brown Shoe Co. v. United States*, 370 U.S. at 317, 82 S.Ct. at 1519.[12]

Before examining the competitive "setting" of the instant merger, the standard for issuing a preliminary injunction in the Second Circuit bears repeating. In order to be entitled to a preliminary injunction, a plaintiff must successfully demonstrate:

(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Seaboard World Airlines, Inc. v. Tiger International, Inc.*, 600 F.2d 355, 359–60 (2d Cir. 1979); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (per curiam); *Jack Kahn Music Co., Inc. v.*

---

**10.** *Accord United States v. General Dynamics Corp.*, 415 U.S. 486, 498, 94 S.Ct. 1186, 1194, 39 L.Ed.2d 530 (1974). In this regard, evidence indicating the purpose of the merger may be useful in predicting the likely cause of conduct of the parties. *Id.*, 370 U.S. at 329 n. 48, 82 S.Ct. at 1526 n. 48. Furthermore, the pre-acquisition anticompetitive conduct of a firm is probative of similar conduct being repeated in the future. *See United States v. General Dynamics Corp.*, 415 U.S. 486, 501, 94 S.Ct. 1186, 1195, 39 L.Ed.2d 530 (1974); *United States v. Aluminum Company of America*, 377 U.S. 271, 277, 84 S.Ct. 1283, 1287, 12 L.Ed.2d 314 (1964); *Brown Shoe Co. v. United States*, 370 U.S. 294, 332, 82 S.Ct. 1502, 1527, 8 L.Ed.2d 510 (1962); *United States v. General Dynamics Corp.*, 258 F.Supp. 36, 62 (S.D.N.Y.1966).

**11.** When determining the probable effects of a merger, the Supreme Court has adopted a slid-

ing scale approach depending on the nature and purpose of a challenged business practice. Thus, a court need not find that a tying arrangement forecloses a "substantial" dollar amount of commerce because the coerciveness of that practice is inherently anticompetitive and is likely "substantially to lessen competition" in the usual case. As compared with the practice of requirements contracts, however, which one more often employed to serve legitimate business needs, a larger foreclosure of commerce may be tolerated where the purpose of the contract is reasonable. *Brown Shoe Co. v. United States*, 370 U.S. at 329–334, 82 S.Ct. at 1526–1528.

**12.** *See United States v. International Telephone & Telegraph Corp.*, 306 F.Supp. 766, 774 (S.D. N.Y.1969) (Timbers, C. J.).

*Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2d Cir. 1979); *Caulfield v. Board of Education*, 583 F.2d 605, 610 (2d Cir. 1978); *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358 (2d Cir. 1976).

## IV.

The Court will begin its "functional" analysis of the market structure at issue here with an overview of the business activities of InterNorth. In a nutshell, InterNorth is a diversified, integrated energy conglomerate with net income of $185.5 million and operating revenues of $2.5 billion.[13] It is possessed of five operating groups, which are all substantially related to natural gas and its derivative products. They are: the natural gas group, liquid fuels, petrochemical products, exploration and production, and coal. InterNorth's natural gas group acquires, transports, and sells natural gas to both wholesale and retail customers. More than half of the operating revenues and over 40% of the net income of InterNorth are derived from the natural gas group. The natural gas group operates a 34,276 mile network of pipeline, which services its 71 utility customers for distribution to 1,094 communities. The retail division, called "People's," is one of the country's 25 largest and services 319 cities and towns. It receives deliveries for sale to 238 of those communities from InterNorth's own wholesale division. In 1979, 61% of the natural gas group's total volume of gas sales to others was to residential, commercial and small volume industrial consumers, and 36% [sic] to large volume commercial and industrial consumers and pipeline companies. For the most part, the natural gas group services a cold weather geographic region, in which natural gas is a comparatively inexpensive form of energy for domestic purposes.

In 1979, 701 billion cubic feet of natural gas were sold at wholesale by InterNorth, and another 173 billion cubic feet of natural gas was sold at retail. Total revenues of more than $1.5 billion were derived from the natural gas sales. Also in 1979, production from InterNorth's own reserves was 787 billion cubic feet. Its certified proven reserves were 7.2 trillion cubic feet or an 8.7 year supply, not including 6 trillion cubic feet under contract awaiting regulatory approval and pipeline construction. Moreover, InterNorth has entered into contracts for the importation of 775 billion cubic feet from Canada. InterNorth is participating as a partner and operator in various joint ventures which will enable it to secure gas supplies in the future. These include the Alaska Northwest Natural Transportation Company, and the Trailblazer Pipeline, which extends from the Overthrust area of Wyoming to eastern Nebraska. Plans also call for construction of approximately 160 miles of additional pipeline in southeastern Texas. InterNorth's wholesale division, in common with the interstate pipeline operations, has faced a supply problem in the past ten years causing it to curtail or cut back service to its customers. Passage of the Natural Gas Policy Act has solved many of InterNorth's supply problems, by establishing equality between interstate and intrastate pipelines. No curtailment is forecasted for 1980, and generally the supply picture has improved. As an industry rule of thumb, however, there will be a decline in overall industry production of 3% a year.[14]

By virtue of its pipeline ownership, InterNorth enjoys a position of monopoly power over natural gas supply throughout most of its geographic area of operation. Even where it is not the sole supplier of certain customers, InterNorth possesses monopoly power because customers cannot practicably turn to others for their supplies.[15] Still,

---

**13.** Much of the information that follows can be found in plaintiff's Exhibits # 115 and 117, and InterNorth's Form 10–k, 1979.

**14.** Pl. Exh. # 210 at p. 7. InterNorth's other traditional sources of natural gas supply have

been the Gulf Coast offshore area, and fields in New Mexico and Montana.

**15.** Transcript at pp. 100, 293–94.

InterNorth is a regulated monopolist, and operates under the supervision of the Federal Energy Regulatory Commission (FERC). This regulation offers a countercheck on InterNorth's "monopoly power." As a result, InterNorth is very sensitive to the needs, desires and opinions of its customers, whose support is solicited by InterNorth and viewed as necessary by it to obtain regulatory approval of such matters as rate increases, new construction, curtailment proceedings,[16] and the transportation of gas for third parties.[17] InterNorth's desire to curry the good will of its customers is reflected in the frequent "customer meetings" it holds around the country.[18] In this regard, InterNorth believes that it enjoys good customer relations, and it feels the need to be careful to conduct itself in a manner that will not endanger that good will.[19]

While much of InterNorth's conduct is regulated, nonetheless, it is able to exercise discretion in a variety of matters, such as in the formulation of rates to be presented to FERC for approval.[20] InterNorth also may, in its discretion, agree to transport excess supplies of gas purchased from a source other than InterNorth, and negotiate its own transportation price.[21] Furthermore, InterNorth may use its discretion in implementing curtailment plans,[22] and in offering new and additional supplies of gas to its wholesale and retail customers. Two caveats must be added for the sake of completeness. Under its regulatory "tariffs" InterNorth agrees to make its best efforts to make gas available if it has the supplies. InterNorth may not, moreover, discriminate in its service among its customers.[23]

The liquid fuels group is engaged in the extraction, purchase, transportation and marketing of liquid hydrocarbons, principally propane, butanes, ethane, and fuel oil. It is one of the largest vertically integrated producers of liquid fuels in the United States. In addition, the liquid fuels group operates natural gas processing plants which separates liquid hydrocarbons from dry gas. In 1979, it produced 734 million gallons of liquid products and purchased an additional 1.1 billion gallons from other companies. Its operating revenues for that same year exceeded $787 million, which was 28.7% of InterNorth's total revenues.

InterNorth's petrochemicals group produces and processes over one billion pounds of petrochemical products each year. In 1979, the petrochemicals group had sales in excess of $327 million, reflecting 13% of InterNorth's total revenues. The exploration and production group conducts extensive exploration and drilling activities to provide new supplies of natural gas for InterNorth's other operations, and holds over one million acres of gas and oil leases. Also in 1979, this group produced 14 billion cubic feet of natural gas and 91,000 barrels of crude oil and condensate, and had operating revenues in excess of $51 million. The recently established coal group has a total of approximately 340 million tons of recoverable reserves under lease and has begun operation in two mines in Colorado. In 1979, operations of the coal group resulted in a 14 cents per share loss. As a final note, InterNorth's interdivisional sales of the various groups in 1979 amounted to over $219 million.

16. *See infra*, note 22.

17. *See infra* at p. 445.

18. Sometimes these meetings are held at a hunting lodge in Easton, Maryland. Pl. Exh. # 229.

19. Transcript at p. 369.

20. *Id.* at p. 103.

21. *Id.* at pp. 103–04; and 282–83. Purportedly, there would be no difference in earnings to InterNorth if it did so.

22. Curtailment describes the situation where gas demand is running at over the system's service capacity. Consequently, the utility must allocate the available supplies. Although its method of doing so is subject to FERC approval, the utility is given discretion in formulating the curtailment plan. *Id.* at p. 282.

23. Transcript at pp. 105, 283–84, 293–96; *Id.* at 105, 444; Sampson Dep. at pp. 225, 228.

The present size of InterNorth is in part attributable to the fact that it has made over 100 acquisitions during the past twenty years.[24] InterNorth is organized into profit centers which have a "dotted line" relationship with the corporate development staff to coordinate future capital expenditures for expansion.[25] Capital expenditures by InterNorth for 1979 were $384.8 million, and it estimates slightly higher expenditures in 1980, increasing to $650 million by 1983. Actual expenditures on capital plants as distinguished from, for example, expenditures on gas contract payments, would amount to approximately $100–$150 million annually. Over the three year period from 1981–83, approximately 59% of InterNorth's proposed $1.8 billion in capital expenditures are for the natural gas area, and the rest is allocated with approximately 10% for liquid fuels, 7% for petrochemicals, 22% for exploration and production, and 2% for coal.[26]

Due to conservative investing in the past several years, InterNorth will have $150 million a year for the next three to five years to spend on further acquisitions. InterNorth views itself as somewhat at a turning point in its corporate development. While parity has been established between the intrastate and interstate pricing of natural gas, and as a result supplies have increased. For the most part, however, traditional sources of natural gas supplies are in a declining stage, with the possibility of the industry moving into more "exotic" forms of production to make up the difference. In its outlook for the future, InterNorth is interested in expanding into the synthetic fuels business, as a means of positioning the company in a growth industry, and guaranteeing earnings of 10% a year.[27]

Crouse-Hinds is the leading company in the manufacture and marketing of electrical construction materials, which is composed of protective fittings and enclosures for the safe use of electricity by industry; load centers, circuit breakers, meter mounts and safety switches; indoor and outdoor lighting fixtures and aviation ground lighting equipment; electrical wiring devices, specialty switches and industrial controls; vehicular traffic control systems; and electrical distribution equipment such as switchboards, panelboards, switchgear, motor control centers and bus ducts.[28]

In addition, Crouse-Hinds' electrical construction materials products include components of secondary electrical power distribution systems required for the assembly of wiring systems by using rigid or flexible metallic conduits and power or control cables, such as cast metal boxes and outlet bodies, unions, couplings, terminators and other fittings for conduit and cable; enclosed lighting fixtures for all types of light sources; cast metal and fiberglass reinforced plastic enclosures for circuit breakers, motor starters, pushbutton stations and instrument and other control devices; and heavy-duty electrical plugs, receptacles and cord connectors.[29]

The majority of these products are especially designed to provide mechanical protection against heavy or abusive use, and most provide environmental protection that makes them suitable for use in wet, dirty, dusty, corrosive, flammable or explosive atmospheres. All are designed to meet the applicable "code" requirements. Crouse-Hinds products are principally used by heavy industries and other operations having heavy service requirements, where physical abuse is common, or where the facilities are exposed to the elements, washed down, or subject to corrosive or explosive, flammable or conductive materials. These industries include: petroleum refining, chemical, petrochemical, steel, rubber, paper, pharmaceutical, flour milling

24. *Id.* at p. 82.

25. Pl. Exh. # 145.

26. Pl. Exh. # 202, Drewry Dep. at pp. 46–7.

27. Pl. Exh. # 102, 104, 145, 204 and 210; Sharp Dep. at pp. 18, 304.

28. *See generally*, Pl. Exh. # 192, 230 [for identification].

29. *Id.*

and paint processing industries, as well as the petroleum pipeline and coal mining industries.[30] Crouse-Hinds' products are employed as part of an industrial facility, and as part of the capital equipment that has to be purchased to build that facility.[31] It is the only company in the hazardous product area that does research and introduces new products on a consistent basis.[32] The shear breadth of the Crouse-Hinds' electrical construction product line lends it a distinct advantage over its competitors.[33] Furthermore, Crouse-Hinds has a broad customer/product base and enjoys high brand recognition and allegiance.[34] This partially explains the reason why Crouse-Hinds continues to enjoy great marketing success, in spite of the fact that many of its competitors manufacture goods of comparable quality, and sometimes at less expense.[35] Its net revenues for the year ending December 31, 1979 were over $372 million.[36]

It is not disputed that the relevant product markets in the instant case include: hazardous service electrical construction materials; industrial lighting; commercial lighting; aviation lighting; and traffic control signal equipment. Crouse-Hinds' products compete throughout the United States, and therefore, the United States as a whole should be considered the relevant geographic market. While the Court has not been provided with statistics indicating industry trends towards or away from concentration, Appendix I to this Opinion contains market share statistics that have been introduced, and these cover selected product markets and submarkets. It will be noted that the four-firm concentration statistics have not been introduced in most instances. The

Appendix also includes a summary of the results of a 1979 brand preference study on electrical construction materials published by McGraw-Hill.[37]

Crouse-Hinds markets its products primarily through the nation-wide networks of three major electrical distributor chains; General Electric Supply Company (GESCO); Westinghouse Electric Supply Company (WESCO); and Graybar Equipment Company. Moreover, Crouse-Hinds' products are marketed through approximately 1,000 independently-owned electrical and electronic distributors, in some cases assisted by commission agents and technically-trained employees of Crouse-Hinds.[38] Many of these distributors carry Crouse-Hinds products as their sole or primary line of electrical construction materials and industrial and commercial lighting.[39] These distributors are the supply source of Crouse-Hinds products to: end users (facility owners) for new construction and for maintenance, repair and operation (MRO) of existing facilities; manufacturers of electrical equipment for incorporation into their own products; and construction engineering and electrical contracting firms.[40]

The marketing effort of Crouse-Hinds' field representatives is directed at these various levels of "buying influence," or at the "specifiers" of electrical construction equipment. The end user, engineers and contractors are called "specifiers" because industry custom requires that electrical construction plan drawings designate a type or standard of electrical product, or actual brand name to be used in a particular project. Sometimes plans are "specified"

---

30. *Id.*

31. Transcript at 144, and Pl. Exh. # 230 [for identification].

32. Pl. Exh. # 205 at p. 2.

33. Pl. Exh. # 196. Transcript at pp. 134–37, 493–94.

34. Pl. Exh. # 119 at p. 080065, # 197 at p. 139.

35. Transcript at p. 239, 494–99; 242, 505–06.

36. Pl. Exh. # 192, Annual Report at p. 31.

37. This study is Pl. Exh. # 197. Note that Crouse-Hinds has lost some ground in preference recently in several categories. *See also* Pl. Exh. # 201 on competition within the Traffic Control Systems industry and Pl. Exh. # 211 on the lighting industry; Transcript at pp. 497–99.

38. Pl. Exh. # 230 [for identification].

39. Transcript at pp. 150, 505.

40. *Id.* at 144–50.

with a general "code" standard which enables the contractor to purchase any brand that satisfies a particular function, and meets the applicable code standards for equipment. More frequently, however, specifications are drafted in the form of a brand name product and one of the terms "or equal" or "approved equal."[41] Crouse-Hinds is usually specified in the brand name part of such specifications.[42] The term "or equal" means that a company's purchasing department may substitute products for the named brand without reference to the designer or engineer for approval. The phrase "or approved equal" denotes that the designer or engineer must be consulted.[43] With the advent of malpractice insurance, it has become a more frequent practice for a designer or engineer to specify one brand name only.[44]

As is readily apparent, manufacturers like Crouse-Hinds are very interested in influencing the "specifiers" in the marketplace to specify its products. The first level of buying influence are the end users. They are the owners of the facility to be constructed, and have the final word on which products will be included.[45] A related level of buying influence would be the in-house design and procurement departments of the end users. The second level of buying influence is the design and constructing firm designated by the end user to design and build the proposed project. The engineering firms are the most frequent source of specifying and therefore a very important aspect of marketing electrical products. Crouse-Hinds often deals with the largest such firms in the country.[46] Much of such firms' specifying work is produced by computerized specifying list which are used to estimate the cost of a project, and reflect a given engineering firm's parts preference based on past experience.[47] For example, the Fluor Corporation, the country's second largest engineering firm, has already placed some Crouse-Hinds products on its vendor list, and these products will automatically be specified on all future jobs. The final level of buying influence is the installing contractor, who is typically given the job of specifying the hundreds of small cost items on a particular project.[48]

Even where the material specification permits an equal or approved equal, an electrical construction materials manufacturer whose brand is not specified by name is at a profound competitive disadvantage. First, there is very little chance a specification will be changed once it is made. The change there is hardly any incentive for a contractor to spend the effort to persuade a designer or end user that a different company's product should be substituted.[49] Other practical considerations also work to place the nonspecified manufacturer at a competitive disadvantage, not only on the initial job, but on future jobs as well. Once a specifier selects a particular product for one job, it is likely that the same product will be specified in the future if it performs satisfactorily.[50] Moreover, after a manufacturer's products are specified and installed, it will have also captured the MRO business, since most users do not maintain

41. Transcript at pp. 494–95.

42. *Id.* at 496–97.

43. Drewry Dep. at pp. 10 and 13.

44. Transcript at p. 726.

45. Transcript at pp. 113–14, 147–58, 202–05, 735–36.

46. *Id.* at 148, 172, 727, 733, 736; Pl Exh # 125; billing for the top 20 firms range between $1–6.5 billion; Pl. Exh. # 209.

47. *Id.* at pp. 227–28, 735–38.

48. *Id.* at 149, 218, 224.

49. Transcript at p. 495–97. The only one mentioned was the possibility on a large job that substantial cost savings could be achieved by switching brands.

50. *Id.* at 153–4, 178, 233, 499–501, "In the sense that the past job will have an indication that you have satisfied the client and the jobs perform properly, it would be imprudent without any other reason to depart from the procedures and the products that you used on that job, it's just an axiom of human behavior." *Id.* at p. 738.

parts for more than one manufacturer.[51] Electrical engineer vendor lists have already been discussed. It should be mentioned here that once a manufacturer's product is listed, a competitor's product will be foreclosed from future business with that specifier for all practical purposes.[52]

Because the market for electrical construction materials and industrial and commercial lighting is organized by fairly rigid trade practices, it is difficult for a new entrant to break into this industry. A further obstacle is the established brand preferences of specifiers.[53] It is also difficult to establish the necessary national network of distribution inventory and service. Most major chains will stock only one primary line, which a new entrant could not realistically expect to displace. In sum, from the limited evidence introduced, the barriers to entry into the electrical materials construction industry are quite high.[54] The Court will now examine plaintiff's antitrust claims and the applicable law.

### V.

Crouse-Hinds asserts that an InterNorth/Crouse-Hinds merger will drastically alter the market structure in the sale of electrical construction materials, industrial and commercial lighting for hazardous environments, and traffic control systems, and reduce the competitive dynamics in those product markets. Allegedly, this new structure will give Crouse-Hinds, as a division of InterNorth, a definite advantage over its competitors, and will, across the several markets affected by the merger, lock Crouse-Hinds into a position of dominance over all other competitors. Such a result, according to Crouse-Hinds, will be destructive of competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. More specifi-

cally, Crouse-Hinds complains that the proposed merger will create market structures that will increase the likelihood of such anticompetitive practices as reciprocal dealing, reciprocal effect, and tying arrangements. Plaintiff's reciprocity claims will be examined first.

While the basis of Crouse-Hinds reciprocity allegations are five-fold, the Court believes that two of these deserve separate treatment at this time. Crouse-Hinds asserts that, in keeping with past policies of inter-divisional purchasing, InterNorth would purchase all of its electrical construction materials from Crouse-Hinds if the companies merged. Its second claim is that an InterNorth/Crouse-Hinds merger would enable InterNorth to specify Crouse-Hinds products in all of its projects constructed by outside contractors. While plaintiff seeks to characterize these claims as reciprocal dealing and reciprocal effect, the Court cannot entirely agree. At issue is to what extent the disputed InterNorth/Crouse-Hinds merger is ascribed the vertical or conglomerate label. Throughout this lawsuit, plaintiff has referred to the proposed merger as having both vertical and conglomerate qualities. *See* Transcript at pp. 49, 804; Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction; Antitrust Issues at p. 31. However, in its Post-Hearing Memorandum, plaintiff states that a vertical allegation was not even advanced as a basis of its preliminary injunction motion. *Id.* at p. 3.

■ Whether or not plaintiff views the instant proposed merger as being vertical or conglomerate, it will be recalled that a merger will at least have vertical characteristics if it involves the acquisition of the stock of a firm that sells a product bought by the acquirer. *See supra,* at p. 420. This seems to be the substance of plaintiff's

---

**51.** *Id.* at 152–53, 176–79, 503, 740. "It is very common, if not the rule, that this future business will always match up with the original installation." *Id.* at 153.

**52.** The importance of the products gathered in these lists was described as follows: "it's part of their file material, it's their boiler plate, it's

their files in the drawer that contain experience of past jobs. That is the material that they put into their specification upon which they depend and base their reputation. *Id.* at 738.

**53.** *Id.* at 156–57, 223.

**54.** Transcript at p. 182. Pl Exh # 205.

first two claims as listed above. Inter-North's ability as a result of the merger, to purchase all of its electrical construction materials from Crouse-Hinds, or to specify only Crouse-Hinds products on its "outside" construction jobs, would not cross the borders of the doctrine of reciprocity, which is the practice by which a firm buys from those who buy from it. *See e. g. FTC v. Consolidated Foods Corp.*, 380 U.S. 592, 594 & n. 2, 85 S.Ct. 1220, 1221 & n. 2, 14 L.Ed.2d 95 (1965); V Areeda & Turner, ¶ 1128 at p. 62. At least with respect to its first two claims, plaintiff does not speak to the possibility of two firms purchasing goods from each other. Rather, it posits a situation where one firm—InterNorth—will be able to meet its needs for certain products by buying those products from its subsidiary. Although it has been said that the doctrines of vertical integration and reciprocity are somewhat related in that they both require a finding of foreclosure of opportunities to rivals, *see United States v. General Dynamics Corp.*, 258 F.Supp. 36, 56–58 (S.D.N.Y. 1966); V Areeda & Turner, ¶ 1122b at pp. 196–97; Bauer, *Challenging Conglomerate Mergers Under Section 7 of the Clayton Act*, 58 B.U.L.Rev. 199, 299 (1978), the Court believes that plaintiff's claims will require separate analysis under both of these doctrines.

Crouse-Hinds' "vertical" claims are summarized as follows. After merging with Crouse-Hinds, InterNorth would satisfy all of its needs for electrical construction materials, and industrial and commercial lighting for hazardous environments, from its newly acquired subsidiary. According to Crouse-Hinds, InterNorth's need for these types of products results from its ownership and interests in a variety of physical plants and energy-related projects. It cites as examples the fact that InterNorth is a substantial purchaser of natural gas and liquid fuels processing plants, natural gas and liquid fuels pipelines, offshore oil and gas production and exploration platforms, petrochemical plants, and will figure prominently in the construction of synthetic fuel production plants. In addition, as mentioned already, InterNorth has been designated the "operator" in joint ventures involving gas production and transmission. Crouse-Hinds argues that InterNorth will be able to influence the specification of Crouse-Hinds' products for these projects.

Crouse-Hinds further points to the fact that all of these capital projects use substantial amounts of electrical construction materials and industrial and commercial lighting. As an industry rule of thumb, approximately 1% to 4% of a plant total would represent the cost of electrical construction materials and industrial and commercial lighting for hazardous use.[55] As alleged by Crouse-Hinds, in the past two years InterNorth's purchases of these products has amounted to approximately $250,-000 to $750,000 annually.[56] Total industry sales of electrical construction materials and industrial and commercial lighting for hazardous environments is approximately $600 million annually. Crouse-Hinds asserts that the proposed merger will foreclose its competitors from access to these sales and consequently will substantially lessen competition or tend to create a monopoly in violation of Section 7. In this regard, if the merger is allowed to proceed, Crouse-Hinds says that it will gain substantial competitive advantages that will entrench its position in a concentrated industry, raise barriers to entry, and discourage smaller competitors from aggressively competing.

InterNorth demurs that Crouse-Hinds' fears concerning the extent of foreclosure from a vertical integration are unfounded. It points to the statistics for present Crouse-Hinds' sales to InterNorth as not only being *de minimis*, but not likely to increase. Testimony of InterNorth officers reveals that, even though InterNorth purchases annually some $3.5 million of wire, cable, electrical equipment and supplies, only 20% of that, or $600,000 would rep-

---

**55.** Transcript at p. 192; Drewry Dep. at pp. 47–48.

**56.** Transcript at pp. 47–8.

**430**

resent products of the type manufactured by Crouse-Hinds.[57] InterNorth states that even considering this latter figure, its purchases from all suppliers would amount to 0.2% of Crouse-Hinds' $300 million annual sales, and 0.08% of total market sales based on Crouse-Hinds' 40% market share.

Aside from the alleged insubstantiality of the commerce at issue, InterNorth maintains that other factors to be considered in a vertical merger case militate against the finding of a Section 7 violation. It argues that Crouse-Hinds has adduced no proof which would demonstrate that an improper economic motive figured into InterNorth's decision to take over Crouse-Hinds. InterNorth claims that its purpose in acquiring Crouse-Hinds was not to secure a captive supplier of electrical products. In its words, "one simply does not make a $500 million acquisition to 'capture' an unthreatened $600,000 supply." Defendants' Post-Hearing Memorandum: Antitrust Claims at p. 17.

InterNorth further states that its past business policies do not indicate that it is intent on illegally foreclosing Crouse-Hinds' competitors from the marketplace. It explains that its policy toward interdivisional sales of liquid fuels is designed to offset swings in the business cycle which may or may not favor having an internal or external supply source. This is one reason why, says InterNorth, it reduced by 50% its interdivisional sales of liquid fuels, which once supplied 100% of the petrochemical group's needs. InterNorth claims this policy was also changed to put the liquid fuels group in a better position to negotiate with petrochemical, and to take advantage of sales opportunities outside the company. Other than the feedstock of liquid fuels, InterNorth asserts it does not coordinate the business activities of the five InterNorth groups which, in fact, are run as independent profit centers.[58] InterNorth additionally argues that militating against the likelihood of foreclosure is the fact that it employs competitive bidding for "commodity" items such as Crouse-Hinds' products where purchases would exceed $3,000.00. Crouse-Hinds has not, according to InterNorth, offered any evidence to suggest that this procedure would be changed after the merger to enable InterNorth to favor the use of Crouse-Hinds' products.

By way of concluding its defense with respect to the vertical ramifications of an InterNorth/Crouse-Hinds merger, InterNorth points out that Crouse-Hinds has failed to offer proof on the critical issues of trends toward concentration, and vertical integration in the markets for electrical construction materials and industrial and commercial lighting for hazardous environments. Nor has Crouse-Hinds shown that the proposed merger would result in heightened barriers to entry in these relevant markets. InterNorth argues that Crouse-Hinds has already taken the position that it is virtually impossible for a new company to enter into its markets.[59] In sum, InterNorth argues that Crouse-Hinds has not demonstrated a probability of success on its vertical foreclosure claim. With the background of the previous sections of this Opinion in mind, the Court will proceed with an analysis of the law of vertical mergers and the merits of plaintiff's claims.

█ The potential anticompetitive significance of a vertical merger is the extent to which it may increase barriers to entry into the market, or reduce competition by (1) foreclosing competitors of the acquiring firm from access to sources of supply, or from access on competitive terms, by (2) foreclosing competitors of the acquired firm from access to the market or a substantial portion of it, or by (3) forcing actual or potential competitors to enter or continue in the market only on a vertically integrated basis because of advantages unrelated to economies attributable solely to integration. *Brown Shoe Co. v. United States*, 370 U.S. 294, 328, 82 S.Ct. 1502, 1525, 8 L.Ed.2d 510

---

**57.** Morley Dep. at pp. 64–67; Drewry Dep. at pp. 36–39, 47, 51.

**58.** Segnar Dep. at pp. 190–93.

**59.** Citing Perdiue testimony, Transcript at pp. 182–83.

(1962); *Fruehauf Corp. v. F.T.C.*, 603 F.2d 345, 352 (2d Cir. 1979) (Mansfield, C. J.); *Mississippi River Corp. v. F.T.C.*, 454 F.2d 1083, 1091 (8th Cir. 1972); *International Telegraph & Telephone Corp. v. General Telephone & Electric Corp.*, 449 F.Supp. 1158, 1173 (D.Ha.1978) (on remand).[60] As the Court held in *Brown Shoe*:

> The primary vice of a vertical merger or other arrangement tying a customer to a supplier is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a "clog on competition," *Standard Oil Co. of California v. United States*, 337 U.S. 293, 314 [69 S.Ct. 1051, 1062, 93 L.Ed. 1371], which "deprive[s] . . . rivals of a fair opportunity to compete." H.R.Rep.No.1191, 81st Cong., 1st Sess. 8. Every extended vertical arrangement by its very nature, for at least a time, denies to competitors of the supplier the opportunity to compete for part or all of the trade of the customer-party to the vertical arrangement.

370 U.S. at 323–24, 82 S.Ct. at 1522–23. *Accord Ford Motor Co. v. United States*, 405 U.S. 562, 569, 570–71, 92 S.Ct. 1142, 1147, 1148, 31 L.Ed.2d 492 (1972). This latter point was elaborated upon in *Freuhauf*, where Judge Mansfield stated:

> [W]e are unwilling to assume that any vertical foreclosure lessens competition. Absent very high market concentration or some other factor threatening a tangible anticompetitive effect, a vertical merger may simply realign sales patterns for insofar as the merger forecloses some of the market from the merging firms' competitors, it may simply free up that much of the market, in which the merging firm's competitors and the merged firm formerly transacted, for new transactions between the merged firm's competitors and the merging firm's competi-

tors. See 2 P. Areeda & D. Turner, *Antitrust Law* ¶ 527a (1978).

603 F.2d at 352 n. 9.

■ Consequently, Section 7 of the Clayton Act requires a Court to assess the likely competitive effect of a vertical merger in specific product and geographic markets. To prove its case, a plaintiff must make a greater showing then simply that a vertical merger will result in a significant percentage of market foreclosure. Recalling the Court's general discussion of Section 7 at Section III of this Opinion, a plaintiff must demonstrate, in addition, some probable anticompetitive effect or impact. *See* 15 U.S.C. § 18; *see also United States v. Marine Bancorporation*, 418 U.S. 602, 623 n. 22, 94 S.Ct. 2856, 2870 n. 22, 41 L.Ed.2d 978 (1974) ("loss of competition"); *United States v. General Dynamics*, 415 U.S. 486, 498, 94 S.Ct. 1186, 1194, 39 L.Ed.2d 530 (1974) ("probability of anticompetitive effects"); *Brown Shoe Co. v. United States*, 370 U.S. 294, 332, 82 S.Ct. 1502, 1527, 8 L.Ed.2d 510 (1962) ("probable future effect"); *United States v. E. I. duPont deNemours & Co.*, 353 U.S. 586, 591, 77 S.Ct. 872, 876, 1 L.Ed.2d 1057 (1957) ("effect may be substantially to lessen competition").[61]

■ Thus, to isolate the probable anticompetitive effect of a merger, if any, the foreclosure that it will probably produce must be assessed within the context of the "various economic and historical factors" of the relevant product and geographic market. *Brown Shoe Co. v. United States*, 370 U.S. at 329, 82 S.Ct. at 1526. It will be useful to list some of the factors outlined in *Brown Shoe* once again; the nature and economic purpose of the arrangement, the extent of foreclosure, extent of concentration of sellers and buyers in the industry, barriers to entry, scale of operating efficiencies, trend toward vertical integration or oligopoly, and elimination of potential competition. 370 U.S. at 322, 82 S.Ct. at

**60.** *See* 351 F.Supp. 1153, 1187–94, *aff'd in part, rev'd in part,* 518 F.2d 913 (9th Cir. 1975).

**61.** *United States v. Marine Bancorporation* —potential competition; *United States v. Gen-*

*eral Dynamics*—strength of competitors; *Brown Shoe Co. v. United States*—trend toward vertical integration; *United States v. E. I. duPont deNemours*—entrenchment.

1522. To this list the *Freuhauf* Court has added: market power possessed by the merged enterprise, and the strength and number of competing suppliers and purchasers. 603 F.2d at 353. *See also, United States v. Columbia Steel,* 334 U.S. 495, 530, 68 S.Ct. 1107, 1125, 92 L.Ed. 1533 (1948) (noting that it is natural for a subsidiary to deal with its parent); V Areeda & Turner, *supra,* at ¶ 1130C. In this manner the Court may determine whether the vertical merger poses a real threat of competitive harm or merely the prospect of a realignment of selling patterns. The Court now turns to an examination of the evidence in view of these principals.

InterNorth does not dispute that the relevant product markets for Crouse-Hinds' vertical claims are electrical construction materials and industrial and commercial lighting for hazardous environments. Nor is it disputed that the relevant geographic market is the entire United States. Although Crouse-Hinds seeks to cast the pale of evil monopolist over InterNorth's motivation to merge with Crouse-Hinds, the evidence—most of which was offered by plaintiff—suggests a far different scenario. InterNorth turned to the acquisition route principally to reap the benefits of diversification. For the most part, its financial future is tied to natural gas, which is a depleting natural resource. InterNorth viewed an acquisition at this time as a cheaper method by which to diversify as compared with building a business from the ground up, especially in a period with a depressed stock market. In addition, the timing of the merger was especially ripe for InterNorth from a capital surplus perspective, as it found itself with a large capital surplus for the next three to five years.

Based on its capital budget, its view of profitable future markets—which centered mainly around energy and synthetic fuels—and its future earnings goals, InterNorth systematically looked for an acquisition candidate. It was confident, due to its past experience, that it could manage a company that was technology and innovations oriented. Candidates were narrowed down by market positions, growth potential, likelihood of competitive offers, and insider holdings. Ultimately, the main concern was how the target company would "fit" with InterNorth's financial structure and management. Finally, five candidates were selected, and detailed market and financial studies were made. Eventually, these candidates were narrowed down to one— Crouse-Hinds. Testimony of various InterNorth officers are consistent with this view of the purpose and motivation for InterNorth's proposed merger.[62] InterNorth's management looked upon Crouse-Hinds as a well run company,[63] a company that InterNorth could manage due to its orientation toward technology and innovation,[64] and a company that has a great future in a major growth market[65]—energy. Furthermore, as planned by InterNorth's management, it was intended that Crouse-Hinds, as a sixth operating company of InterNorth, would be managed as an independent entity. Under InterNorth's plans, it thus would be capable of negotiating with other InterNorth operating groups and even InterNorth's rivals. In view of the generally independent operation of InterNorth's operating groups, this news is hardly surprising.[66] Moreover, such evidence must be given great weight because plaintiff has not offered any proof that would suggest that InterNorth looked upon a merger with Crouse-Hinds as a means by which to establish a captive source of supply. And, contrary to plaintiff's interpretation of the evidence it submits, the fact that both InterNorth and Crouse-Hinds have great expectations for future financial rewards in the synthetic fuels industry, does not prove InterNorth has an anticompetitive motivation. Such evidence falls well short of demonstrating

**62.** *See* Pl Exh # 104, 119, 120, 121, 129, 204, 210.

**63.** Transcript at p. 79.

**64.** *Id.* at 79–80.

**65.** *Id.* at 89, 170.

**66.** Segnar Dep. at pp. 203–05.

that InterNorth sought to acquire Crouse-Hinds as a captive source before moving into these investments. Finally, though, it is not necessarily dispositive of this question, defendant's point that a reasonable and, the Court adds here, even unreasonable company would not make a $500 million acquisition to "capture" $600,000 worth of readily available electrical construction materials, has much to commend it.[67]

The next factor to be considered is to what extent, if any, the InterNorth/Crouse-Hinds merger will cause market foreclosure. For its two "vertical" claims, Crouse-Hinds asks the Court to assess the amount of foreclosure resulting from InterNorth's purchases of electrical construction and industrial and commercial lighting for hazardous environments; and, secondly all specifications for InterNorth projects constructed by outside contractors. The Court notes at the outset that because of InterNorth's purchasing position as an end user, there would appear to be little difference between either of these claims. In any event, they will be construed by the Court to raise the question of foreclosure of InterNorth's MRO work, and new construction, including modifications and expansions.

The limited evidence adduced by plaintiff makes it difficult to even give a rough estimate of the degree of foreclosure that will probably result from InterNorth's purchases of hazardous electrical construction and lighting products of the type manufactured by Crouse-Hinds. However, the statistics that are provided do not indicate that a substantial foreclosure in terms of new construction would result from the merger. As a gross estimate, assuming that InterNorth's capital budget would enable it to purchase a $100–$150 million plant a year,[68] then the evidence shows that purchases of Crouse-Hinds products would account for between 1%–4% of the total, or between $1 and $6 million annually out of a market total of $600 million, or approximately 0.16 to 1.0% of total market sales. If Inter-

North's statistics are used, the percentage becomes approximately half as great because InterNorth estimates that only $600,-000.00 of sales could be foreclosed. Thus, should InterNorth continue to use competitive bidding and independent profit centers, and no evidence introduced would suggest otherwise, then after the proposed merger, Crouse-Hinds' share of the total market "foreclosed" from its competitors and InterNorth's rivals would be 0.6%. Yet, more significant is that absent from this record is any indication that InterNorth's rivals will be unable to purchase products from Crouse-Hinds after the merger or to find other sources of supply at competitive prices and quality. Nor even that Crouse-Hinds' competitors would be unable to adjust their selling patterns to account for the loss in sales. Moreover, no evidence has been introduced to suggest that scale economies or the ability of a potential competitor to enter the market would be effected by the merger in any way.

Crouse-Hinds also claims that because InterNorth will be building synthetic fuel plants and participating in other large joint ventures, it will be able to guarantee sales of Crouse-Hinds' products to the detriment of its rivals. But, based on the paucity of the evidence submitted here, it would be highly speculative to predict what effect such projects would have on Crouse-Hinds' competitive position or even total market sales. Almost as speculative would be a prediction on the extent of foreclosure of Crouse-Hinds' sales for MRO purposes. While the Court has not been provided with any evidence on this issue, it believes that this figure would be *de minimus*. Testimony at the hearing indicated that electrical construction and lighting parts cannot be summarily replaced by another brand due to considerations of inventory control. It is unlikely, then, that the MRO market represents a significant hidden market for Crouse-Hinds products, so as to significant-

---

67. *See Carrier Corp. v. United Technologies Corp.*, 1978–2 Trade Case ¶ 62,393 at p. 76,374 (N.D.N.Y.1977) (tender offeror organized into profit centers).

68. *See supra*, at 423, and accompanying footnotes.

ly alter the accuracy of the $600,000.00 figure discussed above.

The market for hazardous electrical construction materials and lighting is quite concentrated.[69] Although the evidence presented is far from complete, it appears that four firm concentration levels for various products range between 80%–90%. Crouse-Hinds has not presented evidence on the question of the concentration trends, if any, in the above markets. Entry barriers have been discussed elsewhere in this opinion, and it was said that they are relatively high in the product markets involved here.[70] Exactly how these barriers would be increased as a result of the proposed merger is less certain. Other than some mention that InterNorth may increase the budget for Crouse-Hinds' research and development activities, no evidence was presented by plaintiff that would tend to show that barriers to entry would thereby increase. In any event, the evidence on InterNorth's future expenditures for research and development are, in the words of one InterNorth officer, "strictly speculation."[71] For similar reasons, plaintiff's complaint that Crouse-Hinds' dominant position would be further entrenched as a result of the merger does little for its cause. Crouse-Hinds has not offered evidence on the issue of what competitive advantage it would receive due to a merger with InterNorth.[72] In conclusion, Crouse-Hinds has failed to demonstrate probable success on the merits, or sufficiently serious questions going to the merits so as to make them a fair ground for litigation, on its claim that the InterNorth/Crouse-Hinds merger may substantially lessen competition, due to vertical foreclosure in the marketing of electrical construction materials, and industrial and commercial lighting for hazardous environments. Plaintiff's "actual" reciprocity claims will be examined next.

Plaintiff asserts that if the InterNorth/Crouse-Hinds merger is permitted to go forward, InterNorth will induce reciprocal dealing with electrical engineers, contractors and construction firms (jointly referred to as contractors), which specify electrical construction materials and industrial and commercial lighting for hazardous environments. In addition, Crouse-Hinds maintains that it is also likely that InterNorth will engage in reciprocal dealings with manufacturers of gas turbines, which is an item used extensively on pipelines. These items also contain electrical construction materials. Even if InterNorth does not engage in reciprocity, Crouse-Hinds claims that reciprocity effect will result because gas turbine manufacturers will naturally begin to employ Crouse-Hinds' products in order to curry favor with InterNorth and to obtain sales. Finally, Crouse-Hinds says that WESCO and GESCO, two manufacturers of gas turbines and distributors of Crouse-Hinds products, will favor Crouse-Hinds products over other brands, and make it difficult for competitors to gain access to these distribution channels.

■ The term reciprocity refers to a seller's practice of utilizing the volume or potential volume of its purchases to induce others to buy its goods or services. Its counterpart, reciprocity effect, refers to the tendency of a company selling or desiring to sell to another company to channel its purchases to that company. *FTC v. Consolidated Foods Corp.,* 380 U.S. 592, 594, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965); *Southern Concrete Co. v. United States,* 535 F.2d 313, 317 (5th Cir. 1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977); *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.,* 476 F.2d 687,

---

**69.** Pl Exh # 109, 120, 198.

**70.** *See supra,* at 425–426, and accompanying footnotes.

**71.** Transcript at p. 81.

**72.** *See FTC v. Procter & Gamble Co.,* 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); *Emhart Corporation v. USM Corporation,* 527 F.2d

177 (1st Cir. 1975); *Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 865 (2d Cir.), *cert. denied,* 419 U.S. 883, 94 S.Ct. 3210, 41 L.Ed.2d 1161 (1974); (entrenchment requires more than merely showing that an acquiring firm has a "deep pocket"). *Carrier Corp. v. United Technologies Corp., supra,* at p. 76, 368.

694 (2d Cir. 1973); *Allis-Chalmers Mfg. Co. v. White Consolidated Indus., Inc.*, 414 F.2d 506, 518–19 (3d Cir. 1969); *Carrier Corp. v. United Technologies Corp.*, 1971 Trade Cases ¶ 62,393 (N.D.N.Y.1977); *United States v. International Telephone & Telegraph Corp.*, 306 F.Supp. 766, 781 (S.D.N.Y. 1969); *United States v. Northwest Industries, Inc.*, 301 F.Supp. 1066, 1088 (N.D.Ill. 1969); *United States v. Penick Ford, Ltd.*, 242 F.Supp. 518, 523 (D.N.J.1965). Generally, in the absence of reciprocity, buying decisions would be made solely on the competitive merits of the transaction. Reciprocity distorts buying and selling decisions, by injecting an "alien" factor into commercial transactions. *FTC v. Consolidated Foods Corp., supra* at p. 594, 85 S.Ct. at p. 1221; V Areeda & Turner, *supra* at ¶ 1129a.[73] As a result, inferior products may be insulated from the full impact of competition, and deprive a superior product of access to a supplier. A potential competitor may suffer further because of the resulting foreclosure from access to a meaningful portion of the market. *Id.*

At the same time, a consideration of some fundamental economic principals yields the conclusion that not every reciprocal dealing will cause anticompetitive harm. Foremost among these principals is that a reciprocal dealing will not be entered into unless it is profitable to both parties. Thus, a supplier is unlikely to be "coerced" into a reciprocal dealing if the terms of the transaction would be inferior to those it was capable of bargaining with the acquiring company's competitors. Moreover, reciprocity cannot by itself increase the "power" of an acquiring firm. For example, an acquiring firm with purchasing power would be able to use that power to obtain a direct price concession from its supplier. In such a case it would be unnecessary for a large purchaser

to engage in an indirect form of bargaining such as reciprocity, to increase the financial benefits of a deal. *See* V Areeda & Turner, *supra*, at ¶ 1129c.[74]

There may also be instances where a price concession will be disguised in the form of reciprocal dealing in order to keep this fact from the knowledge of the marketplace. This situation would normally occur in an oligopolistic market, where the oligopolist would be interested in concealing a price reduction on its part or by its supplier. In this sense, reciprocity is a form of indirect price competition, that, in the end, may stimulate price cuts by the other oligopolists. Nevertheless, in the case of a regulated monopolist, such as InterNorth, a court should be especially careful in its examination of the possibility of reciprocal dealing, which may be used as a method to avoid the price constraints imposed by the regulatory scheme under which it operates. *See* V Areeda & Turner, *supra*, at ¶ 1129d2.

There are three prerequisites to a finding that a merger violates Section 7 on the grounds of reciprocity and reciprocity effect:

> *First*, the merger must significantly increase the opportunities for reciprocal dealing by creating a market structure conducive to reciprocity or reciprocity effect;
>
> *Second*, there must be a reasonable probability that those opportunities will be exploited; and
>
> *Third*, the resulting reciprocal dealings, if any, must have a tendency substantially to lessen competition.

*Carrier Corp. v. United Technologies Corp.*, 1978–2 Trade Cases ¶ 62,393 at p. 76,371 (N.D.N.Y.1978); *United States v. International Telephone & Telegraph Corp.*, 1971 Trade Cases ¶ 73,619 at 90,545 (N.D.Ill.

---

**73.** *See also United States v. General Dynamics Corp.*, 258 F.Supp. 36, 59 (S.D.N.Y.1966).

**74.** The authors also believe that reciprocity is readily discoverable because reciprocity leaves a "trail" of documentation since buying and selling transactions must be correlated. Thus, they say, that a merger raising this possibility of reciprocity is easily enjoined after a merger

by the authorities should the reciprocity be practiced. *Id.* at ¶ 1130b.

Furthermore, in the Court's view, the question of the form of reciprocity at issue here whether deemed voluntary or coercive, adds little to the present discussion due to the fact that the agreement will not be entered into unless it is profitable to both parties.

1971); *See also, United States v. International Telephone & Telegraph Corp.*, 324 F.Supp. 19, 42 (S.D.N.Y.1970); *United States v. Northwest Industries, Inc.*, 301 F.Supp. 1066, 1088 (N.D.Ill.1969); *United States v. Penick & Ford, Ltd.*, 242 F.Supp. 518, 524–25 (D.N.J.1965).[75]

■ Various factors must be considered in determining whether a merger creates a market structure conducive to reciprocity or reciprocity effect. Those factors include the following: the extent to which the acquiring company's suppliers are actual or potential purchasers of its goods or services, the volume of the acquiring company's purchases relative to those of its rivals, the size and diversification of the other companies supplied by the acquiring company's suppliers, the competitive structure of the suppliers' market, *Carrier Corp. v. United Technologies Corp., supra*, at p. 76,372. *United States v. International Telephone & Telegraph Corp.*, 324 F.Supp. at 42, and whether the products involved are of the type which lend themselves to reciprocity, *id., United States v. International Telephone & Telegraph Corp., supra*, 1971 Trade Cases at pp. 90,545–46. Still, other factors may be useful when assessing the likelihood that reciprocity will occur, such as whether patronage can readily be shifted in the marketplace, *United States v. International Telephone & Telegraph Corp.*, 306 F.Supp. at 788, the relevant product is of the type that lends itself to reciprocity, *id.* at 787–88, the acquiring company and its suppliers' purchasing decisions are discretionary, 324 F.Supp. at 43, the acquiring company's policy toward reciprocity, *id.* at 45–46, *see also, Carrier Corp. v. United Technologies, supra* at p. 76,372; *United States v. Penick &*

*Ford*, 242 F.Supp. at 521–22, the acquiring company is operated on the basis of independent profit centers, *id.; United States v. International Telephone & Telegraph*, 306 F.Supp. at 788, and past evidence of reciprocity or plans to use this device in the future, *Carrier Corp. v. United Technologies Corp., supra*, at p. 76,372; *United States v. General Dynamics Corp.*, 258 F.Supp. 36, 66 (S.D.N.Y.1966). With this guidance in mind the Court turns to an analysis of the relevant evidence introduced at the hearing on plaintiff's request for a preliminary injunction.

To support its claims, plaintiff argues that the merger will produce a market structure (*see* background analysis, *supra*, Section IV at pp. 423–425) which is conducive to reciprocal dealing and reciprocal effect. Crouse-Hinds asserts that if the proposed merger is permitted to proceed, InterNorth/Crouse-Hinds will "face" electrical engineers and contractors in the market as both a purchaser of engineering and contracting services and as a seller of electrical parts and equipment. InterNorth will use, according to Crouse-Hinds, its formidable purchasing power derived from its capital expenditures to coerce its "suppliers" into specifying Crouse-Hinds products on non-InterNorth-related construction projects. Crouse-Hinds claims that this purchasing power is reflected in the $100–$150 million InterNorth spends per year on both in-house and outside design, engineering and construction management services, and its operator status and investments in multimillion dollar projects such as the Northern Border Pipeline project, the Trailblazer Pipeline, and a billion dollar coal gasification plant in North Dakota.[76]

---

**75.** As this Court noted in its decision in *Carrier Corp. v. United Technologies*, this statement of the law of reciprocity is not inconsistent with the Second Circuit's decision in *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.*, 476 F.2d 687 (2d Cir. 1973). The Court in *Gulf & Western* stated that "[i]t is the third-parties' perception of what course would be to their best advantage that may give use to reciprocal dealing by creating a market structure conducive to reciprocity or reciprocity effect," *id.* at 694, but the Court did not indicate that it

was unnecessary to also show a probability that reciprocity will be practiced. *Id.* at pp. 76,371–72.

**76.** Pl. Exh. #210 at pp. 47–48. It is also argued by Crouse-Hinds that a nolo plea entered by InterNorth in a criminal antitrust case, and a consent judgment entered into between InterNorth and the government in 1970 are evidence of InterNorth's "past proclivity for anticompetitive conduct ...." Plaintiff's Proposed Findings of Fact and Conclusions of Law: Antitrust Issues at p. 46. While the

It is further believed by Crouse-Hinds that the altered market structure as a result of the merger will have profound "down-stream" effects because engineering firms will place Crouse-Hinds products on their vendor lists, to be specified automatically on all future construction jobs. Moreover, future orders for such products generally follow the brands used in past jobs, as do orders to satisfy a company's MRO requirements. The anticompetitive consequences, says Crouse-Hinds, will be facilitated by the trade's use of the "or equal" or "approved equal" clauses in its specifications, which will enable such contractors to purchase Crouse-Hinds products even if they were not actually specified by name.

Crouse-Hinds argues that evidence of the probability that InterNorth will engage in reciprocity is revealed from InterNorth's intense interest that it's merger candidate "fit" snuggly within InterNorth's existing market orientation and spheres of influence.[77] Further evidence, says plaintiff, can be found in the fact that InterNorth's subsidiaries engage in "reciprocal dealings" among themselves. Crouse-Hinds also points to InterNorth's corporate structure, which combines in its corporate engineering and research department, the responsibility for specifying electrical construction equipment for hazardous environments, and for choosing construction engineering firms.

According to Crouse-Hinds, if the proposed merger with InterNorth is consummated, there will be a substantial lessening of competition in the market for hazardous construction materials and industrial and commercial lighting. Crouse-Hinds claims that if InterNorth is successful in influencing electrical engineers and contractors to specify Crouse-Hinds products on one or two large construction jobs a year, it would mean additional revenues to Crouse-Hinds of between $20–$80 million a year out of total industry sales of $600 million. This figure would not even include, Crouse-Hinds adds, the potential "down-stream" foreclosure already outlined above.

InterNorth rejoins that Crouse-Hinds overstates the extent of InterNorth's leverage in terms of its purchases of engineering services. It says that the top 16 engineering firms of the type used by InterNorth had total billings of $16 billion. Moreover, InterNorth claims that its recent three year total of engineering billings was $85 million, which is 0.085% of the billings of the top 16 firms during 1977–79. This figure drops to 0.06% if the top 25 firms are used. If InterNorth's in-house engineering services are included, those expenditures are only 0.3% of the billings of the top 25 firms. It is the testimony of one InterNorth witness that "[t]hey [the engineering firms] would laugh at me if I would attempt to exert our buying power to force them to do something illegal or anticompetitive."[78] InterNorth also believes that Crouse-Hinds' products do not lend themselves to reciprocal dealing because, as indicated by the evidence, they are sold on their technical merits and brand preference. In this regard, it says, the evidence demonstrates that Crouse-Hinds is already on the vendor list of the second largest engineering firm, and suggests that it is probably on the vendor lists of other such firms as well.

It is further claimed by InterNorth that there is no evidence that opportunities for reciprocal dealings would be exploited even if they materialized. InterNorth cites the testimony of Mr. Willis A. Strauss, InterNorth's chairman of the board, that the decision to merge with Crouse-Hinds was not motivated by the possibility of inducing InterNorth suppliers to purchase Crouse-Hinds products. In any event, InterNorth believed that it would be unable to success-

---

Court certainly views such evidence as admissible, see Memorandum-Order, dated October 21, 1980, as proof of a defendant's proclivity to violate the antitrust laws. Nevertheless, the very age of the nolo plea and consent decree attenuates its significance for present purposes. Moreover, in view of the other proof introduced in this case on the issue of InterNorth's intent, the instant proof stands but as a slender reed in a river of proof to the contrary.

**77.** Transcript at pp. 90–92; Pl. Exh. # 118 at p. 5; Pl Exh # 129; Pl. Exh. # 206.

**78.** McNamara Dep. at p. 49.

fully induce its suppliers to engage in reciprocity, and that it had never attempted to do so in the past. Mr. Strauss testified that reciprocal dealing is discouraged at Inter-North, and that the Company educates its employees "in sound honest business practices." [79] InterNorth states that there is no evidence to the effect that it will deviate from its pre-acquisition nonreciprocal policy.

The profit center organization of Inter-North, it is claimed, further supports the likelihood that opportunities for reciprocity will not be exploited. Except for interdivisional sales of feed stocks, InterNorth says that the testimony indicates that there is no evidence of the coordination of business activities among the operating groups. In the words of Mr. Strauss, "[e]ach profit center must stand on its own feet." [80] InterNorth argues that its business policy on intragroup dealings reveals that competition among operating groups is encouraged, as is the policy that independent sources of supply should be retained.

Finally, InterNorth maintains that Crouse-Hinds has not proven (a) the volume of purchases of Crouse-Hinds types of products by engineering firms with which Inter-North deals; (b) the product market(s) to which such purchases relate for antitrust purposes; or (c) the relative competitive significance of those purchases to such market(s). InterNorth claims that absent proof of these elements, no finding can be made as to the likelihood of a substantial lessening of competition in any line of commerce. The Court will first consider the probable effect the proposed merger will have on the market structure for Crouse-Hinds products.

The Court does not believe that an Inter-North/Crouse-Hinds merger will create a market structure that will significantly increase the opportunities for reciprocal dealing by InterNorth. On the contrary, the evidence indicates that the present market structure would make it very difficult for a company such as InterNorth to influence electrical engineers to specify Crouse-Hinds products on construction projects other than those involving InterNorth. Plaintiff would have the Court believe that Inter-North's purchasing power is the only influence effecting the market dynamics behind specification of electrical construction materials and industrial and commercial lighting for hazardous environments. A review of the evidence presented by plaintiff demonstrates that this claim fails to comport with the realities of the market structures for these products.

At the hearing for a preliminary injunction, plaintiff took great pains to establish the various "levels" of buying influence in the market for hazardous electrical products. Yet, it is the very same trade customs established by plaintiff as being entirely determinative of sales patterns in this market, that defeats plaintiff's argument on the question of the instant market structure's conduciveness to reciprocity. The testimony revealed, not surprisingly, that ultimate responsibility for specifications is solely within the province of the end user, or the owner of the facility to be constructed. For example, an InterNorth construction contract "is written along the lines of master and slave or Christian and Romans and we usually reserve in the construct [sic] just about all rights." McNamara Deposition at p. 30. Thus, the limitation of plaintiff's argument should become readily apparent. Even assuming that InterNorth did influence an engineering firm to specify Crouse-Hinds' products, the owner of that soon to be built facility could quite simply demand that the specification be changed in favor of one of Crouse-Hinds' competitors. As an employee of the owner, the electrical engineer would presumably comply with the request or be faced with the inevitable problem facing anyone who disagrees with their employer—dismissal.

Further making plaintiff's scenario unlikely is the electrical engineering firm's use of vendor lists. While plaintiff entreats the Court to conclude that the industry's use of

---

79. Strauss Dep. at pp. 216–19, 282–83.

80. *Id.* at p. 218.

vendor lists will compound the anticompetitive effects of InterNorth's reciprocal dealing, the Court believes that the use of vendor lists would work against the likelihood that such anticompetitive conduct would ever materialize. The testimony indicated that vendor lists are looked upon in the trade as having a utility greater than that of a mere catalogue of products. In fact, they contain products which, based upon past job performance, have proven to satisfy the engineering firm's performance standards. No less does the engineer "depend and base [its] reputation" on the material gathered in the vendor list.[81] It is therefore doubtful that this same engineering firm would readily respond to overtures by InterNorth to summarily substitute Crouse-Hinds products for those already listed. The intensity of Crouse-Hinds' sales efforts towards these engineering firms adds support to the view that, even the products of an industry leader such as Crouse-Hinds, are not easily substituted for existing products, which have proven themselves over the course of an engineering firm's previous construction jobs as being reliable.[82] Testimony also shows that the past job performance of a product is a central concern of the contractor as well.[83] And certainly the inventory considerations behind MRO work would preclude InterNorth from successfully exerting leverage over a contractor to specify a product which had not been used in the original installation.[84]

As for the remaining factors to be weighed in assessing the opportunities for reciprocal dealing created by a merger, the record is, for the most part, silent. As a consequence, the Court is unable at this stage to reach a conclusion one way or another on the significance of these factors to the instant dispute. The Court has not been provided with data on the volume of InterNorth's purchases in relation to its rivals, the size and diversification of the other companies to which InterNorth's electrical engineers and contractors sell their services, or the competitiveness of the markets for electrical engineers and contractors.

On the issue of the probability that reciprocity will be exploited, the Court is equally convinced that this is unlikely. The above discussion amply demonstrates that patronage is not readily shifted in the market for electrical construction and industrial and commercial lighting for hazardous environments. Trade customs have erected obstacles to shifts in patronage which would discourage InterNorth from attempting to arrange reciprocal dealing. Militating in favor of the likelihood of reciprocal dealing would be the fact that Crouse-Hinds' products lend themselves to reciprocal dealing because they are of comparable price and quality to other brand lines. In fact, there would be an incentive to use them due to their generally preferred status, Crouse-Hinds' leadership in product innovation, and breadth of product lines. Offsetting this fact, however, is the use of competitive bidding in the industry, which by itself will determine who the supplier will be instead of reciprocity.[85]

While the testimony conflicts on whether InterNorth has a formal policy against reciprocity, its corporate organization is by profit centers, which dictate that purchasing decisions must be made on the basis of price, quality and service.[86] Although these policies are easily abandoned after a merger, Crouse-Hinds has not offered any evidence which would indicate that such a course is likely. At the hearing, not even one instance of actual reciprocal dealing by InterNorth was proffered by plaintiff. The mere fact that InterNorth engages in some

---

81. See supra, note 52.

82. See supra, at p. 425.

83. Id. at pp. 425–426 and accompanying footnotes. Furthermore, a contractor's existing product inventory may work to dissuade it from specifying a brand name which is not included in its existing inventory.

84. Id. at pp. 424–425. See V Areeda & Turner, supra, ¶ 1131d at p. 187 n. 19.

85. Drewry Dep. pp. 15–18; McNamara Dep. pp. 21–23.

86. Becraft Dep. at pp. 112, 140–42; Strauss Dep. at pp. 216–219.

interdivisional sales, without more, does not necessarily mean that InterNorth employs reciprocity. As the Supreme Court held in *United States v. Columbia Steel Co.*, 334 U.S. 495, 523, 68 S.Ct. 1107, 1122, 92 L.Ed.2d 1533 (1948), "[a] subsidiary will in all probability deal only with its parent for goods the parent can furnish." In any event, Crouse-Hinds has not demonstrated that Inter-North's interdivisional sales involve some sort of mutual conditioning of sales or that they are illegal. The proof indicates only that, except for the sale by the liquid fuels division to the petrochemical group, Inter-North does not engage in interdivisional sales. Moreover, Crouse-Hinds has not proffered evidence on an actual plan by InterNorth to use reciprocity once the companies merged.

What evidence that was presented on InterNorth's possible motivation for merging with Crouse-Hinds demonstrates that honest business concerns is the order of the day. InterNorth viewed Crouse-Hinds as a well-run company, and a leader in the market for electrical equipment for hazardous environments in terms of user familiarity, quality, distributor network, availability, and price. In addition, InterNorth was careful to determine whether Crouse-Hinds' management would be compatible with InterNorth's management, and would assure InterNorth of its twin goals of earnings and growth.[87]

Before addressing the question of foreclosure, brief mention must be made with regard to the probability of reciprocity effect resulting from the merger. It would seem that the same rigid trade customs and practices already described would also make it difficult for an electrical engineering firm or contractor to specify Crouse-Hinds products on their other clients' jobs in order to curry favor with InterNorth. Such factors as end user preference, vendor lists, and past experience with other brand names, would make it unlikely that an electrical engineer or contractor would practice reciprocity effect. Furthermore, the industry's use of competitive bidding would combine

to limit the instances of reciprocity effect. The Court is unable to address plaintiff's other claims on the probability of reciprocity and reciprocity effect resulting after the merger in the sale of gas turbines due to InterNorth's relationship with WESCO and GESCO. Virtually no proof was presented on these issues, and thus the Court is unable to determine the merits of the arguments based on the existing record.

Finally, on the issue of foreclosure, the Court's conclusion that the market structure of hazardous electrical construction materials would not increase the probability of the practice of reciprocity and reciprocity effect, also leads to the conclusion that competition would not be substantially lessened as a consequence of an InterNorth/Crouse-Hinds merger. Indeed, Crouse-Hinds may very well continue to lead the industry in sales for hazardous electrical equipment and dominate the new era of electrical construction in synthetic fuel plants. Thus far, however, plaintiff has shown merely a "natural propensity" on the part of the company to accomplish these feats under its own power. In sum, the Court finds that plaintiff has not demonstrated probable success on the merits or sufficiently serious questions going to the merits so as to make them a fair ground for litigation, on the issue of the probability that reciprocity and reciprocity effect would result from a merger between InterNorth and Crouse-Hinds. The Court will now examine plaintiff's claim that the proposed merger would create a market structure conducive to tying arrangements.

Crouse-Hinds asserts that as a result of the InterNorth/Crouse-Hinds merger, InterNorth will be able to use its monopoly power as a transporter of natural gas to coerce its customers into a tying arrangement to buy Crouse-Hinds products. Stated briefly, a tying arrangement is an agreement by a party to sell one product, but only on the condition that the buyer also purchase a different or tied product. *Fortner Enterprises, Inc. v. United States Steel*

87. Pl Exh # 109, 118, 119, 120, 121, 196, 197, 201.

*Corp.*, 394 U.S. 495, 498–99, 89 S.Ct. 1252, 1256–57, 22 L.Ed.2d 495 (1969); *United States v. Loew's*, 371 U.S. 38, 44–45, 83 S.Ct. 97, 101–02, 9 L.Ed.2d 11 (1963); *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–19, 2 L.Ed.2d 545 (1958); *Yentsch v. Texaco*, 630 F.2d 46, 53 (2d Cir. 1980); *Hill v. A–T–O, Inc.*, 535 F.2d 1349, 1352–53 (2d Cir. 1976); *Coniglio v. Highwood Services, Inc.*, 495 F.2d 1286, 1289 (2d Cir. 1974). Although plaintiff recognizes that InterNorth is a regulated utility, it asserts that, nonetheless, InterNorth has discretion in a variety of operations, service, and rate matters which provide it with substantial "residual monopoly" leverage to influence its customers' purchasing decisions. Plaintiff says that if the instant merger is allowed to proceed, InterNorth will exercise this power to increase the sales of Crouse-Hinds products in the markets for electrical construction materials for hazardous environments, industrial and commercial lighting, and vehicular traffic control systems. Defendant InterNorth disputes that the merged firm would seek to employ such power, or would seek to do so even if it could. Consequently, InterNorth says that the merger would not significantly lessen competition.

The anticompetitive significance of tying arrangements was well described by the Court in *Northern Pacific Railway*:

> Indeed 'tying agreements serve hardly any purpose beyond the suppression of competition.' *Standard Oil Co. of California v. United States*, 337 U.S. 293, 305–306 [69 S.Ct. 1051, 1058, 93 L.Ed. 1371]. They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products. For

these reasons 'tying agreements fare harshly under the laws forbidding restraints of trade.' *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 606 [73 S.Ct. 872, 879, 97 L.Ed. 1277]. They are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected. *International Salt Co. v. United States*, 332 U.S. 392 [68 S.Ct. 12, 92 L.Ed. 20]. Cf. *United States v. Paramount Pictures*, 334 U.S. 131, 156–159 [68 S.Ct. 915, 928–929, 92 L.Ed. 1260]; *United States v. Griffith*, 334 U.S. 100 [68 S.Ct. 941, 92 L.Ed. 1236].

356 U.S. at 6, 78 S.Ct. at 518 (footnote omitted).[88] It has been said that the anticompetitive effects of tying arrangements resemble those resulting from reciprocity. *Spartan Grain & Mill Co. v. Ayers*, 581 F.2d 419, 424–25 (5th Cir. 1978). In the usual case, the only difference between the two proscribed forms of business dealings is a matter of form. The reciprocal dealing involves mutual purchases between two parties, whereas the tying arrangement conditions the seller's sale of product "A" on the sale of product "B". Also in the typical case, neither practice actually increases the seller's power over the buyer, nor are tying arrangements necessarily anticompetitive. For example, the tying arrangement, like the reciprocal dealing, which has already been discussed in this Opinion, may simply amount to a disguised price reduction. *See United States Steel Corp. v. Fortner Enterprises*, 429 U.S. 610, 618–19 n. 10, 97 S.Ct. 861, 866–67 n. 10, 51 L.Ed.2d 80 (1977); *Moore v. Matthews & Co.*, 550 F.2d 1207, 1213 (9th Cir. 1977). *See generally*, V Areeda & Turner, *supra*, at ¶ 1134.

For the most part, cases involving tying arrangements have arisen in the context of

---

**88.** *Ohio-Sealy Mattress Mfg. Co. v. Sealey, Inc.*, 585 F.2d 821, 834 (7th Cir. 1978); *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1212–1213 (9th Cir. 1977); *Heatransfer Corp. v. Volkswagenwerk, A. G.*, 553 F.2d 964 (5th Cir. 1977); *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211, 1218–19 (3rd Cir. 1976); *Robert's Warkiki U-Drive v. Budget Rent-A-Car*, 491 F.Supp. 1199, 1206–07 (D.Ha.1980); *Anderson Foreign Motors v. New England Toyota, Etc.*, 475 F.Supp. 973, 980–81 (D.Ma.1979).

Section 1 of the Sherman Act, 15 U.S.C. § 1, or Section 3 of the Clayton Act, 15 U.S.C. § 14. *See e. g., Spartan Grain & Mill Co. v. Ayers, supra.* In the Second Circuit, to prove the existence of a tying arrangement in violation of those statutes, a plaintiff must satisfy a five prong test, *see e. g., Yentsch v. Texaco, supra,* at 56–57, which serves as a useful analytic tool under Section 7 for divining the existence of a tying arrangement, and its anticompetitive impact, if any. When juxtaposed with the provisions of Section 7, the elements to prove the existence of an anticompetitive tying arrangement under Section 7 are as follows: [89]

*First,* to prove the merger creates a market structure conducive to tying arrangements, thereby significantly increasing the opportunity for such practices, a plaintiff must show:

(a) the presence of a tying and a tied product; [90] and

(b) evidence of actual coercion by the seller which indicates a predisposition to utilize tying arrangements.

*Second,* to prove that there is a reasonable likelihood that such opportunities will be exploited, a plaintiff must demonstrate:

(a) sufficient economic power in the tying market to coerce purchaser acceptance of tied product.

*Third,* to prove that the resulting tying arrangements, if any, have a tendency substantially to lessen competition, a plaintiff must show:

(a) anticompetitive effects in the tied market; and

(b) involvement of a "not insubstantial" amount of interstate commerce. [91]

■ Plaintiff claims that the proof it has offered in the instant case demonstrates that an InterNorth/Crouse-Hinds merger would create the opportunities for tying arrangements, whose anticompetitive impact would "not insubstantially," foreclose competition in electrical construction materials for hazardous environments, industrial and commercial lighting, and traffic control systems. Crouse-Hinds asserts that the presence of a tying and tied product is satisfied here because after the merger, InterNorth will be able to tie the transportation and sale of natural gas to the sale of the above-listed Crouse-Hinds products. As for evidence of actual coercion that would

**89.** Plaintiff seeks also to have the Court consider the probability that tying effects would result from the merger. This claim was not argued at the hearing on plaintiff's preliminary injunction motion nor has one shred of evidence been offered by plaintiff to support this theory. Consequently, the Court will give this argument no further consideration.

**90.** Neither party has requested that the Court consider a sometimes used sixth test for determining an illegal tying arrangement—whether the seller of the tying product has a direct economic interest in the market of the tied product. *See e. g. Keener v. Sizzler Steak Houses,* 597 F.2d 453, 456 (5th Cir. 1979). The Court does note, however, that the defendant's interest in the relevant tied products here would satisfy this test.

**91.** InterNorth suggests that a plaintiff in a Section 7 case must make a higher showing of anticompetitive harm due to the requirement that a merger "substantially lessens competition," as opposed to the lesser standard or "not insubstantial" requirement in a Sherman Act or Section 3, Clayton Act case. With qualification the Court disagrees. In *Brown Shoe* the Court held that the extent of foreclosure required to

be proven in any antitrust case depends on the "nature and purpose" of the challenged anticompetitive practice. 370 U.S. at 294, 82 S.Ct. at 1502; *see supra,* n. 11. Where that practice is "inherently anti-competitive," then a lesser degree of foreclosure is required than if that practice has potentially redeeming competitive qualities. Tying arrangements are to be found in the former category. As the Court stated in *Brown Shoe*:

The usual tying contract forces the customer to take a product or brand he does not necessarily want in order to secure one which he does desire. Because such an arrangement is inherently anticompetitive, we have held that its use by an established company is likely "substantially to lessen competition" although only a relatively small amount of commerce is affected. *International Salt Co. v. United States, supra.*

370 U.S. at 330, 82 S.Ct. at 1526. *See also, United States v. Loew's, Inc.,* 371 U.S. 38, 45 n. 4, 83 S.Ct. 97, 102 n. 4, 9 L.Ed.2d 11 (1963); *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *Ohio-Sealey Mattress Mfg. Co. v. Sealy, Inc.,* 585 F.2d 821, 835 (7th Cir. 1978).

be used by InterNorth, Crouse-Hinds cites an incident where InterNorth used the "carrot" of giving certain of its customers extra or "turnback" supplies of natural gas, in return for the favorable testimony of those customers at a rate application proceeding.[92] Crouse-Hinds has also offered evidence of two instances where InterNorth conditioned its compliance with customer requests for increases in service pressure on the purchase by those customers of unwanted transmission lines owned by InterNorth. In the first example, the customer did not want to purchase the transmission lines "at any price," and strongly opposed "conditioning the requested pressure increase for their LNG liquification." In the second example, InterNorth backed down from enforcing its condition, only after it was discovered that the sale would make the customer an interstate transmission company, and therefore subject to FERC's regulatory authority.[93]

The major portion of Crouse-Hinds' evidence on the issue of InterNorth's propensity to use coercion for financial gain pertains to its past practices in transporting gas for third parties. During the mid-seventies when there were shortages of supplies of natural gas, FERC gave approval to a plan which would permit large users of natural gas to independently purchase gas from producers, and contract for the shipment of that gas with transmission companies such as InterNorth.[94] According to Crouse-Hinds, InterNorth exploited its monopoly position in natural gas transmission to the detriment of its customers, by extracting transportation terms which were harshly unfavorable to the customer, though inordinately favorable to InterNorth. Crouse-Hinds has offered evidence uncovering at least four instances where InterNorth enforced a "no-haul or 25% acquisition" policy. This policy provides that InterNorth will not transport gas for others unless that customer agrees to sell or "dedicate"[95] to InterNorth 25% of its gas.[96] In this fashion, InterNorth was able to receive revenues for both transporting the gas as well as for the resale of the gas volumes acquired for its own system. Because of FERC's regulatory scheme, this resale to InterNorth was necessarily at prices substantially below the price originally paid by the customer.[97]

As for the third element that must be proven by a plaintiff, that a defendant must have sufficient economic power to coerce purchaser acceptance of the tied product, Crouse-Hinds points out that InterNorth is the main or sole supplier of gas to electric utilities and many industrial customers, and serves hundreds of communities through its retail division. Crouse-Hinds' claims that these customers are captive in terms of their long-term contracts with InterNorth, and because InterNorth generally has the only facilities that are within reach of various service area. InterNorth also has leverage, according to Crouse-Hinds, in its discretionary authority over operations, service and rate requests. *See, supra,* at p. 422. Crouse-Hinds says that this power

92. Pl Exh # 223. Transcript at pp. 440–47.

93. Pl Exh # 184, Letter, Raasch to Fleer, April 20, 1978 and Transcript at pp. 371–76; Pl Exh # 185, Transcript at p. 377.

94. Transcript at pp. 318–19.

95. The normal term, normal way the word dedication is used is in a situation which an owner of the rights to produce natural gas make a sale of that gas to a purchaser, someone who could possibly transport the gas in interstate commerce, and the contract would normally be a contract that would extend from date of first production for a period of twenty years, and thereafter, there would be a need to obtain permission from the FERC if that sale were to be abandoned. In other words, it is a long-term conveyance of a right to purchase that gas over a period of years. Transcript at p. 316; Pl Exh # 141, Transcript at p. 315–318.

96. National Gypsum, Pl Exh. # 212–213, Transcript at p. 297; Minnesota Gas Co., Pl Exh # 137, Transcript at p. 319; Iowa Beef Processors, Pl Exh # 139, Transcript at p. 323; Freuhauf, Pl Exh # 138, Transcript at p. 329.

97. At that time, the interstate natural gas transmission companies were subject to a regulatory ceiling on the price they could pay for natural gas. An end user was not subject to the same price restrictions.

will be used to coerce InterNorth's customers into buying Crouse-Hinds products. While it claims that the extent of the anticompetitive harm resulting from this coerced purchasing is difficult to measure, Crouse-Hinds argues that because the markets are concentrated, the resulting foreclosure will necessarily be substantial.

In contrast, InterNorth claims that because it is subject to FERC's regulation, its "monopoly power" is undermined by FERC's supervision of the price charged by InterNorth, and its quality of service. This power is further limited, says InterNorth, by the "best efforts" provision of its tariffs, and its obligation to provide non-discriminatory service.[98] *See, supra,* at p. 422. InterNorth also states that the terms of its long-term contracts with customers give them discretion over delivery volumes, and thus a weapon by which they could defend themselves against any attempt by InterNorth to use its supposed leverage.[99] In sum, InterNorth maintains that it does not have the requisite market power to coerce purchaser acceptance of Crouse-Hinds products.

With regard to its alleged proclivity to engage in anticompetitive conduct, InterNorth relies on the same defense it made in response to plaintiff's reciprocity claims. *See, supra,* at pp. 434–435. That is, the testimony InterNorth's executives have successfully refuted Crouse-Hinds' claim that InterNorth wanted to merge with Crouse-Hinds because of the opportunities for reciprocal dealing that would be created. According to InterNorth, Crouse-Hinds has also failed to put forward any relevant evidence to show that the volume of commerce that would be foreclosed from the alleged tying arrangements would be "substantial." It says that plaintiff has not offered evidence concerning (a) which products InterNorth would tie to its sale of natural gas, (b) the extent of Crouse-Hinds' competition for the purchases by InterNorth's customers of Crouse-Hinds type products, (c) the volume of such Crouse-Hinds products or of the equivalent products which are in fact sold to InterNorth's customers, or (d) the proportion of that volume to the total sales of those products. In the absence of such proof, InterNorth claims that there is no evidentiary basis to conclude that because of the theoretical potential for future tying practices, the acquisition "may substantially lessen competition" in any product market.

The Court believes that Crouse-Hinds has easily demonstrated that at issue here are two distinct products. Without great fear of being controversial, the Court concludes that the tying product in this case—which the Court will refer to as natural gas transmission and sale—is a distinct commercial unit from the type of products manufactured by Crouse-Hinds. The "coercion" question, by comparison, would appear to be somewhat more difficult to resolve. In the context of a Sherman Act case, or of Section 3 of the Clayton Act, a plaintiff must demonstrate evidence of actual coercion by the seller that in fact forced the buyer to accept the tied product. *Yentsch v. Texaco, Inc., supra,* at p. 56–57; *Hill v. A–T–O,* 535 F.2d 1349, 1355 (2d Cir. 1976); *Capital Temporaries, Inc. of Hartford v. Olsten Corp.,* 506 F.2d 658, 661–62 (2d Cir. 1974); *Coniglio v. Highwood Services, Inc.,* 495 F.2d 1286, 1290–92 (2d Cir. 1974); *American Manufacturing Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.,* 446 F.2d 1131, 1137 (2d Cir. 1971), *cert. denied,* 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972). In other words, as part of the requirement to establish the existence of a tying arrangement, it must be shown that a plaintiff was "an unwilling purchaser of an unwanted product," and that some pressure was brought to bear in order to force the plaintiff to purchase the undesired item or service. *Capital Temporaries, Inc. of Hartford v. Olsten Corp.,* 506 F.2d at 662. However, Section 7 of the Clayton Act deals in probabilities not cer-

---

**98.** Citing Transcript at pp. 289–295.

**99.** Citing Strauss Dep. at p. 274. InterNorth also claims that the majority of incidents complained of by plaintiff took place when supplies of natural gas were tight, which it states is no longer the case.

tainties, *United States v. General Dynamics*, 415 U.S. 486, 498, 94 S.Ct. 1186, 1194, 39 L.Ed.2d 530 (1974), and, therefore, the Court will proceed to examine the probability that InterNorth will use coercion to force its customers to purchase Crouse-Hinds products.

Before proceeding too much further, the first three "incidents" offered by plaintiff to prove InterNorth's propensity to use coercion can be readily disposed of as being incompetent and irrelevant evidence. In the first example, the evidence does not indicate that InterNorth forced its "unwilling" customers to accept an "unwanted product." Without question the evidence suggests that InterNorth had an "I'll scratch your back if you scratch mine" attitude, but the letter does not demonstrate one way or another that the sale of gas was in fact conditioned on the customer's participation in the rate proceeding, whether the customer would have participated at the proceeding anyway, or if the customer was actually asked to participate as directed in the exhibit. Still, the very face of the exhibit indicates InterNorth's precarious position in making the request for customer support. Presumably, if word got out to its "unnotified" customers that extra supplies of gas were available, they too would likely show up at the rate proceeding with less than enthusiastic comments about the quality of InterNorth's service.[100]

The other two exhibits suffer from similar, if not more severe, shortcomings. While InterNorth proposed certain conditions to its customers in exchange for increasing the service pressure, the exhibits do not show that such conditions were carried through, and in fact they indicate the contrary. The first example, concerning Minnesota Gas Company, shows that negotiations were carried on for over a year, and that there was great concern at InterNorth that if the increase in service pressure was conditioned on the sale of InterNorth's facilities, other customers and even FERC would intervene. In the end, although an InterNorth officer felt the deal could be "forced" on Minnesota Gas Company because the terms of the transaction were not "unreasonable," it was believed that doing so would jeopardize customer good will and that a compromise should be worked out. In the second example, Inter-North voluntarily withdrew its own condition of having its customer purchase some pipeline facilities, because InterNorth believed that the condition was unreasonable.

In addition, when placed in their proper context, the four instances where Inter-North used a "no-haul or 25% acquisition" policy do not demonstrate InterNorth's propensity to use coercion. At the time Inter-North employed these transportation terms the nation was severely short of supplies of natural gas. To partially remedy this problem, FERC gave the interstate pipeline companies, such as InterNorth, the right to independently negotiate with customers to transport their privately purchased supplies of natural gas.[101] It was hoped that this experimental plan would free up the natural gas market by enabling industrial customers to bid for "spot" market supplies, in order to be assured of enough natural gas to continue operations. Due to shortages of natural gas for industrial and commercial use, over 1.2 million people had been laid off from work.[102] Although each transportation agreement was to be negotiated by the customer and the pipeline independently, FERC did not waive its jurisdiction over such transactions. Each had to be registered with FERC and its terms approved by that agency.[103] One of the transportation terms that had received FERC's approval was a percentage acquisition of the natural gas to be transported by the transmission company as a charge for the service.[104]

---

**100.** The letter stated "Low key this so we don't run afoul of any of the customers we didn't notify." Transcript at p. 442; Pl Exh # 223.

**101.** Pl Exh # 190.

**102.** *Id.* Staff Comments, undated at p. 2.

**103.** Transcript at pp. 296, 299, 318, 375.

**104.** *Id.* Association of Gas Distributors, Comments at p. 3.

Like any "spot" market, the price for natural gas would fluctuate. Certainly InterNorth's "no-haul" policy was not etched in stone, nor could it be due to the price competition in the market. *See United States v. Fortner Enterprises, Inc.*, 429 U.S. 610, 617, 97 S.Ct. 861, 866, 51 L.Ed.2d 280 (1977) (purpose of tie-in is often to facilitate price competition). According to one InterNorth officer, "[m]y understanding of each one of the transportation deals with Northern or Peoples, each one is negotiated on its own particular merits . . . . * * * If there even was a policy doesn't mean that you had to abide by it." [105] In other respects, then, the "no-haul" policy was a bargaining point. Thus, in one instance where the Fruehauf Corporation was advised of the "no-haul" policy, "[r]epresentatives of Fruehauf completely rejected any condition which would require them to make a sale to Northern and indicated that if Northern remained adamant regarding this condition or any other condition which would sidetrack their proposal, they would make a direct filing with the Commission." [106] However, as the Court held in *American Manufacturing*, "bartering ploys are not generally the concern of the antitrust laws." 446 F.2d at 1137.[107]

The next issue to be considered is the third element of the test for tying arrangement, whether there is sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product. *United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 620, 97 S.Ct. 861, 867, 51 L.Ed.2d 280 (1977) (Fortner II). Market power can be demonstrated either by showing the existence of a monopoly or market domination, or "whether the seller has some advantage not shared by his competitors in the market for the tying product." *Id.* at 620, 97 S.Ct. at 867. This latter requirement presupposes that the tying product has some sort of "uniqueness" by which economic power is conferred therefrom.[108] "Accordingly, the proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market. *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 504, 89 S.Ct. 1252, 1259, 22 L.Ed.2d 495 (1969) (Fortner I). In defining "uniqueness" in *Fortner I*, the Court held:

Uniqueness confers economic power only when other competitors are in some way prevented from offering the distinctive product themselves. Such barriers may be legal, as in the case of patented and copyrighted products, *e. g., International Salt; Loew's,* or physical, as when the product is land, *e. g., Northern Pacific.* It is true that the barriers may also be economic, as when competitors are simply unable to produce the distinctive product profitably, but the uniqueness test in such situations is somewhat confusing since the real source of economic power is not the product itself but rather the seller's cost advantage in producing it.

---

**105.** Sharp Dep. at pp. 82–83. This fact would also foreclose Crouse-Hinds from the benefit of the doctrine enunciated in *Hill v. A–T–O, Inc.*, 535 F.2d at 1355, where it was held that: "[a]n unremitting policy of tie-in, if accompanied by sufficient market power in the tying product to appreciably restrain competition in the market for the tied product constitutes the requisite coercion under *Capital Temporaries*, given foreclosure of a not insubstantial volume of interstate commerce." [Citations omitted].

**106.** PI Exh # 138.

**107.** Negotiations between InterNorth and National Gypsum were also quite intensive. PI Exh # 212 and 213.

**108.** *See e. g. United States v. Loew's, Inc.*, 371 U.S. 38, 49 n. 6, 83 S.Ct. 97, 104 n. 6, 9 L.Ed.2d 11 (1963):

To use the trial court's apt example, forcing a television station which wants "Gone With The Wind" to take "Getting Gertie's Garter" as well is taking undue advantage of the fact that to television as well as motion picture viewers there is but one "Gone With The Wind."

*See also, Yentsch v. Texaco, Inc., supra,* (franchise agreement); *Hill v. A–T–O, supra,* (buying service); *Coniglio v. Highwood Services, Inc., supra,* (season football tickets); *Capital Temporaries, Inc. of Hartford v. Olsten Corp., supra,* (rejected trademark as unique).

394 U.S. at p. 505 n. 2, 89 S.Ct. at p. 1259 n. 2. *Accord Fortner II, supra*, at p. 621, 97 S.Ct. at p. 868.

Serious questions about the uniqueness of natural gas vis-a-vis other fuel substitutes must be considered in this case. Although plaintiff's customers may be "captive" in the sense that they have no practical alternative source for natural gas, in another sense, those same customers are free to turn to another source of fuel if they so desire. *See Northern Pacific Railway Co. v. United States*, 356 U.S. at 5, 6 n. 4, 78 S.Ct. at 518, n. 4; *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211, 1226 (3d Cir. 1976). In fact, the policy behind FERC's decision to implement the special transportation program outlined above, states that it is to have a limited application to situations "where gas is purchased for high priority uses that otherwise would be curtailed and without an alternate fuel capability." Pl Exh # 190 Staff Comments undated at p. 10; *see also*, Pl Exh # 117 at p. 6. Thus, at least in FERC's view, natural gas is a highly substitutable fuel source and would not be unique for purposes of a tying arrangement analysis.[109] *See Fortner II*, 429 U.S. at 621–22, 97 S.Ct. at 868–69. While natural gas may have some cost benefits over other fuels, it is still a fuel source that is considered readily substitutable for other fuel sources. Moreover, in view of FERC's policy directive, plaintiff's evidence with regard to this specialized transportation plan should be looked upon as having limited use as a springboard to judge the competitive inclinations of InterNorth.

A second question concerning a defendant's economic power to tie a product is suggested by a passage from the Supreme Court's decision in *Northern Pacific Railway*, where it is stated:

Of course where the seller has no control or dominance over the tying product so that it does not represent an effectual weapon to pressure buyers into taking the tied item any restraint of trade attributable to such tying arrangements would obviously be insignificant at most.

356 U.S. at p. 6, 78 S.Ct. at p. 518. From the evidence presented to this Court, it is clear that InterNorth's transmission or sale decisions are not without counterbalancing influences. As has been seen throughout the discussion of the underlying factual premise of plaintiff's tying arrangement claim, InterNorth must seek permission from FERC to construct facilities, improve or reduce service, and in setting rates.[110] For the most part, many of these decisions will be expeditiously rendered by FERC where there is no customer opposition. However, "[i]f the customer generally is questioning the wisdom of the transmission company, or the motive, they can make it extremely difficult for the pipelines to function the way the pipeline would like to function." Transcript at p. 295. Thus, it is important for the transmission companies to maintain the good will of its customers.[111] FERC's regulatory control and the natural gas customer's role in the natural gas regulatory scheme, can only be viewed as factors which fundamentally limit InterNorth's ability to pursue anticompetitive designs should it have them. However, the evidence presented to the Court in no way suggests that such a course of conduct will probably result from an InterNorth/Crouse-

---

**109.** Throughout the mid-seventies the natural gas transmission companies did not have enough gas to supply the requirements of the customers. This is true practically throughout the entire industry. There may have been a couple of minor exceptions. An instance wherein an industrial customer, for instance, where they were not being supplied by the transmission company pursuant to curtailment orders of the FERC, they have various alternatives, *one of which was to seek alternative fuel, such as fuel oil, or perhaps coal.* [Emphasis supplied].

Another situation arose wherein the FERC granted such industrial customers of a transmission company to go to the supply area, itself, and seek out natural gas and have it transported to their point of need by various transmission companies, one of which, of course, would be the transmission company that normally would have supplied the requirements of such customers. Transcript at pp. 296–97.

**110.** *Id.* at 54, 295–96, 299, 318, 375.

**111.** Pl Exh # # 223, 226. Transcript at p. 295.

Hinds merger, or that InterNorth would succeed in such endeavors should it try. For this reason, the Court does not believe that plaintiff's assertion on the question of foreclosure has any merits. In sum, the Court finds that Crouse-Hinds has not demonstrated probable success on the merits, or sufficiently serious questions going to the merits so as to make them a fair ground for litigation, on the likelihood that InterNorth will engage in tying arrangements should it succeed in merging with Crouse-Hinds.[112]

■ The final issue to be resolved under plaintiff's antitrust claims, is the question of irreparable harm. Plaintiff asserts that if the InterNorth/Crouse-Hinds merger succeeds, Crouse-Hinds will likely suffer irreparable harm because InterNorth is not technologically oriented, and would cut the budget of Crouse-Hinds' "life-blood," its research and development activities. On a related issue, Crouse-Hinds claims that if InterNorth were its parent company, Crouse-Hinds would be unable to maintain its present rapport with InterNorth's competitors. Crouse-Hinds says that in its every day dealings with its customers it is privy to a variety of trade secrets which enable it to design products that meet the special needs of its customers. These same customers, according to Crouse-Hinds, would be unwilling to trust Crouse-Hinds with such information after the merger, for fear it would be divulged to InterNorth. Crouse-Hinds finally argues that it will suffer irreparable injury because its highly prized management will leave the company, and they could only be replaced at great

cost to the company in terms of sales and competitive momentum. InterNorth states that these claims are unfounded, and the Court agrees.

As for the questions of research and development and management expertise, Crouse-Hinds' allegations misstate the record. In the words of the Chairman of the Board of InterNorth, "on the surface it just kind of appears to us that the [Crouse-Hinds'] research budget must be a little bit on the low side." Strauss Dep. p. 261. Moreover, InterNorth very much looks upon itself as a technologically oriented company, and carefully assessed its management's technology "fit" with Crouse-Hinds. *See supra,* at pp. 429–430. With regard to the issue of trade secrets, there is no evidence in the record to support Crouse-Hinds' belief. Also, concerning the possible harm flowing to the company from the loss of its management, the Court believes that Crouse-Hinds' claims are equally unfounded. InterNorth identified Crouse-Hinds' management as a valuable resource of the company, and it would be unlikely that they would be encouraged to leave Crouse-Hinds after the merger. While Crouse-Hinds cites *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.,* 597 F.2d 814 (2d Cir. 1979) for the tenet that decreased organizational morale is a factor to be weighed in assessing irreparable harm, the Court concludes that this factor is not as significant a concern here as it was in that case. The facts in *F. & M. Schaefer* concerned a horizontal merger between two direct competitors. It seems to this Court that the possible morale prob-

---

**112.** *See supra,* note 91. *See also, Official Airlines Guides, Inc. v. F. T. C.,* 2 Trade Cases ¶ 63,544 (2d Cir. 1980) ("even a monopolist, as long as he has no purpose to restrain competition or to enhance or extend his monopoly, and does not act coercively, retains this right.") In addition, Crouse-Hinds has alleged that the proposed merger will violate Section 8 of the Clayton Act, 15 U.S.C. § 19. Crouse-Hinds claims that if the merger succeeds, one Dr. James Renier will sit on both the Board of Directors of InterNorth and Honeywell, Inc., the latter being a competitor of Crouse-Hinds. This fact, in Crouse-Hinds' view, will violate Section 8's prohibition against interlocking directorates. In the instance where, as a result

of a merger, a director will sit on the parent company of a subsidiary that competes with another corporation on whose board that same director sits, a central question is to what extent the parent company controls its subsidiary. *Kennecott Copper Corp. v. Curtiss-Wright Corp.,* 584 F.2d 1195, 1205 (2d Cir. 1978). Plaintiff has offered no proof on this issue, and the record contains proof to the effect that if the InterNorth/Crouse-Hinds merger is consummated, Crouse-Hinds will be run as a totally separate and independent corporation. Segnar Dep. at p. 204. Thus, plaintiff has failed to meet the requirements of a prima facie case under Section 8.

lems in that situation is readily distinguishable from the present case, which involves a vertical conglomerate merger. The Court of Appeal's decision in *F. & M. Schaefer* concurs with this judgment. *See* 597 F.2d at 819. In sum, Crouse-Hinds has failed to demonstrate that it will suffer irreparable harm as a result of the InterNorth/Crouse-Hinds merger. The Court will next address plaintiff's securities claims.

### VI.

The second part of Crouse-Hinds' general allegation that InterNorth's tender offer for shares of Crouse-Hinds' stock is illegal, and therefore should be enjoined by the Court, is that the tender offer violates various rules and regulations of the Williams Act.[113] More specifically, Crouse-Hinds complains that InterNorth (a) improperly commenced its offer by failing to comply with applicable SEC rules governing the commencement of an offer by summary publication,[114] and has not satisfied the rule which requires that an offer remain open continuously for twenty business days,[115] (b) has not provided for appropriate withdrawal rights[116] nor satisfied the "twenty-day" provision in its amended offer, (c) has financed its tender offer by an illegal debenture offering which it did not disclose in its tender offer materials,[117] (d) failed to disclose in those same materials that it is subject to potential material liabilities and contemplated governmental proceedings for non-compliance with environmental regulations, and (e) illegally solicited Crouse-Hinds shareholders' proxies in its offer to purchase by using the "Belden condition."[118] Before examining the factual basis of plaintiff's claims, a brief overview of the Williams Act, and the rules and regulations relevant to the instant dispute is in order.

The Williams Act was enacted by Congress in 1968 as an amendment to the 1934 Securities Exchange Act. It was intended to be a regulatory "gap filling" device due to the increasingly popular use of the cash tender offer. Previous to that time, the cash tender offer was not subject to any filing or disclosure requirements. As a consequence, tender offers often would be preceded by secret accumulations of an issue by a few persons friendly to an offeror, who commonly would acquire the target stock at a price below the premium paid by the tender offeror. Still other tender offers would proceed with only minimal disclosure, and target company shareholders were unable to make an informed decision with respect to the persons seeking control. The implications of these problems has been well summarized as follows:

> The shareholder had to make his investment decision on the basis of a premium above a market price which reflected an evaluation of the company based on the assumption that current management and its policies would continue. He knew nothing of the identity and experience of the persons making the tender offer, who in the event that the offer should be successful would control the target company. He had no knowledge of the source of the funds to be used in purchasing the stock or the terms and conditions of any such loans or whether the person soliciting tenders had the funds available to pay for any of the shares. He had no way of knowing whether his shares, if tendered, would be taken up or returned.

Griffin & Tucker, *The Williams Act, Public Law 90–439 Growing Pains? Some Interpretations With Respect to the Williams Act*, 16 How.L.J. 654, 659 (1971); *see also* H.R.Rep.No.1711, 90th Cong., 2d Sess. *quot-*

---

**113.** *See* 15 U.S.C. § 78n(d) and (e); and Regulation 14d and e. 17 C.F.R. §§ 240.14d–1, 240.-14e–1 (1980).

**114.** *See* 17 C.F.R. §§ 240.14d–2, 240.14d–4, 240.14d–6 (1980).

**115.** *See* 17 C.F.R. § 240.14d–2 (1980).

**116.** *See* 15 U.S.C. § 78n(d)(5); 15 C.F.R. § 240.-14d–7 (1980).

**117.** *See* 15 U.S.C. § 78n(e); 17 C.F.R. 240.14e–1 (1980).

**118.** *See* 15 U.S.C. § 78n(a); 17 C.F.R. § 240.-14a–1 (1980). The proxy issue has since become moot.

*ed in* 2 U.S.Code Cong. & Admin.News 2812, 2813–14 (1968).

Congress addressed these problems in the Williams Act by providing for regulatory, filing, dissemination, disclosure, substantive [119] (regulating the length of the tender offer) and antifraud protections.[120] These provisions are triggered if a tender offeror believes that a request for tenders would result in the offeror becoming the "beneficial owner" of more than 5% of the target company's securities.[121] The Act also provides for shareholders' withdrawal rights, pro rata acceptance rights, and the tender offeror's obligation to treat all shareholders equally with regard to increases in the offered consideration. In passing the Williams Act, Congress did not intend to discourage tender offers, which sometimes serve useful purposes. *Id.* Congress further concluded, however, that the target shareholders were generally at a disadvantage in deciding whether to tender. Thus, in passing the Williams Act, Congress indicated that:

> It has been argued that a cash tender offer is a straightforward business proposition which can be rejected or accepted by a shareholder like any other bid for his securities. But where no information is available about the persons seeking control of their plans, the shareholder is forced to make a decision on the basis of a market price which reflects an evaluation of the company based on assumption that the present management and its policies will continue.
>
> The persons seeking control, however, have information about themselves and about their plans which if known to investors, might substantially change the assumptions on which the market price is based. This bill is designed to make the relevant facts known so that shareholders have a fair opportunity to make their decision.

> \* \* \* \* \* \*

The bill avoids tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid. It is designed to require full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to fairly present their case.

While the bill may discourage tender offers or other attempts to acquire control by some who are unwilling to expose themselves to the light of disclosure, the committee believes this is a small price to pay for adequate investor protection. In fact, experience under the Securities Act of 1933 and the Securities Exchange Act of 1934 has amply demonstrated that the disclosure requirements of the Federal securities acts are an aid to legitimate business transactions, not a hindrance. 2 U.S.Code Cong. & Admin.News, 90th Cong., 2d Sess. (1968) at pp. 2813–14.

*See Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 29–31, 97 S.Ct. 926, 943–44, 51 L.Ed.2d 124 (1977); *Rondeau v. Mosinee Paper Co.*, 422 U.S. 49, 58–59, 95 S.Ct. 2069, 2075–76, 45 L.Ed.2d 12 (1975). To implement the provisions of the Williams Act, the Securities and Exchange Commission (SEC) promulgated rules and regulations, which have been amended from time to time. Those regulations which bear on the instant inquiry will now be described.

Under the rules and regulations implemented by the SEC, the date a tender offer is commenced is interrelated to the manner in which the tender offer is disseminated. This is typically accomplished in either of two ways. If a tender offer is commenced by a "long-form" publication, then the date of that publication in a newspaper is considered the commencement date of the tender offer. Similarly, if a "short-form" publication or advertisement is used, then the commencement date of the tender offer

---

**119.** Generally, the regulations track the statutory requirements.

**120.** 15 U.S.C. § 78n(d) and (e).

**121.** If a tender offer, for example, had already purchased up to 5% of a target company's securities, then 17 C.F.R. 13d applies, and its requirements are similar to § 240.14d–1, *et seq.*

is the newspaper publication date.[122] The difference between the long- and short-form publication is in the detail and type of information that each requires under the SEC's rules. The rules specify that a short-form advertisement "shall contain and be limited to" the identity of the bidder, and the subject company, the amount, and class of securities being sought and the type and amount of consideration being offered therefor, the scheduled expiration date of the tender offer, whether it may be extended, and if so, the procedures that will be followed, the various withdrawal dates and the manner in which shares will be accepted for payment and withdrawal, the pro rata rights if the offer is not for all of the outstanding securities of a target company, the purpose of the tender offer if it is made for less than all outstanding shares, a statement that the summary advertisement incorporates by reference the detailed financial and background data that comprise the "tender offer materials," [123] and instructions to obtain those materials. The long-form publication, on the other hand, does not adopt the detailed financial information incorporated by reference into the summary advertisement; it actually publishes that information in the advertisement itself.

The SEC explained the substantial difference and purpose behind these two forms of publication in one of its releases: [124]

> The inclusion of any additional information in a summary advertisement published, sent or given on the date of commencement will make this provision unavailable to the bidder and result in the necessity for publication of the information required by Rule 14d–6(e)(1). A few commentators urged the expansion of the provision to permit the inclusion of additional information. The Commission is concerned that the expansion of summary

advertisements beyond their present limits would erode its intended benefits, viz, rapid notification of the existence of the tender offer and reduction of the scheduling problems and escalating costs associated with making long-form publication of a tender offer. It should also be noted that summary advertisements are only a part of the method of summary publication. Bidders are also required by Rule 14d–4(a)(2)(ii) to furnish tender offer materials containing the information required by Rule 14d–6(e)(1) to any security holder who requests such materials pursuant to the summary advertisement. Security holders are notified of this opportunity in the summary advertisement which is required to include appropriate instructions as to how security holders may obtain promptly, at the bidder's expense, the bidder's tender offer materials. Moreover, the explanatory note to proposed Rule 14d–3(b)(2) has been made into a separate subparagraph of Rule 14d–6(e) which prevents the inclusion of a transmittal letter (whereby securities of the subject company being sought in the tender offer may be transmitted to the bidder or its depository) in the summary advertisement. This is intended to encourage security holders to request the bidder's tender offer materials in making their investment decision with respect to the tender offer.

Once a tender offer is commenced, the tender offeror must "[h]old such tender offer open for . . . twenty business days from the date such tender offer is first published . . . ." [125] The rules further provide that, for the first fifteen days of an offer, a shareholder may withdraw shares already tendered. In addition, a "conditional" withdrawal period is set out under the Williams Act, which states that a shareholder may

---

**122.** *See* 17 C.F.R. 240.14d–2 (1980).

**123.** *See* 17 C.F.R. 14d–1(b)(5) (1980) and discussion *infra* at p. 452.

**124.** SEC releases Nos. 33–6158, 34–16384, IC–10958 reported at 44 Fed.Reg. 70,326, 70–3033–34 (1979). It should be noted that a summary advertisement published after the commence-

ment of an offer need not contain the same information as required in a summary advertisement published at the commencement of a tender offer. *See* 17 C.F.R. § 240.14d–6(b).

**125.** 17 C.F.R. § 240.14e–1(a). *See supra*, note 124 at p. 70,337.

withdraw tendered shares at any time after sixty days from the date of the original offer, provided that the tender offeror does not purchase such shares before they are withdrawn.[126] In addition to these withdrawal rights under the Act, a shareholder is possessed of pro rata rights if the offer is for less than all outstanding shares of the target company, and more shares are tendered than were provided for under the terms of the purchase offer. Thus, a shareholder is entitled to pro rata rights if the shares are tendered within ten days of the original announcement of the tender offer, or within ten days of a notice of an increase in the offered consideration.[127]

Whether a tender offer is commenced by either long- or short-form publication, the tender offeror must file its "tender offer materials" with the SEC "as soon as practicable on the date of the commencement of the tender offer."[128] These materials are to contain the terms and conditions of the offer, including[129] any amendments, the related transmittal letter, and press releases or other publications made at the direction of the offeror, which indirectly or directly solicit the securities of the target company. Under the SEC's rules, these same materials must be disseminated to any target company shareholder who requests them, and two different methods are so provided in the rules to do so, though they are not exclusive.[130] Under either method, the tender offeror must initiate the process by a request to the target company, which must make an election whether to furnish its shareholder lists to the tender offeror who, in turn, will mail the materials to the target company's shareholders. If the target company chooses not to furnish its shareholder lists to the tender offeror, then it must mail out the offering materials itself within three days of delivery of the offering materials by the tender offeror.

The instant discussion of the applicable law will conclude with an examination of the rules pertaining to amending a tender offer. A recent addition to the SEC rules provides that an amendment to a tender offer which increases the price offered for tendered shares of stock, must remain open for an additional ten business days.[131] This time period runs concurrently with the existing twenty day period if the latter has not expired. If the offer is not for all outstanding shares, then the increase in price will also enable the shareholder to take advantage of the relevant pro rata provision.[132] As presently written, however, the rules do not require any minimum time period extension when an offeror amends its offer to decrease the offering price. Some guidance on this subject may be gleaned from the following statement in a SEC release: "[t]ender offers which do not stay open for a reasonable length of time increase the likelihood of hasty, ill-considered decision making on the basis of inadequate or incomplete information as well as the possibility for fraudulent, deceptive or manipulative acts or practices by a bidder and others." With this background in mind, the Court turns to an examination of the relevant facts and claims of the parties.

InterNorth commenced its original tender offer by summary publication in the *Wall Street Journal* and other newspapers on September 12, 1980. Under the terms of that offer, InterNorth proposed to pay $40.00 cash per share for up to 6,700,000 shares of Crouse-Hinds' common stock. The offer was not conditioned upon any minimum number of shares being tendered, but it was conditioned upon the termination

---

**126.** Additional withdrawal rights are also available for ten days once a competing offer is made. This ten day period is computed concurrently with existing withdrawal rights. *See* 17 C.F.R. § 240.14d–7(a)(2) (1980).

**127.** 15 U.S.C. § 78n(d)(5). Additional pro rata rights are available if voluntarily provided by the tender offeror. *See* C.F.R. § 240.14d–8 (1980).

**128.** 17 C.F.R. § 240.14d–3(a).

**129.** *See supra*, note 123.

**130.** *See* 17 C.F.R. § 240.14d–5 (1980).

**131.** 17 C.F.R. § 240.14e–1(b).

**132.** *See supra*, note 124 at 70,337.

of Crouse-Hinds' merger with Belden, or the rejection of the proposed Belden merger by the shareholders of either Crouse-Hinds or Belden. There were other commonly used conditions in the offering materials including: the filing of "adverse litigation," any major change in the target company's financial condition, and even the outbreak of war. Each of these conditions were waivable in InterNorth's sole discretion. InterNorth announced that the purpose of the tender offer was to acquire control and ultimately complete equity ownership of Crouse-Hinds. In this regard, InterNorth planned to follow its tender offer for Crouse-Hinds' shares with a second step merger. Pursuant to its terms, shares of Crouse-Hinds' common stock not purchased in the tender offer, would be exchanged for shares of InterNorth preferred stock with a market value of approximately $40.00 a share.

On September 15, 1980, Belden sued in the Circuit Court of Cook County, Illinois to enjoin InterNorth from proceeding with its tender offer for Crouse-Hinds' shares. The Court granted Belden's motion, and Inter-North was prohibited from taking further steps to proceed with its merger. Before the Illinois injunction was issued, Inter-North attempted to comply with the SEC rules with respect to disseminating tender offer materials, by requesting Crouse-Hinds to either provide InterNorth with the stockholder list and security position listings of Crouse-Hinds, or agree to mail to its security holders the offering materials. Crouse-Hinds declined to comply with InterNorth's request and invoked the terms of the Illinois injunction, which prohibited any direct or indirect publication of InterNorth's offer.

Nonetheless, between September 12 and 16, 1980, InterNorth was able on its own to mail out 3,129 sets of its tender offer materials to various nationally known brokerage houses, and certain banks and trust companies in New York City and central New York.[133] Some additional information on InterNorth's offer was disclosed to Crouse-Hinds' shareholders in a letter from Mr. Chris J. Witting, the Chairman of the Board and Chief Operating Officer of Crouse-Hinds, and in proxy materials disseminated on October 14, 1980 in connection with the Belden merger.[134]

In the meantime, on September 19, 1980, Crouse-Hinds filed a request with the Securities Bureau of the State of New York for a stay of InterNorth's tender offer, pending the outcome of a hearing and investigation pursuant to the New York Security Takeover Disclosure Act. New York Business Corporation Law § 1600, *et seq.* (McKinney 1980). On September 26, 1980, the New York State Attorney General ordered an investigation and public hearings be commenced concerning InterNorth's tender offer, and prohibited InterNorth from paying for shares of Crouse-Hinds pending completion of those proceedings. The Attorney General issued his findings on November 5, 1980, and required InterNorth to make some further disclosures. These included: the fact that the Attorney General was conducting an investigation pursuant to the Martin Act, New York General Business Law § 352 *et seq.* (McKinney 1968), into InterNorth's debenture offering—the likely method of financing the proposed merger—and that debenture holders may be entitled to restitution or recision if the debentures are subsequently found to be illegally issued; a clarification of InterNorth's intention with regard to the "Belden condition"; and additional financial information. On November 10, 1980, the Attorney General lifted his Order after InterNorth amended its purchase offer to reflect the Attorney General's desired changes. That same day, an appellate court in Illinois reversed the Circuit Court and vacated the injunction which had enjoined InterNorth from proceeding with its tender offer.

Two days later, on November 12, 1980, InterNorth amended its purchase offer by announcing: an extension of its offer to

---

**133.** Curtis affidavit, October 13, 1980 at ¶ 4.

**134.** Defendant's November 17, 1980 Memorandum in Opposition at p. 4.

purchase; an increase in the scope of its offer to any and all shares of Crouse-Hinds' common stock; the condition regarding Belden was waived, however, InterNorth would offer $40.00 a share if the Belden merger was terminated or rejected by Crouse-Hinds' shareholders, and $37.00 a share if it was not terminated or rejected; the amended offer would expire on November 21, 1980, eight business days later. The amended offer did not indicate the terms of a shareholder's withdrawal rights. As a final note, no shares were tendered to InterNorth under its original offer to purchase, and the Court is informed that some 13,000 shares have been tendered thus far under the amended offer. The lack of success of InterNorth's offer seems primarily attributable to the fact that the market price of Crouse-Hinds' stock (approximately $41.00) has been higher than InterNorth's offering price.

Crouse-Hinds claims that InterNorth improperly commenced its offer and has not cured the various defects in its amended offer. As a result, it says, Crouse-Hinds' shareholders have been uninformed as to the terms of InterNorth's tender offer, and have been hopelessly confused as to the extent of their rights as provided for in the SEC's rules. According to Crouse-Hinds, the summary advertisement InterNorth used to commence its offer improperly included the "Belden condition," in that the SEC's rules do not contemplate the publication of this type of information in summary advertisements. Thus, argues Crouse-Hinds, InterNorth should have proceeded by long-form publication, as provided in the rules, and since it did not, its tender offer is null and void. Crouse-Hinds also claims that the publication of one such condition is materially misleading, because it suggests that the tender offer was not subject to other conditions, which in actuality was not the case. In addition, Crouse-Hinds contends that the InterNorth offer is illegal in that, due to the Illinois Circuit Court's injunction, the InterNorth offer violated applicable SEC rules, since it has not been

open continuously for twenty business days, nor has InterNorth been able to receive shares of Crouse-Hinds' stock. This has caused further harm to its shareholders, argues Crouse-Hinds, in that their withdrawal and pro ration rights have been eclipsed. Crouse-Hinds states that the Illinois Court's injunction also prohibited InterNorth from complying with the SEC's requirement that tender offer materials be promptly disseminated to the shareholders of the target company.

Furthermore, Crouse-Hinds claims that the amended offer has not cured these deficiencies, but it has compounded them. Crouse-Hinds points to the fact that under its present terms, the amended offer will not be open twenty continuous business days, and asserts that the eight days provided is not a reasonable length of time for shareholders to make a decision whether to tender. Moreover, Crouse-Hinds complains that its shareholders will not be provided with their entitled opportunity to have fifteen days to withdraw their shares, and that the minimal withdrawal rights InterNorth is providing (under the sixty day rule) has not even been published in InterNorth's amended summary advertisement.

InterNorth maintains that it properly commenced its tender offer within the meaning of the Williams Act and the SEC rules, and that its amended offer comports with those rules as well. On the issue of the summary advertisement used in the original offer, InterNorth replies that the absence of a clear statement on the "Belden condition" would have been materially misleading to Crouse-Hinds' shareholders, since the Crouse-Hinds/Belden merger had only been announced three days previously. That announcement, in InterNorth's view, created great uncertainty in the marketplace as to the identity of InterNorth's target,[135] and whether InterNorth's tender offer was directed at Crouse-Hinds alone or Crouse-Hinds/Belden. InterNorth asks the Court to view the informative function of the summary advertisement in a more "reasonable" light than that urged by Crouse-

135. *See* Kies affidavit, October 13, 1980.

Hinds. According to InterNorth, a tender offeror has no assurance that every shareholder who reads a summary advertisement will also read the offer to purchase. It says a summary advertisement without any information on the "Belden condition" would have confused or misled those shareholders.

InterNorth claims further that it is a common practice in the marketplace to expand the information provided in the summary advertisements beyond the SEC's requirements. *See* Farris affidavit, October 13, 1980. At the same time, it contends that it had no practical alternative but to put the "Belden condition" in its summary advertisement. The Belden/Crouse-Hinds merger was an unexpected development, and InterNorth's position on this event could be more quickly communicated through a summary advertisement than a long-form publication, for which newspapers require more advance notice. Moreover, InterNorth states that to the extent possible, it complied with the SEC rules on disseminating offering materials. It additionally argues that the rules do not require that every shareholder be sent a copy of the materials, only those who make a request to that effect. InterNorth also responds that it has satisfied the "twenty-day" rule, because it has had its offer "open" for twenty days. It claims that the position advocated by Crouse-Hinds on the twenty day rule is untenable because it would mean that any time a tender offer was interrupted by a restraining order, such that a tender offeror was unable to actually take down tendered shares for even an hour, then an offeror would have to recommence its tender offer. Such a result, says InterNorth, would make the regulatory scheme unworkable.

In amending its offer, InterNorth contends that it fully satisfied the applicable SEC rules. As for the issue of withdrawal rights, InterNorth maintains that the initial fifteen day withdrawal period provided in the rules expired on October 7, 1980, but that any shareholder may still assert "conditional" withdrawal rights under the "sixty-day" provision of the Williams Act. In addition, InterNorth says that the ten day extension (eight business days) it provides

in the amended offer is a sufficient period of time for Crouse-Hinds' shareholders to consider whether to tender their shares. It claims that merely because it lowered its offering price does not mean that it must recommence its tender offer and keep it open for twenty continuous days. A holding to the contrary by this Court, it says, would disrupt the operation of the tender offer rules, and make financing more difficult for a tender offeror. For the most part, the Court must agree with Inter-North. The Court will begin its analysis with a consideration of the summary publication rules.

The Court cannot help but observe that, in view of the underlying purpose of the Williams Act, which "is designed to require full and fair disclosure for the benefit of investors," 2 U.S.Code & Ad.News 2811, 2813 (1968), the summary publication rules represent something of an anomaly. Despite the Act's stated legislative purpose, the summary publication rules do not necessarily permit a tender offeror to advertise information which, in its view or that of the marketplace, would be essential to an understanding of the terms of the offer. Instead, the tender offeror is "limited" by the SEC rules to only publish in the summary advertisement certain information as specified by the rules. If the offeror desires to publish any other information in its summary advertisement, then the long-form publication must be used.

As quoted above, when it designed the summary advertisement device, the SEC was concerned that if the summary advertisement were expanded beyond its present limits, its intended benefits would be eroded. The SEC believed that the more information included in a summary advertisement, the more it would resemble the long-form publication, with its attendant problems of delay in notification of the existence of a tender offer, cost, and publication scheduling. The SEC also concluded that target shareholders would not be harmed by the limit on information available through a summary advertisement, because the summary publication rules also require at the

same time that a tender offeror disseminate the various tender offer materials.

Nevertheless, viewed another way, the regulations on summary publications have a penalty built in for the tender offeror who is interested in advertising important information about the tender offer to the marketplace, that may or may not arguably fit into the categories of information provided in the SEC's restrictions on summary advertisements. That is, due to the peculiarities of the factual circumstances surrounding a tender offer or the complexities of its terms, an offeror is faced with the prospect of attempting to "fit" those facts or terms into the specified categories of information in the SEC's rules. If they do not, they must endure, as noted by the SEC in its release, the delay involved in publishing a long-form advertisement, and the resulting cost and publication scheduling problems.[136] Moreover, in those questionable situations where the information may or may not "fit," the tender offeror's decision as to what information should be included in a summary advertisement must be made under adverse circumstances. As Judge Friendly remarked in a related context:

> This means that the participants on both sides act, not 'in the peace of a quiet chamber,' *Hellenic Lines Ltd. v. Brown & Williamson Tobacco Corp.*, 277 F.2d 9, 13 (4 Cir.), cert. denied, 364 U.S. 879, 81 S.Ct. 168, 5 L.Ed.2d 102 (1960), but under the stresses of the market place. They act quickly, sometimes impulsively, often in angry response to what they consider, whether rightly or wrongly, to be low blows by the other side. Probably there will no more be a perfect tender offer than a perfect trial. Congress intended to assure basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions that might make

the new statute a potent tool for incumbent management to protect its own interests against the desires and welfare of the stockholders. These considerations bear on the kind of judgment to be applied in testing conduct—of both sides . . . .

*Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969); *accord Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1200 (2d Cir. 1978) (and cases cited therein).[137]

In devising its summary advertisement, InterNorth was confronted with the problem of quickly relating to the marketplace its position on whether it was unconditionally tendering for shares of Crouse-Hinds, in view of Crouse-Hinds stated intention to merge with Belden. InterNorth's interest in having its position known, was not motivated solely out of financial self-interest. Due to the timing of Crouse-Hinds' announced intention to merge with Belden, and InterNorth's announced intention to take over Crouse-Hinds, the marketplace was bound to wonder whether InterNorth was tendering for Crouse-Hinds alone, or Crouse-Hinds/Belden. At the same time, InterNorth did indeed have a position to relate to the marketplace—it did not want to purchase Belden along with Crouse-Hinds.

In one sense, this information fits loosely within two of the SEC's specified categories of information, since it relates to the identity of the "subject company" and the "purpose" of the offer. Due to the facts of this case, however, and InterNorth's position on the Crouse-Hinds/Belden merger, if InterNorth had published that it was merely tendering for "Crouse-Hinds" in its summary advertisement, this statement would have potentially misled the marketplace, and forced Crouse-Hinds' shareholders to

---

**136.** For these reasons and others, long form publications are not favored in the marketplace and are, therefore, rarely used. *See* Kies' letter, November 26, 1980.

**137.** The Court does not doubt that in the typical tender offer case, the parties are not only ably represented by expert counsel, but also well prepared for the financial burdens in-

volved. The typical tender offeror, therefore, will be well prepared to surmount the summary publication hurdle. However, inevitably there will be instances where the facts of a particular case will fall within the "grey area" of the rules, and the Court believes that this is one such case.

hazard a guess on InterNorth's position on the proposed merger. Moreover, such a guess would not have been made in circumstances that were without consequences. Under the terms of InterNorth's tender offer, were a Crouse-Hinds shareholder to vote in favor of the Belden merger, that vote was in effect against the success of InterNorth's tender offer.[138] Due to existing SEC rules, confusion would have reigned in the marketplace for at least three to five days. This is approximately how long it would have taken for InterNorth to send out its tender offer materials,[139] or have Crouse-Hinds do so, and for those materials to be received by Crouse-Hinds' shareholders. Furthermore, if InterNorth had proceeded as Crouse-Hinds suggests, by long-form publication, InterNorth would have had to delay its tender offer by two or three weeks. That is approximately the time period required for a company to schedule the publication of a long-form advertisement in a newspaper. *See* Kies letter, November 26, 1980.

 The Court does not believe that a tender offeror, when faced with this type of predicament, should be required to resolve all doubts on the "regulatory fit" of information which has an immediate and logical or factual relationship with the rule's explicit information categories, against the publication of that "additional information." Such a conclusion would be at the unnecessary expense of accuracy, rapid communication of the existence of a tender offer, and the fundamental purpose of the Williams Act, which is to ensure that the public makes investment decisions based upon full disclosure of information essential to that decision making process. Moreover, this seems an especially appropriate conclusion in this case when it is considered that if

InterNorth had not added the "Belden condition" to its summary advertisement, it is conceivable that Crouse-Hinds could have objected, and reasonably so, that the summary advertisement would have been inaccurate and misleading.

The Court appreciates that summary advertisements are only part of the method of summary publication, and that tender offerors are able to clarify any potentially misleading statements made in their summary advertisements through their tender offering materials, which under the SEC's rule must be forwarded to shareholders who request such materials. Still, the delay in getting these materials to the shareholders, and the attendant sacrifice of accurate information circulating in the marketplace in that interim, adds unneeded complexity to a transaction made under the intense "stresses of the market place." While the SEC is concerned that the expansion of summary advertisements beyond their present limits would "erode its intended benefits," this concern has not been translated into enforcement proceedings aimed at "cleaning-up abuses" of the summary advertisement rules. The Court presumes that the SEC realizes that an overstrict reading of the summary advertisement rules would "erode its intended benefits" as well, and force offerors to use the more cumbersome and less preferred long-form publication. One final point needs only brief mention. Although InterNorth was not able to disseminate all its tender offer materials through the use of shareholder lists or stock position listings as provided in the rules,[140] this fact will not defeat its offer. As already mentioned, the procedure outlined by the SEC's rules is not mandatory, but is only one available means of disseminating tender offer materials. There is no evidence before the Court to suggest that those materials

138. While withdrawal rights are the ultimate shareholder protection against making a decision without full and complete information, there seems little reason to take solace in an interpretation of the summary publication rule which, at the same time, is intentionally callous to the realities of the marketplace in that it creates confusion in the minds of shareholders, but justifies this result on the grounds that the

general regulatory scheme provides some fail-safe protection.

139. Whether it did so on it's own or through the method provided in the SEC's rules.

140. InterNorth had approximately 17,000 sets printed up. Curtis affidavit, October 13, 1980 at ¶ 2.

were insufficient in number to inform the public, or that they were not furnished with reasonable promptness by InterNorth.

As much as plaintiff has narrowly read the SEC's rules on summary advertisements, its reading of the "twenty-day" rule would appear even more so. Plaintiff argues vigorously that InterNorth's offer has not been open continuously for twenty business days because InterNorth has been unable, due to the Illinois Court's injunction, to receive tenders of shares. Thus, according to Crouse-Hinds, InterNorth must recommence its offer in order to comply with the SEC's rules. To support its position, Crouse-Hinds cites the language of the rule itself, a March 5, 1980 SEC interpretive release,[141] and the testimony of an SEC official in the case of *HB Holdings, Inc. v. Rosario Resources Corp.*, 80 Civ. 201 (S.D.N.Y. dismissed per stipulation February 13, 1980), in which the meaning of this rule was expounded upon.[142]

The Court believes that InterNorth's offer has satisfied the requirement that a tender offer remain open for twenty continuous business days, in spite of the Illinois Court's injunction. The language of the rule states: "no person who makes a tender offer shall: (a) Hold such tender offer open for less than twenty business days from the date such tender offer is first published or sent or given to security holders ..." While plaintiff interprets the word "open" to mean open and able to receive tendered shares, a reading of the language of the rule does not inescapably lead, as plaintiff would have the Court believe, to such a conclusion. Actually, the language of the rule is unclear. Some guidance as to the SEC's intent can be found in the prefatory language of the rule, which says that the SEC views the "twenty-day" rule "[a]s a means reasonably designed to prevent fraudulent, deceptive or manipulative acts

or practices ...." Moreover, an SEC release states:

There are several purposes to be served by Rule 14e–1(a). Tender offers which do not stay open for a reasonable length of time increase the likelihood of hasty, ill-considered decision making on the basis of inadequate or incomplete information as well as the possibility for fraudulent, deceptive or manipulative acts or practices by a bidder and others.

\* \* \* \* \* \*

Tender offers which do not remain open for a reasonable period may impede the effective operation of Regulation 14D. In particular, Rule 14d–4 contemplates methods of dissemination which require a considerable period of time to accomplish. Two of these methods, summary publication and the use of shareholder lists and security position listings, involve mailings to security holders. The latter method also requires transmittal to beneficial owners of the securities being sought of the bidder's tender offer materials through the facilities of brokers, banks and similar persons. Although these methods will provide improved dissemination of tender offer materials, mailing and transmittal will reduce the amount of time available to security holders to consider the tender offer materials. The Commission therefore believes a minimum period of twenty business days is necessary.

44 Fed.Reg. at p. 70,337.[143] Still another SEC release, in explaining the operation of the "twenty-day" rule, states that an "offer must remain open continuously from the date of commencement for at least the minimum twenty day business day period ...."[144] That same release indicates that a tender offeror cannot condition its offer on regulatory approval of the merger or utilize some other conditional term, but

**141.** SEC release No. 34–16,623, 45 Fed.Reg. 15,521 (1980).

**142.** *See* Crouse-Hinds Reply Memo on Withdrawal Rights and Twenty Day Rule, November 14, 1980 at pp. 23–25, and Exhibit "A" annexed thereto.

**143.** *See supra*, note 124.

**144.** *See supra*, note 141.

must "be willing at all times during its offer to accept shares for deposit. In order to have an offer, security holders must be in a position to accept the offer or tender for acceptance throughout the period of the offer." [145] And finally, the associate general counsel of the SEC testified in *HB Holdings* that "when you commence a tender offer you must be ready to at least receive shares, although you do not have to take them down." [146]

Certainly none of the SEC's releases specifically addresses the problem of the effect of a preliminary injunction entered after the commencement of a tender offer on the "twenty-day" rule. In looking at the language of the rule, SEC releases, and the *HB Holdings* testimony, it can only be concluded that the SEC's position on this matter has been consistent. The exact nature of the SEC's position, however, is less apparent. Still, the Court believes that this problem can be readily resolved by exploring the implications of plaintiff's view of the operation of the "twenty-day" rule. In this regard, the Court agrees with defendant that if the "twenty-day" rule were interpreted to mean that a tender offeror must be able to receive tendered shares for a continuous period of twenty business days, then any form of interruption for even an hour would make the offeror unable to keep its offer "open;" and consequently, a tender offeror would have to recommence the offer.

The benefit to the shareholder if such a view is adopted, is to ensure that their withdrawal rights would not be undermined, for example, as an injunction continued to restrain a tender offeror from taking down shares beyond the first fifteen days of the offer. Of course, that situation occurred here. Plaintiff has cited authority which concurs with the importance of withdrawal rights as a "safety value" to ensure that shareholders have had adequate time to consider the terms of the offer.[147] Yet, the Court believes that the existing withdrawal periods provided in the Williams Act sufficiently serve this purpose. In addition, if plaintiff's view of the "twenty-day" rule were adopted, it could possibly force the provisions of the Williams Act to overlap. For example, if a tender offeror had to recommence its offer two or three times, in the typical case sixty days would elapse, and the "conditional" withdrawal rights triggered sixty days into an offer would commence.[148] In plaintiff's view, at this point, a shareholder would have two separate types of withdrawal rights. A guaranteed withdrawal right under the fifteen day provision, and a "conditional" withdrawal right under the sixty day provision. The Court does not believe that Congress or the SEC [149] would have intended this result. To the extent that this appears to be merely a hypothetical situation and beyond the realm of probability, it should be considered that the facts of the instant case, in which only one "interruption" resulted, would cause just such an overlap if plaintiff's view of the "twenty-day" rule were adopted. Fur-

---

145. *Id.*

146. *See supra*, note 142.

147. The case of *Corenco Corp. v. Schiavone & Sons, Inc.*, 362 F.Supp. 939 (S.D.N.Y.), *aff'd in pertinent part*, 488 F.2d 207 (2d Cir. 1973) has been cited by plaintiff for the proposition that where shareholders are not supplied with appropriate financial information, a court should order an extension of the withdrawal period. *Corenco* is distinguishable from the instant case in that there the withholding of such information was both intentional and complete. Here, neither is the case. Moreover, not one share has been tendered under InterNorth's original offer. If in some way it can still be said the public has been harmed by the extent to which tender offer materials were dissemi-

nated by InterNorth under the original offer, the amended offer has cured this deficiency.

148. The Williams Act's sixty day withdrawal period commences "after sixty days from the date of the *original* tender offer . . . ." 15 U.S.C. § 78n(d)(5) (emphasis supplied).

149. The fifteen day withdrawal rule was promulgated by the SEC, and modified the seven day period provided in the Williams Act. It should also be noted that an amendment to an offer does not amount to a new offer necessitating that the offeror hold the offer open for twenty additional days. *McDermott, Inc. v. Wheelabrator-Frye*, 649 F.2d 489 (7th Cir., 1980).

thermore, the "twenty-day" rule was designed as a means of curbing "fraudulent, deceptive, or manipulative acts." This purpose would be ill-served if the Court agreed with plaintiff. For all a target company would have to do to frustrate a hostile takeover attempt would be to make timely applications to different courts or concerned state or federal agencies to enjoin the tender offer, for the sole purpose of forcing the offeror to start the offer over again. In fact, it would be to that target company's interest to repeatedly attempt to do so. It seems doubtful that the public would benefit from such a situation, because shareholders would be wondering whether they had learned of the "latest offer," or had received the latest version of the offering materials. That the present regulations seem ill-suited for such a result is further testimony against the adoption of plaintiff's position. And finally, the Williams Act was designed to avoid "tipping the balance" in the tender offer transaction in favor or against the tender offeror or the target company. Crouse-Hinds' version of the "twenty-day" rule would certainly work as a one-dimensional tool for the target company.

▮ Plaintiff's other arguments do little to aid its cause. With regard to the length of time InterNorth has provided in its amended offer, the SEC rules are silent as to a minimal time period requirement where an offeror decreases the offering price. The record in this case does not indicate that the public has been prejudiced, or the purpose of the SEC's rules frustrated, by the ten days InterNorth initially provided. Plaintiff's claim that the SEC rules required InterNorth to publish shareholder withdrawal rights is also without merit. As set forth in the rules, a summary advertisement which is published after the commencement of a tender offer need not include information on shareholder withdrawal rights.[150] Although the Court sympathizes with Crouse-Hinds' belief that this results in some confusion in the market-

place, the solution to this problem lies within the provinces of the SEC and not this Court. In sum, the Court finds that plaintiff has failed to demonstrate irreparable harm and either probable success on the merits, or sufficiently serious questions going to the merits so as to make them fair grounds for litigation, on its claims that InterNorth has violated the "summary publication" or the "twenty-day" rules of the SEC. The Court will next consider plaintiff's claim that InterNorth financed its tender offer by illegally issued debentures.

### VII.

Crouse-Hinds asserts that InterNorth plans to finance its tender offer by a debenture offering that was illegally issued. In June, 1980, InterNorth consummated a public offering of $250 million principal amount of 10¾% sinking fund debentures. According to Crouse-Hinds, in the prospectus issued in connection with the debenture offering, InterNorth concealed its intention to use the proceeds of the debenture offering to finance its imminent, and non-negotiated tender offer for Crouse-Hinds' shares. Crouse-Hinds claims that InterNorth accomplished this concealment by describing its intended use of those proceeds in the following language:

> The net proceeds from the sale of the Debentures offered hereby (the 'Debentures') will be added to the working capital of the Company and will be used for general corporate purposes, including possibly the financing of a portion of the Company's 1980 capital expenditure program (see 'Capital Expenditure Program') and possibly for acquisitions. Although the Company continues to examine the possibilities for expansion through acquisitions, it is not currently conducting any negotiations with respect thereto. Pending the utilization of the proceeds of the offering, the Company may invest all or part of such proceeds in short-term money market instruments.[151]

---

**150.** 17 C.F.R. § 240.14d–6(b).

**151.** McAmis affidavit, October 16, 1980, Exhibit 7 annexed thereto. Section VII of this opin-

Because InterNorth concealed the intended use of the proceeds, Crouse-Hinds contends that InterNorth violated Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e), in that it made a false statement "in connection with" a tender offer. Crouse-Hinds also claims that Inter-North violated the Federal Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*, and the New York State Martin Act, N.Y.Gen.Bus.Law § 352–c. Before the Court addresses plaintiff's claims more specifically, the legal basis of plaintiff's allegation will first be addressed.

Section 14(e) of the Securities Exchange Act in part provides:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

The phrases "material" and "in connection with" deserve further clarification. In view of the Supreme Court's definition of "materiality" in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 439, 96 S.Ct. 2126, 2127, 48 L.Ed.2d 757 (1976), the Second Circuit Court of Appeals has held that for purposes of Section 14(e), a misstatement or omission is "material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding" whether to accept the tender offer. *Prudent Real Estate Trust v. John Camp Realty, Inc.*, 599 F.2d 1140, 1146 (2d Cir. 1979) (Friendly, J.); *accord Seaboard World Airlines, Inc. v. Tiger Intern., Inc.*, 600 F.2d 355, 360 (2d Cir. 1979). The Court in *Prudent Real Estate* also found the fol-

lowing language of the *TSC Industries* opinion enlightening:

What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

*Id.* at 1147, *quoting TSC Industries, Inc. v. Northway, Inc., supra,* 426 U.S. at 449, 96 S.Ct. at 2132.[152]

Courts have held that to be material, a statement in a tender offer need not necessarily relate to a past or existing condition or event. In addition, a material statement may refer to a prospective event, even though that event may not occur, if there appears to be a reasonable likelihood that it may occur in the future. *Sonesta Int'l. Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 251 (2d Cir. 1973); *Gulf & Western Industries, Inc., v. The Great Atlantic & Pacific Tea Co., Inc.,* 476 F.2d 687, 697 (2d Cir. 1973); *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1298 (2d Cir. 1973); *Otis Elevator Co. v. United Technologies, Corp.,* 405 F.Supp. 960, 970–73 (S.D.N.Y.1975). The *Sonesta* Court also held:

A reasonable stockholder, once informed of the contingency, can then determine whether to assume the risk of its occurrence or nonoccurrence in accepting or rejecting the tender offer. Where the event, if it should occur, could influence the stockholder's decision to tender, the chance that it might well occur is a factor that should be disclosed to the investor for consideration in making his or her decision.

ion will cite all exhibits annexed to the McAmis affidavit as Pl Exh # ——.

**152.** *See also, Electronic Specialty Co. v. Inter-National Controls Corp.,* 409 F.2d 937, 948 (2d Cir. 1969); *Flynn v. Bass Bros. Enterprises,*

*Inc.,* 456 F.Supp. 484 (E.D.Pa.1978); *Spielman v. General Host Corp.,* 402 F.Supp. 190, 145–5 (S.D.N.Y.1915), *aff'd,* 538 F.2d 39 (2d Cir. 1976).

462

*Sonesta Int'l. Hotels Corp. v. Wellington Associates, supra,* at p. 251; *accord Otis Elevator Co. v. United Technologies Corp., supra* at p. 971. *See also, Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 871–72 (2d Cir. 1974).

 The focus of Section 14(e) proscriptions to those statements made "in connection with" a tender offer involves an overlapping concept to that of materiality. Thus, pre-offer communications or actions may be considered to have been made or accomplished "in connection with" a tender offer. *See Applied Digital Data Systems v. Milgo Electronic,* 425 F.Supp. 1145, 1155 (S.D.N.Y.1977). This view best comports with the purpose of the Williams Act which recognizes that an investor's decision to tender is more complex than a mere cash transaction. As reflected in the legislative history of the Act:

> the shareholder is forced to make a decision on the basis of a market price which reflects an evaluation of the company based on the assumption that the present management and its policies will continue. The persons seeking control, however, have information about themselves and about their plans which, if known to investors, might substantially change the assumptions on which the market price is based.

2 U.S.Code Cong. & Admin.News 2813 (1968). Certainly, disclosures made by an offeror in financing a tender offer may be materially significant by providing insight into the intentions or competence of the tender offeror's management, and at the same time, may be considered to be logically relevant and made "in connection with" the tender offer. *See Pargas, Inc. v. Empire Gas Corp.,* 423 F.Supp. 199, 209 (D.Md.), *aff'd,* 546 F.2d 25 (4th Cir. 1976) (financial disclosures made in conjunction with tender offer financing provided basis for issuance of a preliminary injunction). For example, plaintiff's allegations with respect to the legality of InterNorth's debenture offering raises the possibility that InterNorth may be subject to actions for recision or damages, and even criminal prosecution. If a shareholder believes that any of

these possibilities are likely to be borne out, it seems reasonable that this information would affect a decision whether to tender.

To fully appreciate the facts surrounding plaintiff's debenture claim, it will be useful to examine the "Use of Proceeds" provision for SEC Form S–16, which is the form used by InterNorth to register its disputed debenture offering with the SEC. The Form requires the issuer to

> State the principal purposes for which the net proceeds to the issuer from the securities to be offered are intended to be used, and the approximate amount intended to be used for each such purpose. *Instruction.* Details of proposed expenditures are not to be given; for example, there need be furnished only a brief outline of any program of construction or addition of equipment. If any material amount of other funds is to be used in conjunction with the proceeds, state the amount and sources of such other funds. If any material amount of the proceeds is to be used to acquire assets, otherwise than in the ordinary course of business, briefly describe the assets and give the names of the persons from whom they are to be acquired. State the cost of the assets to the issuer and the principle followed in determining such cost.

2 Fed.Sec.L.Rep. (CCH) ¶ 7292 at 6433–2. With this background in mind, plaintiff's claims will be examined in greater detail.

 Crouse-Hinds asserts that InterNorth's "use of proceeds" clause in its June, 1980 debenture offering was carefully crafted to conceal that (1) InterNorth had already decided to make a $500 million acquisition and would make this acquisition, if necessary, by a hostile tender offer, (2) Crouse-Hinds was the number one acquisition target, and (3) the debenture proceeds were to be used to fund the acquisition. None of these facts, says Crouse-Hinds, were disclosed in the debenture prospectus as required by the SEC regulations, nor were the consequences of this nondisclosure set forth in the Schedule 14D–1 form InterNorth was required to file in connection

with its tender offer. A summary of Crouse-Hinds' version of the events surrounding the issue of InterNorth's June, 1980 debentures follows.

In early 1979, InterNorth's management decided that a major acquisition in the $500 million range should be studied with a view towards diversifying InterNorth's business interests and guaranteeing future earnings and growth. To accomplish this end, a diversification department was established and headed by Louis Potempa, who reported to Herbert Sampson, a senior vice-president and chief development officer of Inter-North, and a member of its senior management Executive Committee. Because of the magnitude of the contemplated acquisition, in March of 1979, InterNorth for the first time retained an investment banking firm, Morgan Stanley & Company of New York City, to aid in the acquisition process. Morgan Stanley alerted InterNorth, even at this early date in the candidate selection process, that the type of company Inter-North would likely choose would not be interested in a "friendly" takeover. Inter-North also hired the law firm of Sullivan & Cromwell of New York City, to assist in its acquisition planning, and to educate Inter-North's management on tender offer techniques, and the common problems associated with hostile tender offers should that course be found to be necessary.

Potempa drew up a timetable calling for an extensive candidate selection process which was to begin in November, 1979, and end with the selection of a "prime" candidate by April, 1980. In March of 1980, InterNorth completed its winnowing process, and Crouse-Hinds was selected as Inter-North's "target." [153] After March, no other candidate was considered by InterNorth as a possible acquisition candidate. About that same time, InterNorth's management decided that it was willing to proceed unilaterally if it became evident that this was the only way to acquire Crouse-Hinds. Also at about this time, Morgan Stanley commenced a more detailed analysis of Crouse-Hinds, and the possible ways a

tender offer could be financed by Inter-North. Potempa's diversification department also began a more thorough analysis of Crouse-Hinds and retained consultants to aid them.

In the meantime, efforts continued elsewhere within InterNorth's management to devise a financing scheme that would permit InterNorth to both accomplish its diversification goals, and maintain InterNorth's debt/equity ratio and its senior debt "A" credit rating. This responsibility fell to InterNorth's chief financial officer, Dale Te Kolste, and its treasurer, Roy A. Meierhenry, who worked with Sampson and Potempa in considering financing alternatives. From the beginning of their deliberations, it was believed that long-term financing, including the issuance of debentures, would be required. By March 1980, it was determined that at least part of the anticipated acquisition should be financed by debenture proceeds. This conclusion was reached after various other financing methods such as short-term lines of credit, InterNorth's sale or use of its substantial holdings of Mobil Oil Company stock, were found to be either unavailable due to the credit tightening restrictions of the Federal Reserve Board, or inconsistent with InterNorth's objective to obtain an interest coverage ratio of 4.0.

On March 26, 1980, InterNorth's Board of Directors authorized the issuance of what was to be the June, 1980 debenture offering, for the purpose of funding its proposed acquisition of Crouse-Hinds. InterNorth eventually commenced its debenture offering and published its prospectus on June 5, 1980. Its underwriters were Goldman, Sach & Co., and Blyth, Eastman, Paine, Weber, Inc., both of New York City. Notwithstanding the fact that InterNorth had planned to use the debenture proceeds to fund a tender offer for Crouse-Hinds, Inter-North failed to disclose either facts in its debenture prospectus. Moreover, while the prospectus stated that InterNorth was not presently conducting negotiations with any company for purposes of an acquisition, this

---

**153.** *See e. g.* Pl. Exh. # 20, Sampson, Dep.

language disguised InterNorth's full intention to proceed with a hostile offer if it could not negotiate a merger with Crouse-Hinds.

The vagueness of InterNorth's "use of proceeds" clause can be contrasted with the following evidence which demonstrates the certainty of its plans. At a June 12, 1980 meeting of InterNorth's Management Executive Committee and before the debenture offering was closed, Sullivan & Cromwell presented a first draft of InterNorth's tender offer documents which was to be read and commented upon. The first draft states that the Crouse-Hinds' tender offer was to be financed with the proceeds of the debenture offering. Furthermore, Inter-North's internal financial planning forecasts and reports for the time period May through July, 1980 reveal that the June, 1980 debenture proceeds were not contemplated by InterNorth to be used either for its planned 1980 capital expenditure program or for reduction of InterNorth's short-term borrowings. Consequently, the only purpose these proceeds were intended to serve was financing the Crouse-Hinds' acquisition, a fact admitted by Te Kolste, InterNorth's vice-chairman of the board, and chief financial officer.

Crouse-Hinds argues that InterNorth's plans and proposals for a tender offer, though as yet unapproved by InterNorth's Board of Directors, had become sufficiently clear at the time the debenture prospectus was issued, so as to require InterNorth to disclose its highly developed intentions in its debenture prospectus. It is further claimed by Crouse-Hinds that because the debenture registration statement was made "in connection with" a tender offer, Inter-North had the obligation to avoid using "outright lies." In this regard, Crouse-Hinds contends that InterNorth not only did not tell the truth, it omitted material facts. For instance, the statement in the prospectus that InterNorth was not presently conducting any negotiations for a possible acquisition, was designed to suggest that an acquisition was not imminent. However, Crouse-Hinds argues that to avoid making this statement misleading, InterNorth should have stated that it was seriously considering a non-negotiated acquisition of Crouse-Hinds. In sum, Crouse-Hinds maintains that "[b]ecause of this and a number of other half-truths and conscious misdirections, the Debenture Prospectus flouts the requirements of Section 14(e) of the 1934 Act and violates, as well, the 1933 Act." (Footnote omitted).

The Court believes that the principal weakness of plaintiff's debenture scenario is that it bears no resemblance to the actual facts. A reasonable reading of the record readily transforms what Crouse-Hinds describes to be InterNorth's "outright lies," "half-truths and conscious misdirections," into reasoned and honest corporate decision-making. Plaintiff was only able to accomplish the above described version of the facts, by ignoring the import of three fundamental policy decisions that had been made by InterNorth's management, all of which were reflected in InterNorth's "use of proceeds" language. The first of these was that InterNorth's diversification program, from its inception, was designed to first narrow down the selection to a "best possible candidate," which would then be put to the test of a detailed "transactional analysis."[154] If this analysis demonstrated that the company was suitable, then it was to be chosen as InterNorth's "acquisition candidate." While Crouse-Hinds was selected by March or April of 1980 as Inter-North's "best possible candidate," Inter-North had yet to conduct its "transactional analysis" at the time of the June, 1980 debenture offering. In fact, this analysis was conducted throughout the summer of 1980. Thus, Crouse-Hinds had yet to be selected as InterNorth's "acquisition candidate" at the time of the June, 1980 debenture offering.

---

154. Pl Exh # 68, Allardice, Dep. at p. 59–62. Transactional analysis is explained *infra* at p. 87; Wallace, Dep. at pp. 286–289.

The second fundamental policy decision ignored by Crouse-Hinds in its debenture scenario was that InterNorth did not want to proceed with its acquisition through a hostile tender offer if at all possible. Moreover, since InterNorth had not decided upon an acquisition candidate by June, 1980, and therefore was not prepared to make an offer at that time whether hostile or friendly, the "use of proceeds" clause of InterNorth's debenture prospectus accurately described the status of InterNorth's acquisition program.[155] InterNorth was not, as of June, 1980, negotiating with any company for purposes of an acquisition. Actually, the decision to make a hostile tender offer for Crouse-Hinds was only made after the proposed Crouse-Hinds/Belden merger was announced on September 8, 1980.[156] Inter-North viewed it unlikely that Crouse-Hinds would be interested in negotiating a merger with InterNorth because of the Crouse-Hinds/Belden announcement.

Finally, the third policy "overlooked" by Crouse-Hinds in its debenture scenario is InterNorth's ongoing financial strategy. In general, InterNorth meets its capital needs by maintaining a "flexible" financing posture.[157] The first level of this approach subscribes to the view that the capital requirements of InterNorth should primarily be met through short-term borrowing. However, when InterNorth's short-term borrowing reaches a certain level—in the range of $200–$300 million—it is then supplemented by long-term debt. This usually takes the form of debentures or through draw downs on term loans already in place. By July of 1979, InterNorth had reached a point where for approximately four years it had functioned on such short-term borrowing, and was interested in replacing this debt with permanent financing. On July 10, 1979, InterNorth's Board of Directors authorized management to issue up to $200 million in debentures should market conditions become favorable. Although interest

rates were very high in the fall of 1979, by the spring of 1980 it became apparent to InterNorth's management that the market for a debenture issue was favorable, and consequently, on March 26, 1980, Inter-North's Board approved the June debenture issue.

Still, at the time the June, 1980 debentures were issued, the proceeds from those debentures were not earmarked for any particular purpose. This is because the second level of InterNorth's "flexible" financing approach is to be able to readily shift available sources of financing to achieve the maximum benefit to the corporation. Although InterNorth was concerned about reducing its short-term borrowing, it looked upon the debenture issue as only one available means to do so. It was perfectly willing, if it was in the best interests of the company, to use these same proceeds to fund capital expenditures, or finance an acquisition should that be eventually decided upon. Moreover, the debenture proceeds were not the only source of funds available to InterNorth. Its financing approach enabled it to combine and shift various forms and methods of funding at any given time to meet the company's total capital requirements. In sum, in spite of Crouse-Hinds' allegation, InterNorth's financing philosophy would have prevented it from committing the June, 1980 debenture proceeds to a Crouse-Hinds' acquisition, especially since InterNorth's acquisition plans were still inchoate at the time the debentures were issued. The factual predicate for these conclusions merits further examination.

InterNorth's decision to make a tender offer for Crouse-Hinds marked the culmination of a sophisticated acquisition selection process. The use of an acquisition to ensure corporate growth first received approval from InterNorth's management planning group in 1977. As the idea gained momentum, InterNorth's technical talent

---

155. *See e. g.* Pl Exh # 355, Te Kolste, Dep. at p. 159.

156. Warden affidavit, October 23, 1980, Exh # 52 annexed thereto. Section VIII of this

opinion will refer to exhibits annexed to the Warden affidavit as Def Exh # ——.

157. *See e. g.* Def Exh # # 62, 64, 66; Segnar, Dep.

was brought together under the auspices of a corporate development department. This group was to make recommendations to a corporate planning committee, which was to coordinate the project with InterNorth's treasury department, outside consultants, and financial and legal experts.[158] This process was in turn supervised by a management executive committee which, upon the approval of InterNorth's chairman of the board, would make an acquisition recommendation to InterNorth's board of directors.

These various committees and offices are filled by the following personnel: Willis A. Strauss is the chairman of the board and chief policy officer, and serves as ex-officio member of the management executive committee. The remaining members of that committee are Samuel F. Segnar, president, member of the board of directors, and chief executive officer, Dale Te Kolste, chief financial officer and vice chairman of the board, Herb M. Sampson, senior vice-president and chief development officer,[159] Rocco LoChiano, senior vice-president and chief technical officer, and John R. Becraft, executive vice-president of operations. Those officers reporting to Te Kolste included Roy A. Meirhenry, treasurer, Washington G. Thompson, controller, and Dean Wallace, general counsel. Louis Potempa is the vice-president of the diversification department (also known as corporate development), and he headed a seven member staff.

The corporate development group began its task by examining InterNorth's projected future revenues, net income, and capital expenditures, and thereafter developed a profile of an acquisition candidate that would compliment InterNorth in terms of management expertise, organizational structure, and growth potential.[160] By April, 1979 the corporate planning committee had developed "diversification criteria." This criteria favored a large acquisition of up to $500 million for equity, and preferably a cash transaction of a capital intensive company involved in the production and sale of capital goods and commodities. Even at this early date the committee indicated that "[t]he Company *does not desire an* unfriendly situation," (emphasis in original)[161] but that ruling out such a possibility would be too limited a course. The committee suggested that InterNorth rely on the advice of Morgan Stanley, its investment banker hired for purposes of the acquisition, for continuing advice on this subject.[162] Concern was also expressed that InterNorth be able to maintain its "A" credit rating, acceptable equity capitalization and earning levels, and that the transaction should be accomplished by a cash tender offer. Finally, the criteria indicated that the labor history of a target candidate would be an important consideration.[163]

The screening process continued through the summer and fall of 1979. A pool of 3,300 companies was whittled down by computer and by hand. In November, 1979 five "prospective targets" had been selected based upon the corporate development committee's criteria, and one of these companies was Crouse-Hinds. Three companies had, in addition, been identified as "target back-ups," which were smaller companies receiving "good marks" and could be investigated simultaneously with the "prospective targets." Moreover, six companies were identified as "special situations," in that they had an "extraordinary appeal" to InterNorth.[164]

In early December, 1979, Potempa had worked out a schedule in coordination with

---

**158.** The corporate planning committee eventually merged into the management executive committee.

**159.** Sampson reported to Segnar.

**160.** Def Exh # 5, Segnar, Dep.; Def. Exh # 6. InterNorth hoped the acquisition would guarantee 10% growth per year. Projections indicated that without an acquisition, InterNorth would only grow at a 8% rate. Pl Exh # # 47, 52.

**161.** Def Exh # 7; Pl Exh # 53, Te Kolste, Dep.

**162.** Def Exh # 7.

**163.** *Id.*

**164.** Def Exh # # 13, 14, 15, Potempa, Dep.

Morgan Stanley which set April 1, 1980 as the date by which the existing candidates would be narrowed down to one or two, and these names then would be reported to the management executive committee.[165] The narrowing process would be accomplished by an analysis of the candidates' financial performance, prospects and earning potentials. It was anticipated that outside industry consultants would have to be hired, and that Sullivan & Cromwell would be brought in after the first of the year for advice on target approach strategies. Alternate financing programs were also to be devised through the coordination of Morgan Stanley, and InterNorth's diversification and treasury departments. [166]

The April 1, 1980 date did not represent a deadline by which time one candidate would be selected. It was merely a time schedule that would assure that progress would be maintained. As described by Sampson, the April 1, 1980 date had the following significance:

> It refers to getting the material to the Executive Committee by the 1st of April to make a determination of the then appropriate acquisition candidate or candidates and you will note below that first paragraph [Pl Exh # 17] there's no reference to market studies. So that prior to the week of 17th of March, which is referred to as the target approach strategy, this time schedule was developed to pare down, if you please, the target candidates to a small enough number, hopefully one, but a small enough number that we could begin detailed market studies and all other factors that would go into the acquisition.

Def Exh # 19, Sampson, Dep. at 51–2.[167] An examination of the difference between the initial and detailed studies will prove useful. The initial studies were based on public financial information as provided in earnings records, annual reports, and form 10K's.[168] By contrast, the secondary studies included legal and "transactional analysis." The latter contained detailed studies of market shares, product lines, labor relations, the candidate company's board of directors, character of shareholdings, stock trading record, and the attractiveness of the company to other suitors. Thus, the initial analysis would enable InterNorth to choose one or two candidates, which would then be put to a legal and transactional analysis in order to produce the final acquisition candidate.[169] If one of those candidates did not emerge as suitable, InterNorth planned to go back to the list and conduct a further analysis of the remaining finalists.[170]

The process of further studying and narrowing of candidates continued in January and February of 1980.[171] By late February and on into March, both Sullivan & Cromwell and Morgan Stanley began to prepare InterNorth for the possibility that it would have to proceed by a hostile tender offer. InterNorth did not want to proceed with its offer in this manner, but it was advised that the type of company it was looking for—with a record of good earnings, management, and prospects—would probably not be interested in a friendly offer.[172] As Sampson testified: "[i]n February of 1980 we didn't necessarily contemplate this acquisition would be unfriendly, and we didn't gear our operation to that other than to become mentally prepared that, if that is ultimately the path it took, that we would be properly prepared." Def Exh # 23.

**165.** Def Exh # 17; Pl Exh # 65, Potempa, Dep.

**166.** Pl. Exh. # 23, Segnar Dep. at 60.

**167.** Def Exh # 120, Potempa, Dep.; Def. Exh. # 27, Sampson, Dep.; Pl Exh # 20, Te Kolste, Dep.; Def. Exh. # 65, Potempa, Dep.

**168.** Pl. Exh. # 20, Te Kolste, Dep.; Pl. Exh. # 68, Allardice of Morgan Stanley.

**169.** Segnar, Dep. at 59–62.

**170.** *Id.* at 62.

**171.** Def Exh # # 21, 22.

**172.** Def Exh # 24, Te Kolste, Dep. at 25.

In March 1980, the management executive committee selected Crouse-Hinds as the primary acquisition candidate for further study.[173] As a result, Potempa's staff intensified their study of Crouse-Hinds, and withdrew the outside consultants from studying the remaining two candidates. Moreover, the attention of the executive committee began to focus on the financing of the tender offer, and the possible problems that tight credit restrictions would create.[174] Various forms of financing were considered, but most were eliminated due to their probable effect on InterNorth's equity level, interest coverage ratio, and credit rating.[175] There appeared to be a general consensus among InterNorth's various executives that a debenture offering would be the best way to finance the tender offer.[176] At the board of directors meeting on March 26, 1980, Te Kolste and Meirhenry asked for and received authorization to issue $250 million worth of debentures. The board also approved management's request to issue up to $250 million in promissory notes in connection with a $250 million credit agreement with the Chase Manhattan Bank, which was in addition to the existing $300 million short-term lines of credit and a stand-by five and ¾ year term loan for $250 million. Management's request that the board reaffirm authority to use InterNorth's Mobil Oil Company stock in connection with the $200 million sale of debentures was granted as well.[177]

It cannot be emphasized enough that, despite InterNorth's desire to use debenture proceeds to fund a possible acquisition, at this point InterNorth had not committed itself to this form of acquisition financing, or for that matter to make an acquisition.

This was reflected in the fact that the board of directors had been informed by Strauss that the various funds were "needed to get into a position where cash was available," [178] but the board did not discuss or address the specific use of any of these funds for an acquisition. Instead, the funding requests came in the context of a review of the general financial needs of the company, and as already described, *supra* at 465, were in response to favorable money market conditions. Thus, according to Segnar, InterNorth's need for the new promissory notes and debentures "was part of our financing program that I had mentioned earlier. It was also to be prepared to pursue an acquisition if we decided to do so." [179] "But it was made very clear to our board that this was simply a process under way in our company. It didn't represent any final determination at all, and we wouldn't be in a position to recommend [a specific target] until we had completed our detailed studies." [180]

In April the studying process continued, and Crouse-Hinds remained the prime candidate.[181] By May, InterNorth's management was having its initial meetings in preparation for the debenture issue. Discussions were held on virtually every level of those involved in the diversification project on the "use of proceeds" section of the proposed debenture prospectus. An initial working group meeting was held on May 15, and attended by representatives of Goldman Sachs, Blyth Eastman Paine Weber, Sullivan & Cromwell, and Te Kolste and Meirhenry. The InterNorth officials were asked by the various financial and legal experts to give an indication as to the sta-

**173.** Def Exh # 25, Sampson, Dep. at 29; Allandice, Dep. at 25; Pl Exh # 25, Potempa, Dep.

**174.** Pl Exh # # 55, 71, 75, 77, 307, 309, 310, 311, 312.

**175.** Pl. Exh. # # 92, 95, Segnar, Dep. at pp. 94, 96, 97; Te Kolste, Dep. at 98, Meirhenry Dep. at pp. 98–100.

**176.** Pl. Exh. # 87, Potempa, Dep. at 88; Meierhenry, Dep. at 89; Sampson, Dep. at 90; Te

Kolste, Dep. at 317; Segnar, Dep. at pp. 105–06.

**177.** Pl Exh # 318.

**178.** *Id.*

**179.** Pl Exh # 319, Segnar Dep.

**180.** *Id.*

**181.** Pl. Exh. # 19, Sethness of Morgan Stanley, Dep.; Pl. Exh. # # 20, 78, Te Kolste, Dep.

tus of the acquisition selection process. The experts were informed that an acquisition was not imminent, and that the earliest InterNorth could go ahead with an authorization for an acquisition would be at the July board meeting; with a view towards making the actual acquisition by the end of 1980, if the company finally decided to so proceed. Even at this point, InterNorth had not committed itself one way or the other.[182] Te Kolste summarized the information conveyed by InterNorth's officials at that meeting:

> We told them as best as I can recall exactly what the situation was, namely that we had conducted a lot of studies, that no decision had yet been made that we did not know whether we would acquire another company or not, but that we had to maintain the financing flexibility to achieve that should that ultimately occur. I think we also told them that we were looking at a specific company, but that a lot of work remained before any decision would be made with respect to any such acquisition. We did not even tell them at that point that we were expecting to make the acquisition, hostile or otherwise.

Pl Exh # 355, Te Kolste, Dep.[183] The "use of proceeds" language drafted at that meeting, and in the concerted judgment of those involved, accurately reflected the status of InterNorth's acquisition process. The language was also approved by Segnar as being appropriate.[184]

The status of InterNorth's acquisition process did not change in any respect throughout June.[185] At a June 12, 1980 meeting the first draft of a proposed offer to purchase was prepared and circulated by Sullivan & Cromwell for discussion. The draft contained a "use of proceeds" section which listed debenture proceeds as the source of financing. The draft was circulated for comment, and was intended as a model to be worked from should a tender offer be decided upon; but it was not discussed at the time.[186] The draft, which was the first of six such drafts, was circulated for two reasons. First, in the words of Segnar, "[w]e felt that we should be prepared to move forward quickly if we should decide to recommend to the Board and if the Board approved this acquisition, and we were trying to shorten the time span as much as possible between the time the Board would approve and we could make the offer." Pl Exh # 337, Segnar, Dep. And secondly, the drafts were intended to be used as an educational tool for InterNorth's management, which was unfamiliar with the kinds of documents used in a tender offer.[187] Kies, affidavit, October 20, 1980, at 2. At approximately the same time, further preparations were being made in case InterNorth decided to proceed by a hostile tender offer.[188]

Still, the likelihood that InterNorth would proceed with a tender offer for Crouse-Hinds was considered remote, as addressed by Segnar in the following statement:

> No, it was obvious, in that time frame, that we were coming down to a decision point and where—let me say, six months earlier, there may have been one chance in 20 that we would have made an offer for Crouse-Hinds, we were getting down to the point where maybe there was one chance in five or six. Still a lot of bridges to cross but nevertheless it was coming to that point and I wanted us to

---

**182.** Pl Exh # 343, 345, Berry Dep. of Goldman Sachs.

**183.** This view of the status of the acquisition process and the meeting was confirmed by Meirhenry's testimony. Pl Exh # 356, Meirhenry, Dep. *See also*, Pl Exh # 358, Wallace, Dep. (To have said that the company had decided to proceed by hostile tender offer "would have been very misleading in my opinion").

**184.** Pl Exh # # 334, 337, Segnar, Dep.; Segnar, Dep. at 167.

**185.** Pl Exh # 364, Sampson, Dep.; Pl Exh # 388, Te Kolste, Dep.

**186.** Pl Exh # 324, Sethness, Dep.

**187.** Segnar, Dep. at 166.

**188.** Pl Exh # # 56, 58, Segnar, Dep.

be ready in the event we decided to make the offer now. I believe I pointed out earlier in the day that if we elected not to make an offer for Crouse-Hinds that we would expect to study another company and in time make an offer for that company or yet another one.

Segnar, Dep. at 165; and pp. 168–69.

In any event, the debentures were issued on June 18, 1980, and the proceeds were immediately segregated and placed into short-term money market instruments, in case InterNorth decided to proceed with an acquisition. The "use of proceeds" language of the prospectus stated clearly that InterNorth might do exactly this after the debentures were issued. However, as Te Kolste testified, "there was still no definitive decision or recommendation to the Board as to exactly how we would finance [an acquisition]. This did not come up until the September Board meeting." Te Kolste continued: "[w]e needed to have the funds available in the event we had to have the financial flexibility in the event a decision ultimately would be made to acquire [Crouse-Hinds].[189] And those funds were available for that purpose." Pl Exh # 322, Te Kolste, Dep. See also, Pl Exh # 328, Te Kolste, Dep.

In fact, even after the debentures were issued, InterNorth's plan to finance an acquisition by the use of the June, 1980 debentures was considered rather "speculative."[190] The possible need to fund an acquisition represented only part of InterNorth's immediate capital requirements. Others included: the continuing effort to retire short-term financing by permanent financing, and the ongoing capital program. Segnar described the situation this way:

That [the possible acquisition] was one thing going on in our company.

Something else going on was our ongoing business, our—let me say $400 million capital program, our continuing financing arrangements, and it was an excellent point in time, considering all of those things, to go to the market for 250 million dollars.

We would have needed to do that and wanted to do that with or without an acquisition. If there came to be an acquisition, we might use part or all of the money for the acquisition or we might not. If there never came to be one, we would use it in our ongoing capital program.

It isn't quite accurate to try to tie the two together. They simply were not tied together. At any rate, I would have to say that should events unfold, so that we would make an offer for Crouse-Hinds, we would very likely use some of the money for that.

Def Exh # 66, Segnar, Dep.[191]

InterNorth's "1980 Cash Forecast by Months" throughout the summer of 1980, demonstrates InterNorth's flexible financing approach. The forecasts for March-June planned to pay for capital expenditures through a draw down on its long-term loan or short-term borrowings.[192] As of July 23, 1980, the Cash Forecast showed the debenture proceeds as a source of funds to pay for capital expenditures.[193] By August 22, 1980, the term loan was scratched as an available means of financing, but the Forecast continued to list the debenture proceeds as a source of financing.[194] The fig-

---

**189.** Te Kolste put the chances of acquiring Crouse-Hinds at this time period at 50/50. Def Exh # 65, Te Kolste, Dep.

**190.** *Id.*

**191.** Def Exh # 65, Te Kolste, Dep.; Def Exh # # 62, 64, Segnar, Dep.

**192.** *See generally*, Appendix A to McAmis affidavit; Pl Exh # 406.

**193.** Def Exh # 70.

**194.** Def Exh # 72.

Previous projections reflected bank term loan draw downs of $150 million in August and $100 million in September. The decision to utilize in September the $250 million proceeds from the June debenture offering and avoid term loan draw downs in the interim if possible results in the August and September revisions as shown. The above projection does not provide for any additional long term financing during the period shown.

*Id.*

ures for September 10, 1980, which is after the decision to acquire Crouse-Hinds was made, reveal that the debenture proceeds were no longer listed as available for reducing short-term debt, and additional draw downs on the term loan were required.[195]

It was exactly this type of financial flexibility that InterNorth planned to rely upon if it, as it did eventually, decide to make a tender offer for Crouse-Hinds. InterNorth viewed the cash tender offer as the most desirable form of financing, and kept both internal and external sources of funds available, including additional debt, the sale of marketable securities, bank loans and, if necessary, even the issuance of preferred stock.[196] Based on its past track record, exactly which source of funding InterNorth would call upon to finance an acquisition would depend on InterNorth's overall capital requirements at the particular time, and general market conditions.

On July 8, 1980, InterNorth's Board of Directors met again.[197] Among the business considered was the status of the acquisition selection process. The issues discussed at the meeting are illustrative of the status of those efforts, approximately one month after InterNorth had issued its debentures, and the veracity of the accompanying prospectus with the disputed "use of proceeds" language. The Board invited Sampson, Meirhenry, Wallace, and Potempa into the meeting, as well as George Kern of Sullivan & Cromwell, Barry Allardice and Charles Sethness of Morgan Stanley. At the request of Strauss, the Morgan Stanley representatives were asked to discuss "certain practical aspects" of making an acquisition, which included a discussion of friendly tender offers. Information about

Crouse-Hinds was reviewed, although the company was not referred to by its name. In addition, the Morgan Stanley people offered analysis of various other companies which had recently been acquired by others. Next, Kern discussed acquisition procedures and "related legal matters," and incorporated an analysis of different cases involving hostile tender offers. Meirhenry also gave a presentation, and "reviewed various modes of financing a possible acquisition." The above individuals were then excused from the meeting.

At this point, Strauss asked the directors if they felt that management should continue to develop additional information about a possible acquisition. A consensus opinion was reached that "a possible hostile tender offer should not preclude management from proceeding with its objective of growth and further diversity of operations." The meeting was closed after it was agreed that "management should proceed" and report back at the next meeting. Strauss later testified that the purpose of the various reports and discussions on a possible acquisition was to educate the board. Crouse-Hinds entered the discussion only as a "mythical company," and in order to prepare the board on the problems associated with hostile tender offers. As is evident from the tenor of the July 8th board meeting, InterNorth's acquisition plans had yet to reach the level of probability or certainty. Despite Crouse-Hinds' allegations, even one month after InterNorth issued its debentures it had not decided on an acquisition target, the form of financing that would be used if the acquisition was made, or whether it would proceed by a friendly or hostile tender offer.

**195.** Def Exh # 73.
The previous projection [*i. e.*, August 22] reflected that during September the $250 million proceeds from the June debenture offering would be utilized in reducing short-term debt. The decision to draw down $100 million of bank term loans during September and $150 million during October and not to use the proceeds from the debenture offering to reduce short-term borrowings results in the September and October revisions as shown. The provided projections do not as-

sume any additional long term financing through September 1981.
*Id.*

**196.** Def Exh # 77, Te Kolste, Dep; Def Exh # 78, Meirhenry, Dep.

**197.** The following information is taken from the minutes of the July 8, 1980 board meeting, Pl Exh # 29, Pl Exh # 31, Strauss, Dep., and Wallace, Dep. at pp. 244–55.

Events after the July 8th board meeting lend further support to these conclusions. Studies on various aspects of Crouse-Hinds' business and labor relations were still in progress during the summer months. Specifically, a study was being conducted of Crouse-Hinds' projected real growth, and the results of this study were not presented to the management executive committee until late July or early August, 1980.[198] At the July 8th meeting, the board had also expressed concern about an acquisition candidate's labor relations, and a report on Crouse-Hinds' labor problems was conducted through the end of August.[199] After these studies were completed, the management executive committee met to consider the findings. At the same time, Segnar and Sampson visited Strauss in Oregon, and he was given a slide presentation of the financial data concerning Crouse-Hinds. This was the first time he was presented with such materials. The purpose of the meeting was to ask for further expenditures of time and money to conclude the ongoing studies of Crouse-Hinds, with the goal of reaching a consensus of the management executive committee and making a recommendation to the board.[200]

198. Def Exh # 37, 38, Potempa, Dep.

199. Def Exh # 40, Te Kolste, Dep.; # 41, 43, Sampson, Dep.

200. Def Exh # 44, Strauss, Dep.; # 43, Sampson, testimony before New York State Attorney General (NYSAG).

201. Def Exh # 45, 46, Segnar Dep. and NYSAG testimony; 47, Sampson Dep.

202. At that time we reviewed, first of all, our financial requirements for our existing operations for the next five years in detail, because this is the time of year that we determine our capital expenditure requirements and authorize the profit centers varying amounts. This is done firmly for the next year and next, 1981, and we also give them an idea as to our thinking of the capital that they will receive for various projects over the next two years. And next that's 1982 and 1983.

We had detailed discussions of those projects and of the various financial aspects, primarily the earnings per share that would result from our existing operations over this period of time.

Another hurdle that InterNorth had not crossed was its August budget meetings. Every August, each of InterNorth's five operating divisions and subsidiaries make presentations to the management executive committee on proposals concerning business opportunities within their industries.[201] Decisions are then made after these hearings as to the level of capital funding to be provided to each operating group during the next year, and estimates are made for the following two years. Until these needs were established, InterNorth was not prepared to make any decision with respect to an acquisition. As Segnar testified: "[b]efore we had the [budgetary] meetings, under at least my administration, it's impossible to consider such an offer [such as for Crouse-Hinds] or to make a decision to make it." Def Exh # 45, Segnar, Dep.

During the first week of September, InterNorth's management executive committee met for four consecutive days and reviewed the information and studies generated during the previous months. The executive committee reviewed the different factors that went into its consideration of the prospective acquisition of Crouse-Hinds. The nature of these deliberations was extensive, and was described by Sampson as set forth in the margin.[202] After the meet-

We also reviewed our 10-year forecast, and following that, we reviewed a number of aspects of Crouse-Hind's looking at the market in detail, which appear in documents that we ultimately submitted to the Board on September 9th . . . .

We decided then about Thursday or Friday of the week of September 2nd that the Management Committee would recommend to the Board of Directors the acquisition of Crouse-Hinds and I might insert parenthetically, up until this time Northern's Board of Directors, to my knowledge, had never heard the name, Crouse-Hinds, from any of Northern's Management people.

As a result of those deliberations, during the week of September 2nd, we prepared the documents for presentation to the Board of Directors over the weekend prior to the Board meeting on September 9th.

We also instructed Sullivan [& Cromwell] at that point to prepare the documents.

We had received in August a final report . . . on the status of the union situation at Crouse-Hinds, including any actions or complaints or strikes that occurred over a num-

ing, Segnar advised Strauss that the executive committee was recommending that InterNorth proceed with an acquisition of Crouse-Hinds. Following discussions about financing and the views of InterNorth's advisors, Strauss gave his approval for presentation of the committee's recommendation to the board of directors.[203] On September 9, 1980, InterNorth learned, for the first time, of the proposed merger between Crouse-Hinds and Belden. Because InterNorth knew little about Belden, Segnar, with the concurrence of Kern and the executive committee, decided to make the recommendation to the board.[204] That same day, after two hours of discussions, the board accepted management's recommendation, and voted to authorize the making of an offer to purchase 6,700,000 shares of Crouse-Hinds common stock,[205] on the condition that the Crouse-Hinds/Belden merger would not be consummated. Prior to the Belden developments, InterNorth had intended to communicate with Crouse-Hinds presumably in an effort to negotiate a deal.[206] However, because of the announcement of the proposed merger with Belden, it was decided that Crouse-Hinds would not be interested in disavowing its agreement with Belden. Consequently, the board decided to proceed unilaterally in a tender offer for Crouse-Hinds.

The Court is convinced that the above presentation overwhelmingly demonstrates that the "use of proceeds language" accurately reflects InterNorth's purpose in making its debenture offering. InterNorth was correctly advised by counsel and its financial experts that the "proceeds" language properly conformed to the contingent nature of InterNorth's plans, and to the applicable SEC instructions on the manner in which the purpose of a securities issue must be described. Crouse-Hinds' claims to the contrary are completely unfounded in both fact and law.[207] The last issue to be considered is Crouse-Hinds' allegation that InterNorth has failed to disclose material environmental liabilities.

### IX.

 Crouse-Hinds' final claim is that InterNorth's Schedule 14D–1 [208] fails to disclose potential material liabilities and contemplated governmental proceedings for non-compliance with environmental requirements. The factual basis of plaintiff's assertions lies in InterNorth's supposed environmentally unsound operation of the Northern Petrochemical Company (Northern) in Morris, Illinois. Crouse-Hinds contends that disposing of waste products from the various chemical processes employed at the Morris facility has generated multiple environmental problems which InterNorth has failed to disclose in any of its periodic filings as required by the SEC. These problems include significant contingent liabilities and contemplated governmental procedures resulting from InterNorth's violation of federal and state environmental laws.

---

ber of years past. I believe that report is also in the documents that we have submitted.
We made several financial studies during that week of September 2nd, relating to Crouse-Hinds and how a proposed acquisition would be financed.
We decided during that week, for a variety of reasons that we would use both cash and preferred stock and that the preferred stock would be non-convertible preferred stock.
We then looked at Crouse-Hinds, the acquisition of Crouse-Hinds over a ten-year period melded into the entire InterNorth operation and reviewed the figures in detail as to the financial impact that Crouse-Hinds would have on the total InterNorth operations.
Def Exh # 47, Sampson, Dep.; see also, Def Exh # 48, Segnar, Dep.

**203.** Def Exh # 49, Strauss, Dep.

**204.** Wallace, Dep. at 277–280; Def Exh # 48, Segnar, Dep.

**205.** Def Exh # 51, minutes of September 9, 1980 board meeting.

**206.** Def Exh # 52, Segnar, Dep.

**207.** For this reason, the Court need not address the question of irreparable harm with regard to the debenture offering.

**208.** 17 C.F.R. § 240.14d–100 (1980).

As an example, Crouse-Hinds points to Northern's use of a pond at the Morris facility, into which Northern has been dumping gypsum. Crouse-Hinds claims that clean-up costs for the "gypsum pond" could total $55 million. Such a liability, says Crouse-Hinds, is material and should have been disclosed by InterNorth in its Schedule 14D–1 statement. Crouse-Hinds further maintains that InterNorth has not disclosed contemplated proceedings in which the government is a party, or Inter-North's policy of actively resisting environmental regulations which it considers unreasonable.

■ For the most part, the SEC's environmental disclosure requirements are summarized in Release No. 5704 and 12414, May 6, 1976 [209] as follows:

(1) disclosure of the material effects that compliance with federal, state and local provisions which have been enacted or adopted regulating the discharge of materials into the environment, or otherwise relating to the protection of the environment, may have upon the capital expenditures, earnings and competitive position of the registrant and its subsidiaries; and

(2) disclosure of any administrative or judicial proceedings known to be contemplated by governmental authorities and arising under federal, state or local provisions which have been enacted or adopted regulating the discharge of materials into the environment, or otherwise relating to the protection of the environment, or any other material pending administrative or judicial proceeding. Any proceeding brought by a governmental authority is deemed material.

(3) all other environmental information of which the prudent investor ought reasonably to be informed.

Unfortunately, the force of plaintiff's argument begins to lose momentum at this junc-ture. These particular rules are not applicable to a Schedule 14D–1, but are instead to be followed in completing SEC forms S–1, S–2, S–7, S–9, Form 10 and Form 10–K.[210] Thus, InterNorth did not have to comply with the above SEC rules in the course of completing its tender offer materials.

However, InterNorth would be subject to existing Schedule 14D–1 requirements, and those of Section 14E,[211] which obligate it to avoid misstating or omitting material facts. *Sonesta Int'l Hotels Corp. v. Wellington Assoc.*, 483 F.2d 247, 251 (2d Cir. 1973). *See* cases and discussion, *supra* at 461–462. It could be argued that liabilities of the type complained of by plaintiff would have to be disclosed in some form, either as an offset against earnings, or as an expense under capital expenditures. But such a claim in this case would do little to aid plaintiff's cause because it has not alleged that InterNorth has failed to disclose an environmental liability or penalty, contingent or otherwise, which has been determined or assessed against InterNorth by an environmental agency. Nor has Crouse-Hinds shown that InterNorth is not complying with some undisclosed legal requirement that has caused its statement of earnings to be materially inflated. Moreover, plaintiff has not demonstrated that Inter-North is the subject of a lawsuit or the type of proceeding by an environmental agency that would result in material damages, fines, or penalties, and which were not disclosed.

In addition, plaintiff's case support is inapposite to the matters at hand. The case of *In re Occidental Petroleum Corporation*, Exchange Act Release No. 34–16950, [Current] Fed.Sec.L.Rep. (CCH) ¶ 82,622 bears little resemblance to the facts of the instant case. The *Occidental* case involved an administrative proceeding commenced by the SEC against Occidental alleging that the

**209.** Plaintiff's Environmental Brief, Exhibit 2 annexed thereto.

**210.** *Id.*

**211.** 15 U.S.C. § 78n(e).

company failed to file accurate Form 10–K's and other reports. Apparently, Occidental had failed to disclose that it was the subject of numerous environmental lawsuits seeking millions of dollars in damages, and administrative proceedings in which findings of statutory or regulatory violations were made and formed the basis of penalties and fines. Furthermore, over the course of four years, Occidental had failed to disclose the pendency of any of 90 administrative environmental actions brought against it. The second case plaintiff cites is *In re United States Steel Corp.*, [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 82,319 (1979), and is similar to the *Occidental* case. In this second case, however, the company failed to disclose in its Form 10–K estimates of future material expenditures—ranging at $1 billion—which were required to meet environmental standards. Also, the company did not disclose certain environmental proceedings, some of which had been initiated by the company; the issuance of formal notices of violation and the capital costs associated with bringing the company into compliance; and the company's general policy of delaying capital expenditures as much as possible even though such an approach was in violation of the regulations.

By comparison, plaintiff has not made the same type of allegations here. It does point to the fact that InterNorth has been issued a notice of violation by the federal Environmental Protection Agency,[212] but this may very well lead to a negotiated settlement, as is often the case.[213] Crouse-Hinds also cites a letter from the Illinois EPA that InterNorth is not complying with applicable regulations on "special waste," and was warned that if it continued to do so the matter would be referred to the EPA's legal department.[214] There is no evidence to suggest that defendant intends to pursue a course of conduct, and that would make such a suit necessary.

■ The substance of plaintiff's claims are actually weaker than this. Plaintiff asserts that InterNorth *could* be the subject of the types of proceedings involved in *Occidental* and *United States Steel* due to the manner in which it presently operates its Morris facility. The Court does not believe, however, that this is the appropriate forum or time to conduct a de novo review of InterNorth's alleged flouting of the environmental laws, or to estimate the type of penalties to which InterNorth may be subject. As a threshold matter, this type of analysis is best left to an environmental agency, which is invested with the expertise and facilities to resolve such questions. Moreover, even if the Court were to embark on such a course, it would be highly speculative to find InterNorth liable under the environmental laws, assess a penalty, and then find this penalty should be disclosed under the securities laws. If plaintiff would have the Court do so (and presumably sit as an environmental agency would in such a case) the pointlessness of such a task becomes obvious. An environmental agency has a variety of enforcement mechanisms at its disposal, only one of which would involve penalizing the environmental offender, and might just as well pursue a less drastic course. Moreover, a settled environmental action has little significance for the typical investor. In any event, the Court believes that the instant record is inadequate to justify a judgment one way or the other. As a final note, the SEC is empowered to design and enforce rules and regulations which fulfill its responsibilities under the environmental laws and protect the public interest.[215] Existing rules appear to adequately meet the SEC's mandate, without this Court writing new ones especially applicable in the context of a tender offer.

**212.** *See generally*, Plaintiff's Proposed Findings of Facts and Conclusions of Law on Environmental Disclosure Issues.

**213.** *In re United States Steel* at p. 82,381.

**214.** *Id.*

**215.** *See generally*, SEC Releases No. 5704 and 12414, May 6, 1976.

## APPENDIX 1

| Product | Crouse-Hinds Market Share | Four-Firm (concentration) |
|---|---|---|
| Hazardous conduit fittings | 30% | 85% |
| Hazardous starters | 30% | 80% |
| Hazardous panels | 30% | 80% |
| Hazardous receptacles | 40% | 80% |

### CROUSE–HINDS COMPANY AND INDUSTRY SALES DATA

#### 1978 SALES

**RIGID CONDUIT FITTINGS:**

| PRODUCT SIC CODE | PRODUCT DESCRIPTION | INDUSTRY SALES $ | C–H SALES $ | C–H % SHARE |
|---|---|---|---|---|
| 3644251 | CAST CONDUIT BODIES, COVERS AND GASKETS | $45,926,000 | $18,880,000 | 41.1% |
| 3644253 | COUPLINGS, CONNECTORS AND UNIONS | $24,810,000 | $8,937,000 | 36.0% |
| 3644254 | LOCKNUTS AND BUSHINGS | $14,004,000 | $1,323,000 | 9.4% |
| 3644259 | ALL OTHER RIGID CONDUIT FITTINGS | $19,696,000 | $8,752,000 | 44.4% |

### CROUSE–HINDS COMPANY AND INDUSTRY SALES DATA

#### 1978 SALES

**VEHICULAR AND PEDESTRIAN TRAFFIC CONTROL EQUIPMENT:**

| PRODUCT SIC CODE | PRODUCT DESCRIPTION | INDUSTRY SALES $ | C–H SALES $ | C–H % SHARE |
|---|---|---|---|---|
| 3662342 | SIGNAL HEADS, INCLUDING PARTS AND ACCESSORIES | $26,005,000 | $3,062,000 | 11.8% |
| 3662343 | ELECTRONIC AND ELECTROMECHANICAL CONTROLLERS, DETECTORS AND SENSORS, PARTS AND ACCESSORIES | $82,374,000 | $8,112,000 | 9.8% |

### CROUSE–HINDS COMPANY AND INDUSTRY SALES DATA

#### 1978 SALES

**OTHER INDUSTRIAL LIGHTING TYPES SUCH AS EXPLOSION–PROOF, VAPOR–PROOF, DUST–PROOF:**

| PRODUCT SIC CODE | PRODUCT DESCRIPTION | INDUSTRY SALES $ | C–H SALES $ | C–H % SHARE |
|---|---|---|---|---|
| 3646316 | INCANDESCENT (INCLUDING PORTABLE) | $23,172,000 | $7,500,000 | 32.4% |
| 3646317 | FLUORESCENT (INCLUDING PORTABLE) | $22,920,000 | $1,087,000 | 4.7% |
| 3646319 | MERCURY AND OTHER HIGH INTENSITY DISCHARGE TYPES (including integrally mounted and remote ballasts) | $34,759,000 | $19,307,000 | 55.5% |

NOTE: Explosion-proof motor control, circuit breaker and instrument cast metal and plastic enclosures are not included above. (No specific 7-digit SIC codes exist.)

## CROUSE–HINDS COMPANY AND INDUSTRY SALES DATA

### 1978 SALES

HEAVY DUTY INDUSTRIAL PLUGS AND RECEPTACLES:

| PRODUCT SIC CODE | PRODUCT DESCRIPTION | INDUSTRY SALES $ | C–H SALES $ | C–H % SHARE |
|---|---|---|---|---|
| 3643020 | Pin and Sleeve Convenience and Power Outlets – General Purpose (120 volts and over, 20 amps and over) | $11,735,000 | $4,513,000 | 38.5% |
| 3643021 | Pin and Sleeve Attachment Plug Caps – General Purpose (120 volts and over, 20 amps and over) | $11,148,000 | $5,291,000 | 47.5% |
| 3643022 | Pin and Sleeve Connector Bodies – General Purpose (120 volts and over, 20 amps and over) | $2,224,000 | $779,000 | 35.0% |
| 3643023 | Pin and Sleeve – Dust and Explosion Proof Convenience and Power Outlets (120 volts and over, 20 amps and over) | | | |
| 3643024 | Pin and Sleeve – Dust and Explosion Proof Attachment Plug Caps (120 volts and over, 20 amps and over) | $13,261,000* | $4,650,000* | 35.1%* |
| 3643025 | Pin and Sleeve – Dust and Explosion Proof Connector Bodies (120 volts and over, 20 amps and over) | | | |
| 3643026 | Pin and Sleeve – Less than 120 volts, Less than 20 amps – All types, Excluding Electronic | | | |

*Revised

## CROUSE–HINDS COMPANY AND INDUSTRY SALES DATA

### 1978 SALES

CAST METAL BOXES, COVERS, GASKETS AND ACCESSORIES:

| PRODUCT SIC CODE | PRODUCT DESCRIPTION | INDUSTRY SALES $ | C–H SALES $ | C–H % SHARE |
|---|---|---|---|---|
| 3644341 | FS AND FD SWITCH AND RECEPTACLE TYPE | $9,448,000 | $3,692,000 | 39.1% |
| 3644342 | OUTLET TYPE | $22,354,000 | $7,637,000 | 34.2% |
| 3644343 | JUNCTION TYPE | $24,363,000 | $3,511,000 | 14.4% |

*NEMA BASIS

CROUSE–HINDS COMPANY AND INDUSTRY SALES DATA

1978–79 SALES

VEHICULAR AND PEDESTRIAN TRAFFIC CONTROL EQUIPMENT:

| PRODUCT DESCRIPTION | | INDUSTRY SALES $ | C–H SALES $ | C–H % SHARE |
|---|---|---|---|---|
| SIGNALS | 1978: | $20,910,000 | $3,093,000 | 14.8% |
| | 1979: | $23,810,000 | $4,187,000 | 17.6% |
| CONTROLLERS | 1978: | $34,605,000 | $7,853,000 | 22.7% |
| | 1979: | $36,633,000 | $9,207,000 | 25.1% |
| SUPERVISORY EQUIPMENT, DETECTION DEVICES, | 1978: | $22,095,000 | $261,000 | 1.2% |
| PARTS AND ELECTRIC INFORMATIONAL SIGNS | 1979: | $26,252,000 | $688,000 | 2.6% |

*NATIONAL ELECTRICAL MANUFACTURERS ASSOCIATION

# EC&M 1979 BRAND PREFERENCE STUDY

ELECTRICAL CONTRACTORS

CAST CONDUIT BODIES (FS, L, T, C, etc.)

22A

| Manufacturers | (subsidiary/brand component – current year) | Year | Rank | Bar Chart History – % Total Weighted Mentions | % Total Weighted Mentions | % First Choice Mentions | Percent of Respondents Mentioning |
|---|---|---|---|---|---|---|---|
| CROUSE-HINDS | | 1979 | 1 | XXXXXXXXXXXXXXXXXXXX@@@@@@@@@@@@@@@XXXXXXXXXX | 30.2 | 36.2 | 55.9 |
| | | 1977 | 1 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 33.3 | 41.6 | 58.4 |
| | | 1975 | 1 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 39.4 | 48.4 | -- |
| | | 1973 | 1 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 36.2 | 43.2 | -- |
| | | 1971 | -- | | -- | -- | -- |
| APPLETON ELECTRIC | | 1979 | 2 | XXXXXXXXXXXXXXXXXXXXXXXXXXX | 24.7 | 20.0 | 49.4 |
| | | 1977 | 2 | @@@@@@@@@@@@@@@@@@@@@@@@@ | 21.3 | 18.6 | 42.3 |
| | | 1975 | 2 | @@@@@@@@@@@@@@@@@@@@@@@@@ | 22.1 | 16.3 | -- |
| | | 1973 | 2 | @@@@@@@@@@@@@@@@@@@@@@@@@ | 22.3 | 16.9 | -- |
| | | 1971 | -- | | -- | -- | -- |
| KILLARK ELECTRIC MFG | | 1979 | 3 | XXXXXXXXXXXXXXXXXXXXXXXX | 19.5 | 20.0 | 40.4 |
| | | 1977 | 3 | @@@@@@@@@@@@@@@@@@@@@@ | 19.5 | 16.5 | 39.4 |
| | | 1975 | 3 | @@@@@@@@@@@@@@@@@ | 14.7 | 14.0 | -- |
| | | 1973 | 3 | @@@@@@@@@@@@@@@@@@@@ | 17.1 | 16.3 | -- |
| | | 1971 | -- | | -- | -- | -- |
| MASON L E RED DOT | ( 7.9%TWM, 7.2%FCM, 17.4%RM) | 1979 | 4 | XXXXXXXXX | 8.2 | 7.6 | 18.1 |
| | | 1977 | 4 | @@@@@@@@@@ | 9.1 | 10.4 | 16.8 |
| | | 1975 | 4 | @@@@@@@@ | 6.6 | 5.6 | -- |
| | | 1973 | 5 | @@@@@ | 4.3 | 4.3 | -- |
| | | 1971 | -- | | -- | -- | -- |
| SQUARE D BELL ELECTRIC | ( 4.0%TWM, 4.9%FCM, 7.2%RM) | 1979 | 5 | XXXXX | 4.0 | 4.9 | 7.2 |
| | | 1977 | 6 | @@@@@ | 3.8 | 3.2 | 7.9 |
| | | 1975 | 6 | @@@@@ | 3.9 | 4.0 | -- |
| | | 1973 | 4 | @@@@@@ | 4.4 | 5.2 | -- |
| | | 1971 | -- | | -- | -- | -- |
| GENERAL SIGNAL OZ/GEDNEY | ( 3.2%TWM, 2.3%FCM, 6.8%RM) | 1979 | 6 | XXXX | 3.2 | 2.3 | 6.8 |
| | | 1977 | 7 | @@@ | 2.4 | 1.8 | 6.1 |
| | | 1975 | 7 | @@@ | 2.6 | 2.3 | -- |
| | | 1973 | 7 | @@@ | 2.5 | 2.1 | -- |
| | | 1971 | -- | | -- | -- | -- |
| GOULD EFCOR | ( 2.5%TWM, 2.3%FCM, 5.7%RM) | 1979 | 7 | XXX | 2.7 | 2.3 | 6.0 |
| | | 1977 | 5 | @@@@@ | 3.8 | 3.9 | 7.2 |
| | | 1975 | 5 | @@@@@ | 4.0 | 4.0 | -- |
| | | 1973 | 6 | @@@@ | 2.8 | 2.4 | -- |
| | | 1971 | -- | | -- | -- | -- |
| RACO | | 1979 | 8 | XX | 1.2 | 0.8 | 3.0 |
| | | 1977 | -- | | -- | -- | -- |
| | | 1975 | -- | | -- | -- | -- |
| | | 1973 | -- | | -- | -- | -- |
| | | 1971 | -- | | -- | -- | -- |
| OTHERS | | 1979 | -- | XXXXXXXX | 6.3 | 6.0 | 13.6 |

-- INDICATES NOT RANKED

©1979 McGraw-Hill, Inc.—All rights reserved

# EC&M 1979 BRAND PREFERENCE STUDY

**CAST CONDUIT BODIES (FS, L, T, C, etc.)** 22B

## PLANT ELECTRICAL MEN

| Manufacturers | (subsidiary/brand component – current year) | Year | Rank | Bar Chart History – % Total Weighted Mentions | % Total Weighted Mentions | % First Choice Mentions | Percent of Respondents Mentioning |
|---|---|---|---|---|---|---|---|
| CROUSE-HINDS | | 1979 | 1 | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX@@@@@@@@@@@@@@@@@@XXXXXXXXXXX | 46.3 | 58.7 | 77.5 |
| | | 1977 | 1 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 48.6 | 63.7 | 82.7 |
| | | 1975 | 1 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 48.8 | 64.6 | -- |
| | | 1973 | 1 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 46.9 | 61.2 | -- |
| | | 1971 | -- | | -- | -- | -- |
| APPLETON ELECTRIC | | 1979 | 2 | XXXXXXXXXXXXXXXXXXXXXXXX | 24.7 | 18.3 | 50.6 |
| | | 1977 | 2 | @@@@@@@@@@@@@@@@@@@@@@@@@@ | 26.4 | 18.5 | 54.8 |
| | | 1975 | 2 | @@@@@@@@@@@@@@@@@@@@@@@@ | 24.3 | 14.6 | -- |
| | | 1973 | 2 | @@@@@@@@@@@@@@@@@@@@@@@@@ | 25.0 | 18.1 | -- |
| | | 1971 | -- | | -- | -- | -- |
| KILLARK ELECTRIC MFG | | 1979 | 3 | XXXXXXXXXXXXXX | 14.4 | 12.3 | 30.6 |
| | | 1977 | 3 | @@@@@@@@@@@ | 11.6 | 8.5 | 25.8 |
| | | 1975 | 3 | @@@@@@@@@@@@ | 12.5 | 10.1 | -- |
| | | 1973 | 3 | @@@@@@@@@@@ | 11.0 | 9.2 | -- |
| | | 1971 | -- | | -- | -- | -- |
| MASON L E RED DOT | ( 2.0%TWM, 1.3%FCM, 4.3%RM) | 1979 | 4 | XX | 2.0 | 1.3 | 4.3 |
| | | 1977 | -- | | -- | -- | -- |
| | | 1975 | -- | | -- | -- | -- |
| | | 1973 | -- | | -- | -- | -- |
| | | 1971 | -- | | -- | -- | -- |
| SQUARE D BELL ELECTRIC | ( 1.8%TWM, 2.6%FCM, 3.0%RM) | 1979 | 5 | XX | 1.9 | 2.6 | 3.4 |
| | | 1977 | 6 | @@ | 1.6 | 2.0 | 3.2 |
| | | 1975 | 7 | @ | 1.4 | 1.2 | -- |
| | | 1973 | 7 | @ | 1.1 | 0.3 | -- |
| | | 1971 | -- | | -- | -- | -- |
| SCOTT & FETZER ADALET | ( 1.7%TWM, 0.9%FCM, 3.8%RM) | 1979 | 6 | XX | 1.7 | 0.9 | 3.8 |
| | | 1977 | 8 | @ | 1.1 | 0.4 | 3.2 |
| | | 1975 | -- | | -- | -- | -- |
| | | 1973 | -- | | -- | -- | -- |
| | | 1971 | -- | | -- | -- | -- |
| GOULD EFCOR | ( 1.6%TWM, 1.3%FCM, 3.4%RM) | 1979 | 7 | XX | 1.6 | 1.3 | 3.4 |
| | | 1977 | 4 | @@ | 1.8 | 0.8 | 4.4 |
| | | 1975 | 6 | @@ | 1.6 | 1.2 | -- |
| | | 1973 | 5 | @@ | 1.7 | 1.7 | -- |
| | | 1971 | -- | | -- | -- | -- |
| GENERAL SIGNAL OZ/GEDNEY | ( 1.3%TWM, 0.9%FCM, 3.8%RM) | 1979 | 8 | X | 1.3 | 0.9 | 3.8 |
| | | 1977 | 5 | @@ | 1.8 | 0.4 | 6.0 |
| | | 1975 | 4 | @@@ | 2.9 | 2.8 | -- |
| | | 1973 | 6 | @@ | 1.5 | 1.0 | -- |
| | | 1971 | -- | | -- | -- | -- |
| OTHERS | | 1979 | -- | XXXXXX | 6.1 | 3.8 | 14.0 |

-- INDICATES NOT RANKED

© 1979 McGraw-Hill, Inc.—All rights reserved

See other side for additional brands having 10% or more total weighted mentions.

# EC&M 1979 BRAND PREFERENCE STUDY

CAST CONDUIT BODIES
(FS, L, T, C, etc.)

22C

## ELECTRICAL CONSULTANTS

| Manufacturers | (subsidiary/brand component – current year) | Year | Rank | Bar Chart History – % Total Weighted Mentions | % Total Weighted Mentions | % First Choice Mentions | Percent of Respondents Mentioning |
|---|---|---|---|---|---|---|---|
| CROUSE-HINDS | | 1979 | 1 | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX@@@@@@@@@@@@@@@@@@XXXXXXXXX | 46.8 | 67.5 | 87.2 |
| | | 1977 | 1 | | 47.8 | 72.2 | 85.8 |
| | | 1975 | 1 | | 49.5 | 74.8 | -- |
| | | 1973 | 1 | | 49.8 | 76.2 | -- |
| | | 1971 | -- | | -- | -- | -- |
| APPLETON ELECTRIC | | 1979 | 2 | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | 30.9 | 21.2 | 70.4 |
| | | 1977 | 2 | | 26.5 | 13.6 | 65.7 |
| | | 1975 | 2 | | 26.0 | 14.0 | -- |
| | | 1973 | 2 | | 28.2 | 14.3 | -- |
| | | 1971 | -- | | -- | -- | -- |
| KILLARK ELECTRIC MFG | | 1979 | 3 | XXXXXXXX | 9.0 | 3.4 | 29.6 |
| | | 1977 | 3 | | 9.5 | 3.0 | 30.2 |
| | | 1975 | 3 | | 10.0 | 2.4 | -- |
| | | 1973 | 3 | | 7.3 | 2.4 | -- |
| | | 1971 | -- | | -- | -- | -- |
| GENERAL SIGNAL OZ/GEDNEY | ( 2.5%TWM, 2.0%FCM, 7.4%RM) | 1979 | 4 | XXX | 2.8 | 2.5 | 7.9 |
| | | 1977 | 4 | @@@ | 3.2 | 3.0 | 7.1 |
| | | 1975 | 6 | @ | 1.4 | 0.9 | -- |
| | | 1973 | -- | | -- | -- | -- |
| | | 1971 | -- | | -- | -- | -- |
| MIDLAND-ROSS RUSSELL & STOLL | ( 1.1%TWM, 0.5%FCM, 3.0%RM) | 1979 | 5 | XX | 2.2 | 1.5 | 5.9 |
| | | 1977 | 5 | @@@ | 3.1 | 2.4 | 8.9 |
| | | 1975 | 5 | @@ | 1.5 | 0.9 | -- |
| | | 1973 | 4 | @@@ | 3.4 | 1.3 | -- |
| | | 1971 | -- | | -- | -- | -- |
| AKZONA PYLE-NATIONAL | ( 1.3%TWM, 0.0%FCM, 5.4%RM) | 1979 | 6 | X | 1.3 | 0.0 | 5.4 |
| | | 1977 | 6 | @@ | 1.6 | 0.0 | 5.3 |
| | | 1975 | 4 | @@@ | 2.7 | 0.0 | -- |
| | | 1973 | 5 | @@@ | 3.3 | 0.6 | -- |
| | | 1971 | -- | | -- | -- | -- |
| SCOTT & FETZER ADALET | ( 1.2%TWM, 1.0%FCM, 3.0%RM) | 1979 | 7 | X @ | 1.2 | 1.0 | 3.0 |
| | | 1977 | 9 | @ | 1.2 | 0.6 | 3.6 |
| | | 1975 | 7 | @ | 1.4 | 0.9 | -- |
| | | 1973 | -- | | -- | -- | -- |
| | | 1971 | -- | | -- | -- | -- |
| SQUARE D | | 1979 | 8 | X | 1.1 | 1.5 | 2.0 |
| | | 1977 | 8 | @ | 1.4 | 1.2 | 3.0 |
| | | 1975 | 8 | @ | 1.2 | 0.9 | -- |
| | | 1973 | -- | | -- | -- | -- |
| | | 1971 | -- | | -- | -- | -- |
| OTHERS | | 1979 | -- | XXXXX | 4.7 | 1.5 | 13.8 |

-- INDICATES NOT RANKED

© 1979 McGraw-Hill, Inc.—All rights reserved

See other side for additional brands having 1.0% or more total weighted mentions.

# EC&M 1979 BRAND PREFERENCE STUDY

ELECTRICAL CONTRACTORS

RIGID CONDUIT FITTINGS
(elbows, couplings, connectors, etc.)

24A

| Manufacturers | (subsidiary/brand component – current year) | Year | Rank | Bar Chart History – % Total Weighted Mentions | % Total Weighted Mentions | % First Choice Mentions | Percent of Respondents Mentioning |
|---|---|---|---|---|---|---|---|
| APPLETON ELECTRIC | | 1979 | 1 | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | 16.5 | 16.5 | 33.8 |
| | | 1977 | 2 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 11.6 | 9.7 | 23.7 |
| | | 1975 | 1 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 13.5 | 12.0 | -- |
| | | 1973 | -- | | -- | -- | -- |
| | | 1971 | -- | | -- | -- | -- |
| GOULD EFCOR | (10.3%THM, 10.1%FCM, 25.3%RM) | 1979 | 2 | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | 11.7 | 10.5 | 26.2 |
| | | 1977 | 1 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 12.7 | 13.3 | 25.9 |
| | | 1975 | 2 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 12.8 | 14.6 | -- |
| | | 1973 | -- | | -- | -- | -- |
| | | 1971 | -- | | -- | -- | -- |
| RACO | | 1979 | 3 | XXXXXXXXXXXXXXXXXXXXXXXXXX | 9.7 | 10.1 | 20.7 |
| | | 1977 | 5 | @@@@@@@@@@@@@@@@@@@@@@@@ | 8.8 | 10.1 | 16.9 |
| | | 1975 | 5 | @@@@@@@@@@@@@@@@@@@@@ | 7.6 | 8.4 | -- |
| | | 1973 | -- | | -- | -- | -- |
| | | 1971 | -- | | -- | -- | -- |
| THOMAS & BETTS T&B | ( 7.8%THM, 8.0%FCM, 16.5%RM) | 1979 | 4 | XXXXXXXXXXXXXXXXXXXXXXXX | 9.6 | 10.6 | 19.4 |
| | | 1977 | 4 | @@@@@@@@@@@@@@@@@@@@@@@@@ | 9.7 | 9.4 | 19.8 |
| | | 1975 | 3 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 11.1 | 10.6 | -- |
| | | 1973 | -- | | -- | -- | -- |
| | | 1971 | -- | | -- | -- | -- |
| CROUSE-HINDS MIDWEST ELECTRIC | ( 2.1%THM, 0.8%FCM, 5.5%RM) | 1979 | 5 | XXXXXXXXXXXXXXXXXXXXXXX | 9.0 | 7.6 | 19.8 |
| | | 1977 | 3 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 11.0 | 12.2 | 21.2 |
| | | 1975 | 4 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 10.1 | 11.7 | -- |
| | | 1973 | -- | | -- | -- | -- |
| | | 1971 | -- | | -- | -- | -- |
| GENERAL SIGNAL OZ/GEDNEY | ( 7.0%THM, 6.8%FCM, 16.0%RM) | 1979 | 6 | XXXXXXXXXXXXXXXXXXX | 7.0 | 6.8 | 16.0 |
| | | 1977 | 6 | @@@@@@@@@@@@@@@@@@ | 6.8 | 6.5 | 14.0 |
| | | 1975 | 7 | @@@@@@@@@@@@@@@@ | 6.0 | 4.7 | -- |
| | | 1973 | -- | | -- | -- | -- |
| | | 1971 | -- | | -- | -- | -- |
| MIDLAND-ROSS STEEL CITY | ( 4.5%THM, 4.2%FCM, 9.3%RM) | 1979 | 7 | XXXXXXXXXXX | 4.6 | 4.2 | 9.7 |
| | | 1977 | 12 | @@@@@@@ | 2.4 | 1.4 | 6.5 |
| | | 1975 | 11 | @@@@@@@ | 2.2 | 1.4 | -- |
| | | 1973 | -- | | -- | -- | -- |
| | | 1971 | -- | | -- | -- | -- |
| REPUBLIC STEEL | | 1979 | 8 | XXXXXXXXXXX | 4.4 | 5.9 | 7.6 |
| | | 1977 | 8 | @@@@@@@@@@@ | 4.7 | 5.8 | 8.6 |
| | | 1975 | 6 | @@@@@@@@@@@@@@@@@@ | 6.7 | 9.1 | -- |
| | | 1973 | -- | | -- | -- | -- |
| | | 1971 | -- | | -- | -- | -- |
| OTHERS | | 1979 | -- | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | 27.5 | 27.9 | 57.4 |

-- INDICATES NOT RANKED

See other side for additional brands having 10% or more total weighted mentions.

© 1979 McGraw-Hill, Inc.—All rights reserved

# EC&M 1979 BRAND PREFERENCE STUDY

**PLANT ELECTRICAL MEN**

**RIGID CONDUIT FITTINGS**
(elbows, couplings, connectors, etc.)

24B

| Manufacturers | (subsidiary/brand component – current year) | Year | Rank | Bar Chart History – % Total Weighted Mentions | % Total Weighted Mentions | % First Choice Mentions | Percent of Respondents Mentioning |
|---|---|---|---|---|---|---|---|
| CROUSE-HINDS | | 1979 | 1 | XXXXXXXXXXXXXXXXX@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 25.9 | 31.7 | 50.2 |
| | | 1977 | 1 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 27.2 | 35.9 | 52.6 |
| | | 1975 | 1 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 23.1 | 29.6 | -- |
| | | 1973 | -- | | -- | -- | -- |
| | | 1971 | -- | | -- | -- | -- |
| APPLETON ELECTRIC | | 1979 | 2 | XXXXXXXXXXXXXXXXX@@@@@@@@@@@@@@@ | 19.5 | 17.6 | 42.3 |
| | | 1977 | 2 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 21.2 | 18.7 | 47.4 |
| | | 1975 | 2 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 20.5 | 17.3 | -- |
| | | 1973 | -- | | -- | -- | -- |
| | | 1971 | -- | | -- | -- | -- |
| THOMAS & BETTS | | 1979 | 3 | XXXXXXXXXXXXX@@@@@@@ | 10.7 | 11.0 | 22.5 |
| T&B | ( 9.7%THM, 10.6%FCM, 19.8%RM) | 1977 | 3 | @@@@@@@@@@@@@@ | 9.0 | 7.2 | 20.7 |
| | | 1975 | 3 | @@@@@@@@@@@@@@@@@@@ | 12.5 | 11.9 | -- |
| | | 1973 | -- | | -- | -- | -- |
| | | 1971 | -- | | -- | -- | -- |
| GOULD | | 1979 | 4 | XXXXXXXXXX | 7.3 | 7.1 | 15.9 |
| EFCOR | ( 7.1%THM, 7.1%FCM, 15.9%RM) | 1977 | 4 | @@@@@@@@@@ | 7.3 | 6.4 | 18.7 |
| | | 1975 | 4 | @@@@@@@@ | 5.5 | 4.2 | -- |
| | | 1973 | -- | | | | -- |
| | | 1971 | -- | | | | -- |
| GENERAL SIGNAL | | 1979 | 5 | XXXXXXXXXXXX | 7.0 | 6.2 | 15.9 |
| OZ/GEDNEY | ( 6.9%THM, 6.2%FCM, 15.4%RM) | 1977 | 7 | @@@@@@ | 4.0 | 4.0 | 9.2 |
| | | 1975 | 5 | @@@@@@@@ | 5.3 | 4.9 | -- |
| | | 1973 | -- | | | | -- |
| | | 1971 | -- | | | | -- |
| KILLARK ELECTRIC MFG | | 1979 | 6 | XXXXXXXXX | 5.4 | 4.0 | 14.1 |
| | | 1977 | 6 | @@@@@@@@@@@@ | 5.8 | 4.8 | 13.9 |
| | | 1975 | 8 | @@@@@@@@ | 3.9 | 2.3 | -- |
| | | 1973 | -- | | | | -- |
| | | 1971 | -- | | | | -- |
| RACO | | 1979 | 7 | XXXXXXX | 4.5 | 4.4 | 10.1 |
| | | 1977 | 5 | @@@@@@@@@@@@ | 6.0 | 7.2 | 13.1 |
| | | 1975 | 6 | @@@@@@@@@ | 4.9 | 4.9 | -- |
| | | 1973 | -- | | | | -- |
| | | 1971 | -- | | | | -- |
| REPUBLIC STEEL | | 1979 | 8 | XXXXXXX | 3.9 | 5.3 | 7.1 |
| | | 1977 | 8 | @@@@@ | 2.6 | 3.2 | 5.2 |
| | | 1975 | 7 | @@@@@@@@ | 4.4 | 5.3 | -- |
| | | 1973 | -- | | | | -- |
| | | 1971 | -- | | | | -- |
| OTHERS | | 1979 | -- | XXXXXXXXXXXXXXXXXXXXXXXXXXXXX | 15.9 | 12.8 | 38.3 |

-- INDICATES NOT RANKED

See other side for additional brands having 10% or more total weighted mentions.

© 1979 McGraw-Hill, Inc.—All rights reserved

# EC&M 1979 BRAND PREFERENCE STUDY

**RIGID CONDUIT FITTINGS** (elbows, couplings, connectors, etc.) 24C

### ELECTRICAL CONSULTANTS

| Manufacturers | (subsidiary/brand component — current year) | Year | Rank | Bar Chart History — % Total Weighted Mentions | % Total Weighted Mentions | % First Choice Mentions | Percent of Respondents Mentioning |
|---|---|---|---|---|---|---|---|
| CROUSE-HINDS MIDWEST ELECTRIC | ( 1.4%TWM, 1.2%FCM, 3.7%RM) | 1979 | 1 | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | 23.9 | 30.5 | 49.4 |
| | | 1977 | 1 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 21.4 | 26.3 | 45.6 |
| | | 1975 | 1 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 21.8 | 30.4 | -- |
| | | 1973 | -- | -- | -- | -- | -- |
| | | 1971 | -- | -- | -- | -- | -- |
| APPLETON ELECTRIC | | 1979 | 2 | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | 21.4 | 17.7 | 49.4 |
| | | 1977 | 2 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 18.8 | 15.0 | 46.9 |
| | | 1975 | 2 | @@@@@@@@@@@@@@@@@@@@@@@@@@@@@@@ | 15.3 | 10.8 | -- |
| | | 1973 | -- | -- | -- | -- | -- |
| | | 1971 | -- | -- | -- | -- | -- |
| GENERAL SIGNAL O/Z/GEDNEY | ( 7.5%TWM, 4.9%FCM, 18.9%RM) | 1979 | 3 | XXXXXXXXXXXXXXX | 7.7 | 4.9 | 19.5 |
| | | 1977 | 3 | @@@@@@@@@@@@@ | 6.5 | 6.3 | 15.6 |
| | | 1975 | 5 | @@@@@@@@@@@ | 5.4 | 3.8 | -- |
| | | 1973 | -- | -- | -- | -- | -- |
| | | 1971 | -- | -- | -- | -- | -- |
| THOMAS & BETTS T&B | ( 6.5%TWM, 7.3%FCM, 15.2%RM) | 1979 | 4 | XXXXXXXXXXXXXX | 7.6 | 8.5 | 18.3 |
| | | 1977 | 4 | @@@@@@@@@@@@ | 6.2 | 4.4 | 16.9 |
| | | 1975 | 3 | @@@@@@@@@@@@@@@@@@@ | 9.5 | 9.7 | -- |
| | | 1973 | -- | -- | -- | -- | -- |
| | | 1971 | -- | -- | -- | -- | -- |
| RACO | | 1979 | 5 | XXXXXXXXXXXXX | 6.6 | 6.7 | 15.9 |
| | | 1977 | 5 | @@@@@@@@@@@@ | 6.0 | 7.5 | 13.1 |
| | | 1975 | 8 | @@@@@@@ | 3.8 | 2.7 | -- |
| | | 1973 | -- | -- | -- | -- | -- |
| | | 1971 | -- | -- | -- | -- | -- |
| TRIANGLE/PMC TRIANGLE | ( 3.7%TWM, 4.3%FCM, 7.9%RM) | 1979 | 6 | XXXXXXXX | 4.0 | 4.9 | 8.5 |
| | | 1977 | 10 | @@@@@@ | 3.0 | 3.8 | 6.3 |
| | | 1975 | 7 | @@@@@@@@ | 3.9 | 3.8 | -- |
| | | 1973 | -- | -- | -- | -- | -- |
| | | 1971 | -- | -- | -- | -- | -- |
| MIDLAND-ROSS STEEL CITY | ( 3.8%TWM, 3.7%FCM, 9.2%RM) | 1979 | 7 | XXXXXXXX | 3.9 | 3.7 | 9.8 |
| | | 1977 | 8 | @@@@@@@@ | 3.8 | 3.8 | 9.4 |
| | | 1975 | 6 | @@@@@@@@ | 3.9 | 3.2 | -- |
| | | 1973 | -- | -- | -- | -- | -- |
| | | 1971 | -- | -- | -- | -- | -- |
| KILLARK ELECTRIC MFG | | 1979 | 8 | XXXXXXXX | 3.7 | 2.4 | 12.2 |
| | | 1977 | 7 | @@@@@@@@@ | 4.1 | 1.9 | 12.5 |
| | | 1975 | 10 | @@@@@@@ | 2.7 | 0.5 | -- |
| | | 1973 | -- | -- | -- | -- | -- |
| | | 1971 | -- | -- | -- | -- | -- |
| OTHERS | | 1979 | -- | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | 21.1 | 20.7 | 50.0 |

-- INDICATES NOT RANKED

See other side for additional brands having 1.0% or more total weighted mentions.

© 1979 McGraw-Hill, Inc.—All rights reserved